**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724** |
| | **HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:** | |
| | **Civil Action No.** |
| *State Attorneys General Litigation* | |
| | **17-3768** |
| THE STATE OF CONNECTICUT;<br>THE STATE OF ALABAMA;<br>THE STATE OF ALASKA;<br>THE STATE OF ARIZONA;<br>THE STATE OF ARKANSAS;<br>THE STATE OF CALIFORNIA;<br>THE STATE OF COLORADO;<br>THE DISTRICT OF COLUMBIA;<br>THE STATE OF DELAWARE;<br>THE STATE OF FLORIDA;<br>THE STATE OF HAWAII;<br>THE STATE OF IDAHO;<br>THE STATE OF ILLINOIS;<br>THE STATE OF INDIANA;<br>THE STATE OF IOWA;<br>THE STATE OF KANSAS;<br>THE COMMONWEALTH OF KENTUCKY;<br>THE STATE OF LOUISIANA;<br>THE STATE OF MAINE;<br>THE STATE OF MARYLAND;<br>THE COMMONWEALTH OF<br>   MASSACHUSETTS;<br>THE STATE OF MICHIGAN;<br>THE STATE OF MINNESOTA;<br>THE STATE OF MISSISSIPPI;<br>THE STATE OF MISSOURI;<br>THE STATE OF MONTANA;<br>THE STATE OF NEBRASKA;<br>THE STATE OF NEVADA;<br>THE STATE OF NEW HAMPSHIRE;<br>THE STATE OF NEW JERSEY;<br>THE STATE OF NEW MEXICO;<br>THE STATE OF NEW YORK;<br>THE STATE OF NORTH CAROLINA; | **June 15, 2018**<br><br>**PLAINTIFF STATES'<br>CONSOLIDATED AMENDED<br>COMPLAINT**<br><br><br>**Non-Public Version:**<br>**Filed Under Seal** |

THE STATE OF NORTH DAKOTA;
THE STATE OF OHIO;
THE STATE OF OKLAHOMA;
THE STATE OF OREGON;
THE COMMONWEALTH OF
     PENNSYLVANIA;
THE COMMONWEALTH OF PUERTO RICO;
THE STATE OF RHODE ISLAND;
THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE;
THE STATE OF UTAH;
THE STATE OF VERMONT;
THE COMMONWEALTH OF VIRGINIA;
THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA;
THE STATE OF WISCONSIN;
THE STATE OF WYOMING;

      v.

ACTAVIS HOLDCO U.S., INC.;
ACTAVIS PHARMA, INC.;
ASCEND LABORATORIES, LLC;
APOTEX CORP.;
AUROBINDO PHARMA USA, INC.;
CITRON PHARMA, LLC;
DR. REDDY'S LABORATORIES, INC.;
EMCURE PHARMACEUTICALS, LTD.;
GLENMARK PHARMACEUTICALS, INC.;
HERITAGE PHARMACEUTICALS, INC.;
LANNETT COMPANY, INC.;
RAJIV MALIK;
MAYNE PHARMA INC.;
SATISH MEHTA;
MYLAN PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL COMPANIES, INC.;
SANDOZ, INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TEVA PHARMACEUTICALS USA, INC.;
ZYDUS PHARMACEUTICALS (USA), INC.

## TABLE OF CONTENTS

I.   SUMMARY OF THE CASE .................................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................................ 7

III. THE PARTIES...................................................................................................................... 8

IV. FACTS SUPPORTING THE LEGAL CLAIMS .................................................................. 15

    A.  The Generic Drug Market.................................................................................................. 15

        1.   The Hatch-Waxman Act............................................................................................... 15

        2.   The Importance of Generic Drugs ............................................................................... 16

        3.   The Players in the Drug Distribution System .............................................................. 17
            a. *Manufacturers/Suppliers* ........................................................................................... 17
            b. *Wholesalers/Distributors* .......................................................................................... 20
            c. *Group Purchasing Organizations (GPOs)*............................................................... 21
            d. *Pharmacy and Supermarket Chains* ......................................................................... 21
            e. *Customer Incentives* .................................................................................................. 22

        4.   The Cozy Nature of the Industry and Opportunities for Collusion ............................ 24
            a. *Trade Association and Customer Conferences* ........................................................ 24
            b. *Industry Dinners and Private Meetings*.................................................................... 25

        5.   The Overarching Conspiracy Between Generic Manufacturers –.............................. 27
            Playing Nice In The Sandbox

        6.   Generic Drug Price Spikes Since 2013......................................................................... 33

    B.  The Illegal Schemes............................................................................................................ 34

        1.   Market Allocation Agreements to Maintain Market Share and Avoid
            Price Erosion............................................................................................................... 34
            a. Nimodipine................................................................................................................ 34
              i.   The Heritage/Sun Agreement. .............................................................................. 34
              ii.  The Heritage/Ascend Agreement. ....................................................................... 39
            b. Zoledronic Acid ........................................................................................................ 42
            c. Meprobamate............................................................................................................. 46
            d. Doxy DR ……………………………………………………………………….49
              i.   The Heritage/Mylan Agreement............................................................................ 49
                 I.   The Large Wholesaler Account ("Wholesaler A")....................................... 51
                 II.  The Large Retail Pharmacy Account ("The Pharmacy")............................. 52
                 III. Other Customer Accounts .......................................................................... 54

          ii.  The Heritage/Mayne Agreement ................................................................... 56

   2.  Agreements to Fix Prices ....................................................................................... 61
      a.  Doxycycline Monohydrate (2013) ....................................................................... 62
      b.  Heritage 2014 Price Increases ............................................................................. 67
          i.        Acetazolamide ............................................................................... 74
          ii.       Fosi-HCTZ .................................................................................... 76
          iii.     Glipizide-Metformin ...................................................................... 80
          iv.     Glyburide ...................................................................................... 81
          v.       Glyburide-Metformin ..................................................................... 87
          vi.     Leflunomide .................................................................................. 90
          vii.    Nystatin ......................................................................................... 92
          viii.  Paromomycin ................................................................................ 97
          ix.     Theophylline ER ............................................................................ 98
          x.       Verapamil ...................................................................................... 101

  C.  Consciousness of Guilt ............................................................................................ 104

V.  TRADE AND COMMERCE ............................................................................................ 105

VI. MARKET EFFECTS ...................................................................................................... 106

COUNT ONE
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE AND SUN, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR THE GENERIC DRUG NIMODIPINE IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................................................... 107

COUNT TWO
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE AND ASCEND, AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR THE GENERIC DRUG NIMODIPINE IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................................................... 108

COUNT THREE
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE AND DR. REDDY'S, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS FOR THE GENERIC DRUG ZOLEDRONIC ACID IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................................................... 110

COUNT FOUR
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE AND DR. REDDY'S, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR THE GENERIC DRUG
MEPROBAMATE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT .................. 111

COUNT FIVE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANTS HERITAGE, EMCURE
AND MYLAN, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT .................................................................................... 112

COUNT SIX
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANTS RAJIV MALIK
AND SATISH MEHTA) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT .................................................................................... 113

COUNT SEVEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANTS HERITAGE AND
MAYNE, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND
SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS
FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 114

COUNT EIGHT
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, LANNETT, PAR AND MYLAN, AND ALL OTHER CORPORATE
DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL
CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG DOXY MONO IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................................................ 116

COUNT NINE
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, TEVA AND ZYDUS, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
RAISE PRICES FOR THE GENERIC DRUG ACETAZOLAMIDE IN VIOLATION
OF SECTION 1 OF THE SHERMAN ACT .............................................................................. 117

COUNT TEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, AUROBINDO, CITRON, GLENMARK AND SANDOZ, AND ALL
OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG
FOSI-HCTZ IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ............................ 118

COUNT ELEVEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, MYLAN AND TEVA, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
RAISE PRICES FOR THE GENERIC DRUG GLIPIZIDE-METFORMIN IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................................................ 120

COUNT TWELVE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANTS HERITAGE, TEVA,
AUROBINDO AND CITRON, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
RAISE PRICES FOR THE GENERIC DRUG GLYBURIDE IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT .................................................................................... 121

COUNT THIRTEEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, TEVA, AUROBINDO AND ACTAVIS, AND ALL OTHER CORPORATE
DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL
CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG GLYBURIDE-
METFORMIN IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................ 122

COUNT FOURTEEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, TEVA AND APOTEX, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
RAISE PRICES FOR THE GENERIC DRUG LEFLUNOMIDE IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT .................................................................................... 124

COUNT FIFTEEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, TEVA, AND SUN, AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
RAISE PRICES FOR THE GENERIC DRUG NYSTATIN IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT .................................................................................... 125

COUNT SIXTEEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE AND SUN, AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE
PRICES FOR THE GENERIC DRUG PAROMOMYCIN IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT ................................................................................... 126

COUNT SEVENTEEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE AND TEVA, AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE
PRICES FOR THE GENERIC DRUG THEOPHYLLINE IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT ................................................................................... 128

COUNT EIGHTEEN
(BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS
HERITAGE, MYLAN AND ACTAVIS, AND ALL OTHER CORPORATE
DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL
CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG VERAPAMIL IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................................................... 129

COUNT NINETEEN– SUPPLEMENTAL STATE LAW CLAIMS ........................................ 130

Connecticut ................................................................................................................................ 130
Alabama ..................................................................................................................................... 131
Alaska ........................................................................................................................................ 132
Arizona ...................................................................................................................................... 132
Arkansas .................................................................................................................................... 133
California .................................................................................................................................... 134
Colorado .................................................................................................................................... 135
District of Columbia .................................................................................................................. 136
Delaware .................................................................................................................................... 136
Florida ....................................................................................................................................... 137
Hawaii ....................................................................................................................................... 139
Idaho .......................................................................................................................................... 140
Illinois ....................................................................................................................................... 140
Indiana ....................................................................................................................................... 141
Iowa ........................................................................................................................................... 142
Kansas ....................................................................................................................................... 143
Kentucky ................................................................................................................................... 143
Louisiana ................................................................................................................................... 147
Maine ......................................................................................................................................... 147
Maryland .................................................................................................................................... 147
Massachusetts ............................................................................................................................ 148
Michigan .................................................................................................................................... 149
Minnesota .................................................................................................................................. 150

Mississippi ..................................................................................................................... 154
Missouri ........................................................................................................................... 155
Montana ........................................................................................................................... 155
Nebraska .......................................................................................................................... 157
Nevada ............................................................................................................................. 158
New Hampshire ............................................................................................................... 159
New Jersey ....................................................................................................................... 162
New Mexico ..................................................................................................................... 163
New York ......................................................................................................................... 164
North Carolina ................................................................................................................. 165
North Dakota ................................................................................................................... 169
Ohio ................................................................................................................................. 169
Oklahoma ........................................................................................................................ 170
Oregon ............................................................................................................................. 170
Pennsylvania .................................................................................................................... 171
Puerto Rico ...................................................................................................................... 181
Rhode Island .................................................................................................................... 181
South Carolina ................................................................................................................. 182
Tennessee ........................................................................................................................ 183
Utah ................................................................................................................................. 184
Vermont ........................................................................................................................... 185
Virginia ............................................................................................................................ 185
Washington ...................................................................................................................... 186
West Virginia ................................................................................................................... 187
Wisconsin ........................................................................................................................ 187
Wyoming ......................................................................................................................... 188


PRAYER FOR RELIEF ............................................................................................................ 190

JURY DEMAND ....................................................................................................................... 191

**PLAINTIFF STATES' [PROPOSED] CONSOLIDATED AMENDED COMPLAINT**

The States of Connecticut, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, West Virginia, Wisconsin and Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania, Puerto Rico and Virginia, and the District of Columbia (the "Plaintiff States"), by and through their Attorneys General, bring this civil law enforcement action against Actavis Holdco U.S., Inc., Actavis Pharma, Inc., Ascend Laboratories, LLC, Apotex Corp., Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories, Inc., Emcure Pharmaceuticals, Ltd., Glenmark Pharmaceuticals, Inc., Heritage Pharmaceuticals, Inc., Lannett Company, Inc., Rajiv Malik, Mayne Pharma, Inc., Satish Mehta, Mylan Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Teva Pharmaceuticals USA, Inc., and Zydus Pharmaceuticals (USA), Inc. (collectively, the "Defendants") and allege as follows:

## I.    SUMMARY OF THE CASE

1.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Over time, the investigation expanded and Connecticut was joined in its efforts by forty-five (45) additional states. As a result of the information and evidence developed through that investigation, which is still ongoing, the Plaintiff States allege that the Defendants, and several as-of-yet unnamed coconspirators, entered into numerous contracts, combinations and conspiracies that had the

1

effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the generic pharmaceutical industry throughout the United States, including but not limited to, the markets for the following fifteen (15) generic drugs: Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil and Zoledronic Acid.

2.      Plaintiff States also allege that Defendants participated in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry. The overarching conspiracy was effectuated by a series of conspiracies that affected and continue to affect the market for a number of generic drugs identified in this Consolidated Amended Complaint.

3.      The Plaintiff States focus here on the role of these named Defendants and their participation in and agreement with this overarching conspiracy. The Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy. The Plaintiff States continue to investigate additional conspiracies, involving these and other generic manufacturers, regarding the sale of other drugs not identified in this Complaint, and will likely bring additional actions based on those conspiracies at the appropriate time in the future.

4.      Defendants' illegal agreements have raised prices, maintained artificially inflated prices and frustrated the potential of the industry to deliver great value to Plaintiff States and those they represent. Generic drugs are pharmaceutically equivalent to the referenced brand name drug in dosage, form, route of administration, strength or concentration, and amount of

2

active ingredient. Generic drugs can save (and have saved) consumers and other purchasers of drugs tens of billions of dollars annually because generic drugs are a lower-priced alternative to brand name drugs. When the manufacturer of a branded drug loses the market exclusivity that comes with patent rights, generic drugs offer lower prices and greater access to healthcare for all consumers in the United States through genuine competition. A consumer with a prescription can fill that prescription not only with the brand name drug, but also with a generic version of that drug, if one is available. State laws often require pharmacists to fill prescriptions with generic versions of the drug.

5.      Typically, when the first generic manufacturer enters a market for a given drug, the manufacturer prices its product slightly lower than the brand-name manufacturer. A second generic manufacturer's entry reduces the average generic price to nearly half the brand-name price. As additional generic manufacturers market the product, the prices continue to fall slowly. For drugs that attract a large number of generic manufacturers, the average generic price falls to 20% or less of the price of the branded drug.

6.      Generic drugs were one of the few "bargains" in the United States healthcare system. Health care experts believe cost savings from the growing number of generic drugs helped keep the lid on increasing health care costs. With the Hatch-Waxman Act of 1984, Congress designed the generic drug market to keep costs low and the market initially operated that way.

7.      At some point, that price dynamic changed for many generic drugs. Prices for dozens of generic drugs have risen – while some have skyrocketed, without explanation, sparking outrage from politicians, payers and consumers across the country whose costs have doubled, tripled, or even increased 1,000% or more. The growing outrage and public reports of

3

unexplained and suspicious price increases caused the State of Connecticut to commence its investigation in July of 2014. Shortly thereafter, Congress opened an inquiry and various companies acknowledged that a criminal grand jury investigation had been convened by the United States Department of Justice Antitrust Division.

8.      Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – illegal collusion among generic drug manufacturers. Prices of many generic pharmaceuticals were and remain artificially inflated through collusive bid rigging and market allocation agreements designed to prevent price wars from occurring when key competitive opportunities arise in the marketplace.

9.      Generic drug manufacturers, through their senior leadership and marketing and sales executives, have routine and direct interaction. The Defendants exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements. These anticompetitive agreements are further refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, frequent telephone calls, emails and text messages.

10.      The anticompetitive conduct -- schemes to fix and maintain prices, allocate markets and otherwise thwart competition – has caused, and continues to cause, significant harm to the United States healthcare system, which is ongoing. Moreover, executives at the highest levels in many of the Defendant companies, including but not limited to Defendants Rajiv Malik and Satish Mehta, conceived and directed many of these schemes.

4

11.     Defendant Heritage is a consistent participant in the conspiracies identified in this Complaint, but the conduct is pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition.  Through its senior-most executives and account managers, Heritage participated in a wide-ranging series of restraints with more than a dozen generic drug manufacturers, all of whom knowingly and willingly participated.  As a result of these conspiracies, Defendants reaped substantial monetary rewards.

12.     Defendants' anticompetitive conduct falls principally into two categories, the overarching goal being to avoid price erosion and maintain inflated pricing within and across their respective broad product portfolios and, at times, increase pricing for targeted products without triggering a "fight to the bottom" among existing competitors.  First, to avoid competing with one another and thus eroding the prices for a myriad of generic drugs, Defendants -- either upon their entry into a given generic market or upon the entry of a new competitor into that market -- communicated with each other to determine and agree on how much market share and which customers each competitor was entitled to.  They then implemented the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful.  Defendants agreed to allocate the market for Nimodipine, Meprobamate, Zoledronic Acid, and Doxycycline Hyclate Delayed Release, among others.  These schemes reduced or eliminated competition for a particular drug, and allowed Defendants to maintain artificially supra-competitive prices in these markets throughout the United States.

13.     Second, and often in conjunction with the market allocation schemes, competitors in a particular market communicated -- either in person, by telephone, or by text message -- and agreed to collectively raise and/or maintain prices for a particular generic drug.  The Defendants

5

collectively agreed to raise and/or maintain prices for Acetazolamide, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, and Verapamil, among others.

14.     Defendants here understood and acted upon an underlying code of conduct that is widespread in the generics industry: an expectation that any time a company is entering a particular generic drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high.  While different drugs may involve different sets of companies, this background understanding remains constant and is an important component of the Defendants' ability to reach agreements for specific drugs.

15.     The Defendants knew their conduct was unlawful.  The conspirators usually chose to communicate in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings.  When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications.

16.     As a result of the conspiracies identified in this Consolidated Amended Complaint (also referred to herein as the "Complaint"), consumers nationwide, including the Plaintiff States, paid substantially inflated and anticompetitive prices for numerous generic pharmaceutical drugs, and the Defendants illegally profited as a result.

17.     The Plaintiff States seek a finding that the Defendants' actions violated federal and state antitrust and consumer protection laws; a permanent injunction preventing the

6

Defendants from continuing their illegal conduct and remedying the anticompetitive effects caused by their illegal conduct; disgorgement of the Defendants' ill-gotten gains; damages on behalf of various state and governmental entities and consumers in various Plaintiff States; civil penalties and other relief as a result of Defendants' violations of law.

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 & 26, and under 28 U.S.C. §§ 1331 and 1337.

19.    In addition to pleading violations of federal law, the Plaintiff States also allege violations of state law, as set forth below, and seek civil penalties, damages and equitable relief under those state laws.  All claims under federal and state law are based on a common nucleus of operative fact, and the entire law enforcement action commenced by this Consolidated Amended Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.  The Court has jurisdiction over the non-federal claims under 18 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

20.    This Court may exercise personal jurisdiction over all of the Defendants because they either transact business both in this District and in the District of Connecticut where this action was commenced, or they have engaged in anticompetitive and illegal conduct that has had an impact both in this District and in the District of Connecticut.  Specifically, the corporate Defendants market and sell generic pharmaceutical drugs in interstate and intrastate commerce to consumers nationwide through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs. The two individual Defendants were

7

executives of Defendants Mylan and Emcure who engaged in and directed some of the unlawful conduct addressed herein. The acts complained of have, and will continue to have, substantial effects both in this District and in the District of Connecticut.

21.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c). At all times relevant to the Plaintiff States' Consolidated Amended Complaint, the Defendants resided, transacted business, were found, or had agents in this District, and a portion of the affected interstate trade and commerce described below has been carried out in this District.

## III.     THE PARTIES

22.     The Attorneys General are the chief legal officers for their respective States. They are granted authority under federal and state antitrust and consumer protection laws to bring actions to protect the economic well-being of the Plaintiff States and obtain injunctive and other relief from the harm that results from the violations of antitrust and consumer protection laws alleged herein. All Plaintiff States seek equitable and other relief under federal antitrust laws in their sovereign or quasi-sovereign capacities. To the extent specified in the state claims asserted in this Consolidated Amended Complaint, certain Attorneys General of the Plaintiff States have and here exercise authority to secure relief, including monetary relief, including for governmental entities and consumers in their states who paid or reimbursed for the generic pharmaceutical drugs that are the subject of this Consolidated Amended Complaint. As specified in Count Nineteen, some states also seek damages for state entities or their consumers under state antitrust law, and some states seek additional relief for violations of state consumer protection laws.

8

23. Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceutical USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc. – the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals) – was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

24. Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals. Unless addressed individually, Actavis Holdco and Actavis Pharma, Inc. are collectively referred to herein as "Actavis." At all times relevant to the Consolidated Amended Complaint, Actavis has marketed and sold generic pharmaceuticals in this District and throughout the United States.

25. Defendant Ascend Laboratories, LLC ("Ascend") is a corporation organized and existing under the laws of the State of New Jersey, with a principal place of business at 339 Jefferson Road, Parsippany, New Jersey. At all times relevant to the Consolidated Amended

9

Complaint, Ascend has marketed and sold generic pharmaceuticals in this District and throughout the United States.

26.     Defendant Apotex Corp. ("Apotex") is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is 2400 North Commerce Parkway, Weston, Florida.  Apotex is in the business of, among other things, developing, manufacturing, and selling generic versions of branded pharmaceutical products for distribution in the United States, including in this District.  At all times relevant to the Consolidated Amended Complaint, Apotex has marketed and sold generic pharmaceuticals in this District and throughout the United States.

27.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6 Wheeling Road, Dayton, New Jersey.  At all times relevant to the Consolidated Amended Complaint, Aurobindo has marketed and sold generic pharmaceuticals in this District and throughout the United States.

28.     Defendant Citron Pharma, LLC ("Citron") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey. At all times relevant to the Consolidated Amended Complaint, Citron has marketed and sold generic pharmaceuticals in this District and throughout the United States.

29.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 107 College Road East, Princeton, New Jersey.  At all times relevant to the

Consolidated Amended Complaint, Dr. Reddy's has marketed and sold generic pharmaceuticals in this District and throughout the United States.

30.     Defendant Emcure Pharmaceuticals, Ltd. ("Emcure") is a corporation organized and existing under the laws of India, having its principal place of business in Pune, India. Emcure is the parent company of Defendant Heritage Pharmaceuticals, Inc. ("Heritage") and another U.S.-based entity, Emcure Pharmaceuticals USA, Inc., which has a principal place of business in East Brunswick, New Jersey. At all times relevant to the Consolidated Amended Complaint, Emcure has marketed and sold generic pharmaceuticals in this District and throughout the United States, and has also participated in and directed the business activities of Defendant Heritage.

31.     Defendant Glenmark Pharmaceuticals, Inc., USA ("Glenmark") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey. At all times relevant to the Consolidated Amended Complaint, Glenmark has marketed and sold generic pharmaceuticals in this District and throughout the United States.

32.     Defendant Heritage is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey. Heritage is a wholly-owned subsidiary of Defendant Emcure. At all times relevant to the Consolidated Amended Complaint, Heritage has marketed and sold generic pharmaceuticals in this District and throughout the United States.

33.     Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 9000 State

11

Road, Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett has marketed and sold generic pharmaceuticals in this District and throughout the United States.

34.     Defendant Rajiv Malik ("Malik") is an individual residing at 605 Grandview Drive, Gibsonia, Pennsylvania. At all times relevant to the Consolidated Amended Complaint, Malik has acted as the President and Executive Director of Mylan N.V., which is the parent company of Defendant Mylan. In his role as President of Mylan N.V., Malik is responsible for overseeing the sales and marketing of Mylan's generic pharmaceutical business, which is accomplished at least in part through acting on behalf of Defendant Mylan.

35.     Defendant Mayne Pharma Inc. ("Mayne") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3301 Benson Drive, Suite 401, Raleigh, North Carolina. In 2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories ("Midlothian"), and has also operated under the name Midlothian since that time. At all times relevant to the Consolidated Amended Complaint, Mayne has marketed and sold generic pharmaceuticals in this District and throughout the United States.

36.     Defendant Satish Mehta ("Mehta") is an individual residing at Prasanna 4, Mumbai Pune Road, Kirkee, Pune-3, India. At all times relevant to the Consolidated Amended Complaint, Mehta has acted as the Chief Executive Officer and Managing Director of Defendant Emcure. Mehta has also held a position on the Board of Directors of Defendant Heritage.

37.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania. At all times relevant to the Consolidated

12

Amended Complaint, Mylan has marketed and sold generic pharmaceuticals in this District and throughout the United States.

38.     Defendant Par Pharmaceutical Companies, Inc. ("Par") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York. At all times relevant to the Consolidated Amended Complaint, Par has marketed and sold generic pharmaceuticals in this District and throughout the United States.

39.     Defendant Sandoz, Inc. ("Sandoz") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business at 100 College Road West, Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. At all times relevant to the Consolidated Amended Complaint, Sandoz has marketed and sold generic pharmaceuticals in this District and throughout the United States.

40.     Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a corporation organized and existing under the laws of the State of Michigan with its principal place of business at 1 Commerce Drive, Cranbury, New Jersey. Sun is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd. and Taro's U.S. subsidiary, Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the time period relevant to this

Consolidated Amended Complaint, Sun marketed and sold generic pharmaceutical drugs in this District and throughout the United States.

41.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. At all times relevant to the Consolidated Amended Complaint, Teva has marketed and sold generic pharmaceuticals in this District and throughout the United States.

42.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 73 Route 31 North, Pennington, New Jersey. At all times relevant to the Consolidated Amended Complaint, Zydus has marketed and sold generic pharmaceuticals in this District and throughout the United States.

43.     Whenever any reference is made in any allegation of this Consolidated Amended Complaint to any representation, act or transaction of Defendants, or any agent, employee or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants, while acting within the scope of their actual or apparent authority, whether they were acting on their own behalf or for their own benefit, did or authorized such representations, acts or transactions on behalf of Defendants, respectively.

14

## IV. FACTS SUPPORTING THE LEGAL CLAIMS

### A. The Generic Drug Market

#### 1. The Hatch-Waxman Act

44.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the "Hatch-Waxman" Act. Its intention was to balance two seemingly contradictory interests: encouraging drug innovation, and promoting competition between brand and generic drugs in order to lower drug prices. To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of market exclusivity for newly-approved products; this increased the financial returns for investment in drug research and development.

45.     To promote price competition, the law established a new regulatory approval pathway for generic products to help ensure that generic drugs became available more quickly following patent expiration. To gain approval for a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") showing that the new drug is safe and effective for its intended use. Developing a new drug and obtaining an NDA can take many years and cost tens or hundreds of millions of dollars.

46.     The Hatch-Waxman Act encouraged faster approval for generic versions of brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs"). These applications rely on the safety and efficacy evidence previously submitted by the branded drug manufacturer, permitting generic manufacturers to avoid conducting costly and duplicative clinical trials.

47.     Hatch-Waxman succeeded in both of its goals. Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to

15

over 80% of prescriptions filled. A recent study found that, in 2011 alone, generic medicines saved $193 billion for consumers. During the same period, innovation has continued to lead to many new and helpful drugs.

## 2. The Importance of Generic Drugs

48. Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States. In 2015, sales of generic drugs in the United States were estimated at $74.5 billion dollars. Today, the generic pharmaceutical industry accounts for nearly 90% of all prescriptions written in the United States.

49. A branded drug manufacturer that develops an innovative drug can be rewarded with a patent granting a period of exclusive rights to market and sell the drug. During this period of patent protection, the manufacturer typically markets and sells its drug under a brand name, and the lack of competition can permit the manufacturer to set its prices extremely high.

50. Once the brand-name drug's exclusivity period ends, additional firms that receive FDA approval are permitted to manufacture and sell "generic" versions of the brand-name drug. As generic drugs enter the market, competition typically leads to dramatic reductions in price. Generic versions of brand name drugs are priced lower than the brand-name versions. Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug must be "dispensed as written."

51. As additional manufacturers enter a particular drug market, competition pushes the price down much more dramatically. Often, the price of a generic drug will end up as low as 20% of the branded price or even lower. For this reason, generic drugs have long been referred

16

to as one of the few "bargains" in the United States healthcare system. Experts have stated that the substantial cost savings gained from the growing number of generic drugs have played a major role in keeping health care costs from increasing more dramatically.

52.     Where there is genuine competition, the savings offered by generics drugs over their brand-name equivalents provide tremendous benefits to consumers and health care payors. Patients typically see lower out of pocket expenses, while lower costs for payors and insurers can lead to lower premiums for those who pay for health insurance, and lower costs to government health care programs like Medicare and Medicaid mean greater value for taxpayers.

### 3.   The Players in the Drug Distribution System

53.     The United States prescription drug distribution system includes entities that can be involved at various stages of the distribution channel through which prescription drugs are delivered to end users.

#### a.   *Manufacturers/Suppliers*

54.     Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain. Unlike branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic drugs that can be substituted (often automatically under state law) for the branded drug after expiration of the brand's exclusivity. Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments and creams. A manufacturer seeking to sell a "new drug" in the United States (including generic versions of previously approved drugs) must obtain approval from the FDA, which evaluates many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling and quality control.

17

55.     Generic drug manufacturers operate manufacturing facilities, and compete with each other to sell the generic drugs they produce to wholesalers, distributors, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

56.     Generic drug manufacturers also sell some of their drugs through auctions to different purchasers in the supply chain, e.g., group purchasing organizations, retail pharmacies and supermarket chains with pharmacies.

57.     In marketing their generic drugs, manufacturers often do not attempt to differentiate their products because, primarily, a generic drug is a commodity. Consequently, competition is dictated by price and supply. As a result, generic drug manufacturers usually all market the drug under the same name, which is the name of the active ingredient (e.g., Acetazolamide).

58.     Drug suppliers can include the manufacturers themselves, or other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company. The Defendants in this action are all drug manufacturers and suppliers who compete with one another for the sale of generic pharmaceutical drugs which are ultimately sold to consumers in the United States.

59.     Drugs sold in the United States may be manufactured either domestically or abroad. Many manufacturers that produce drugs for the United States market are owned by, or are, foreign companies. Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively. Drug manufacturers typically sell their products through

18

supply agreements negotiated with wholesalers and distributors, group purchasing organizations, pharmacy benefit managers and large retailers like pharmacy and supermarket chains.

60. Generic manufacturers report certain benchmark or list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"); these sometimes serve as benchmarks, but given the different characteristics of different buyers and the nature of individual negotiations, a manufacturer will frequently supply the same generic drug at several different prices depending on the customer or type of customer.

61. In addition, generic manufacturers that enter into a Medicaid rebate agreement must report their average manufacturer prices ("AMP") to the federal Centers for Medicare and Medicaid Services on a monthly and quarterly basis. Pursuant to federal law, AMP is defined as the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

62. Medicaid reimbursement for certain generic drugs is calculated using a formula that is derived from a manufacturer's AMP for that specific generic drug. Put another way, a manufacturer's AMP may have a direct impact on how much a state Medicaid program pays for a generic drug dispensed to a Medicaid beneficiary.

63. The corporate Defendants in this case are among the largest generic pharmaceutical manufacturers in the industry. Each has a broad portfolio of generic drugs which it sells to distributors, retailers and group purchasing organizations, many of whom have a nationwide presence. Competitors for particular pharmaceutical products fluctuate given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market. Every Defendant's portfolio remained broad, and was marketed

19

to customers in virtually every state across the United States, at all times relevant to this Complaint.

64.     The Defendants' customers supply generic pharmaceuticals to a wide swath of consumer populations, including but not limited to Medicaid recipients; private and public sector employees with commercial payor, employer-funded, or self-funded health plans; patients in non-profit, for-profit, or public hospitals or long-term care facilities; and prisons.

65.     The generic pharmaceutical portfolios of the Defendants run the gamut of indications, servicing a wide range of health needs, from potentially less common health problems such as hypercalcemia treated with Zoledronic Acid and complications of liver disease treated by Paromomycin, to the more commonplace such as bacterial infections treated with Doxycycline Monohydrate and glaucoma, epilepsy, or altitude sickness treated by Acetazolamide ER.

66.     Taken together, customers purchase a wide range of generic pharmaceutical products, in enormous volumes, in every state.  Defendants' business plans and strategies for their broad portfolios focus on the nationwide supply and demand chain that funnels their products through various purchasers, including state governments, municipalities, and private sector employers, in order to reach consumer populations in every state.  This supply and demand chain is described in more detail below.

### b. *Wholesalers/Distributors*

67.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, long-term care and other medical facilities.  Some wholesalers sell to a

broad range of customers while others specialize in sales of particular products (e.g., biologic products) or sales to a particular type of customer (e.g., nursing homes).

68.     Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers. Some of the largest wholesalers and distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris & Dickson").

### c.  *Group Purchasing Organizations (GPOs)*

69.     Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group of purchasers. GPOs leverage their buying power to obtain better prices and terms for their members, and assist buyers in trade relations and contract management with sellers. GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains. Some of the GPOs who sell large volumes of Defendants' generic products for distribution nationwide include Vizient (formerly Novation), Premier, Inc. ("Premier"), Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions ("Econdisc").

### d.  *Pharmacy and Supermarket Chains*

70.     Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer. There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies. If a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers may agree to contract with them directly. Such retailers can obtain

attractive terms by avoiding the markups or fees charged by wholesalers, distributors, and GPOs.

Retailers large enough to purchase drugs directly from manufacturers include Rite Aid

Corporation ("Rite Aid"), CVS Health ("CVS"), The Walgreen Company ("Walgreens"), Wal-

Mart Stores, Inc. ("Walmart"), Target Corporation, and Publix Super Markets, Inc. ("Publix").

### e. *Customer Incentives*

71.     Some of the largest downstream buyers that purchase from generic manufacturers

actually benefit when prices are higher.  For example, in McKesson's 2014 10-K filing, the

company reported the following:

> A significant portion of our distribution arrangements with the
> manufacturers provides us compensation based on a percentage of
> our purchases. In addition, we have certain distribution
> arrangements with pharmaceutical manufacturers that include an
> inflation-based compensation component whereby *we benefit when
> the manufacturers increase their prices* as we sell our existing
> inventory at the new higher prices. *For these manufacturers, a
> reduction in the frequency and magnitude of price increases*, as
> well as restrictions in the amount of inventory available to us,
> *could have a material adverse impact on our gross profit margin.*

In that same filing, McKesson also reported that "The business' practice is to pass on to

customers published price changes from suppliers."

72.     Similarly, in Cardinal's 2014 10-K filing, the company reported that

> Gross margin in our Pharmaceutical segment is impacted by
> generic and branded pharmaceutical price appreciation and the
> number and value of generic pharmaceutical launches. In past
> years, these items have been substantial drivers of Pharmaceutical
> segment profit.  Prices for generic pharmaceuticals generally
> decline over time. But at times, *some generic products experience
> price appreciation, which positively impacts our margins*.

73.     ABC's Annual Summary 2014 and Annual Report 2014 make very similar

observations:

> **Our results of operations continue to be subject to the risks
> and uncertainties of inflation in branded and generic
> pharmaceutical prices and deflation in generic pharmaceutical
> prices.**
> Certain distribution service agreements that we have entered into
> with branded and generic pharmaceutical manufacturers continue
> to have an inflation-based compensation component to them.
> Arrangements with a small number of branded manufacturers
> continue to be solely inflation-based. As a result, our gross profit
> from brand-name and generic manufacturers continues to be
> subject to fluctuation based upon the timing and extent of
> manufacturer price increases. *If the frequency or rate of branded
> and generic pharmaceutical price increases slows, our results of
> operations could be adversely affected.* In addition, generic
> pharmaceuticals are also subject to price deflation. *If the frequency
> or rate of generic pharmaceutical price deflation accelerates, our
> results of operations could be adversely affected.*

74.     Other large retail customers have similar contractual provisions in their contracts

with generic manufacturers that allow for potentially greater compensation when prices are

higher.   For example, contracts between Walgreens Boots Alliance Development GmbH, a

GPO, and generic manufacturers contain provisions about Rebates and Administrative fees that

are directly tied to "total contract sales" – a number that increases when prices increase.   In other

words, that GPO (and other larger retail customers with similar contractual terms) may make

more money when generic pharmaceutical prices are higher.

75.     The generic manufacturers are keenly aware that some of their customers benefit

from their price increases.   For example, when Defendant Heritage planned to increase prices on

a large number of different drugs in April 2014, as discussed more fully below, one of the

national account representatives noted at that time that in addition to benefitting Heritage

"[t]hese increases help customers w/ Annual Incentives."

## 4. The Cozy Nature of the Industry and Opportunities for Collusion

76. The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

### a. *Trade Association and Customer Conferences*

77. Many customers of the Defendants, including but not limited to (a) large wholesalers or distributors like ABC, Cardinal, HD Smith, McKesson and Morris & Dickson, (b) GPOs like Premier, MMCAP and Econdisc, and (c) other large drug purchasers like pharmacy or grocery store chains, hold multi-day conferences throughout the year in various locations throughout the United States. Generic manufacturers from across the United States are invited to attend.

78. Additionally, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), in a variety of locations throughout the United States.

79. At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including Defendants, interact with each other and discuss their respective businesses and customers. Many of these conferences and trade shows include organized recreational and social events such as golf outings, lunches, cocktail parties and dinners that provide additional opportunities to meet with competitors. Defendants use these opportunities to discuss and share competitively-sensitive information concerning upcoming

24

bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

80.     These trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### b. *Industry Dinners and Private Meetings*

81.     In addition to these frequent conferences and trade shows, senior executives and sales representatives gather in smaller groups, allowing them to further meet face-to-face with their competitors and discuss competitively sensitive information.

82.     Many generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude. At least forty-one (41) different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Par, Sandoz, Sun, Teva and Zydus.

83.     High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives from Defendants Actavis, Aurobindo, Dr. Reddy's, Lannett and Sun, among many other generic manufacturers, attended this particular dinner.

84.     At these industry dinners, one company is usually responsible for paying for all of the attendees. For example, in a group email conversation among the competitors in December 2013, one of the participants -- a high-ranking executive for Defendant Dr. Reddy's -- joked "[y]ou guys are still buying for Mark and I, right?" The response from another executive: "Well. . . I didn't think the topic would come up so quickly but . . . we go in alphabetical order by company and [a generic drug manufacturer not identified in this Complaint as a conspirator] picked up the last bill. . . . PS. . . . no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

85.     Some generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meeting or dinner. During these events, the sales representatives meet with their competitors and discuss competitively sensitive information.

86.     Many "Women in the Industry" dinners were organized by a salesperson from Defendant Heritage, A.S., who resides in the State of Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area. However, out of town sales representatives were also aware of these dinners and were included when in the area. For example, in November 2014, a salesperson from Defendant Lannett sent A.S. a text message asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible...." A.S. responded: "There is an XMas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week -- this was an exception."

87.     Sometimes dinners were also planned around visits of out-of-town competitors. As A.S. stated in organizing the dinner:

26

> Sorry if the meeting/dinner invite is a little short notice, but [K.N., a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry too -- we can recap all our findings from NACDS [trade show] over a martini or glass of wine! :) Plus the food is super Yummy!

88. Several different GNOs were held in 2015, including: (1) at the ECRM

conference in February (involving Defendants Citron, Dr. Reddy's, Heritage, Lannett and Teva,

among others); (2) in Baltimore in May (involving Defendants Citron, Dr. Reddy's, Heritage,

Teva and Zydus, among others); and (3) at the NACDS conference in August (involving

Defendants Citron, Dr. Reddy's and Heritage, among others).

### 5. The Overarching Conspiracy Between Generic Manufacturers – *Playing Nice In The Sandbox*

89. As a result of these communications, sales and marketing executives in the

generic pharmaceutical drug industry are aware of their competitors and their current and future

business plans. This familiarity and opportunity leads to agreements among competitors to

allocate markets to avoid price competition.

90. The overarching conspiracy among generic manufacturers, however – which ties

together all of the agreements on individual drugs identified in this Complaint – is an agreement

that each competitor is entitled to its "fair share" of the market, whether the market is a particular

generic drug, or a number of generic drugs. "Fair share" is an approximation of how much

market share each competitor is entitled to, based on the number of competitors in the particular

drug market, with a potential adjustment based on the timing of their entry. Generally speaking,

if a generic manufacturer is the first to enter a particular drug market it is entitled to a little more

than its proportional share of the market; conversely, those generic manufacturers that enter later

are typically entitled to a little less than their proportional share.

27

91.     There is a common understanding among generic manufacturers, including Defendants, about what represents "fair share" in different circumstances. This collusive methodology has evolved over time during the numerous in-person meetings, telephonic communications and other interactions between generic manufacturers about specific drugs over the course of several years, but general rules of the road have been in place since at least 2006. These events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person. These in-person meetings gave the Defendants the opportunity to have these conversations, and reach these agreements, without fear of detection.

92.     This overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in this Complaint. The Plaintiff States focus here on the role of these named Defendants and their participation in and agreement with this overarching conspiracy. This Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

93.     As described in more detail below, when necessary, the larger understanding was reinforced through phone calls and text messages between the Defendants to discuss fair share and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

94.     For example, from the period of July 1, 2013 through July 30, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Heritage spoke to representatives of every other U.S.-based corporate Defendant by

28

phone and/or text on multiple occasions.  The following Table (Table 1), which is conservative

because it is based on phone and text message records from only some of the executives and

salespeople at issue,[1] and therefore shows only some of the phone calls and text messages

between the Defendants during that period, sheds some light on the frequency with which

Defendants communicate with each other.

Table 1
Heritage phone/text communications with other Defendants (by month)
July 1, 2013 – July 30, 2014

| | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Jul-13 to Jul-14 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | | | | | | | | | 2 | | | | 2 |
| Apotex | | | | | | | | | | | 17 | 2 | 1 | 20 |
| Ascend | | | | | | | | | | 1 | | | | 1 |
| Aurobindo | | | | | 1 | 1 | | 1 | | 5 | 2 | 1 | 3 | 14 |
| Citron | | | | 6 | 1 | 12 | | | 1 | | 2 | 29 | 52 | 110 |
| DRL | 1 | 6 | 3 | 2 | | | | | 1 | 5 | 3 | | | 21 |
| Glenmark | | | | | | | | | 1 | | | | 3 | 4 |
| Lannett | 0 | 35 | | 27 | | | 21 | 8 | | 3 | 3 | 14 | 2 | 113 |
| Mayne | | | | | | | 1 | | 2 | 7 | 3 | | | 13 |
| Mylan | 3 | 1 | | | 1 | | 1 | | 2 | 8 | | 2 | | 18 |
| Par | | | | | | | | | | | 3 | 6 | | 9 |
| Sandoz | | | | | | | | | | | 4 | 3 | | 7 |
| Sun | 1 | 2 | | 1 | | | | 3 | | 3 | 10 | 32 | 7 | 59 |
| Teva | 7 | 9 | | | | | | 5 | 5 | 3 | | 1 | 5 | 35 |
| Zydus | | 61 | 19 | 6 | | | | | | | | | 1 | 87 |
| | | | | | | | | | | | | | | 513 |

95.     Similarly, senior sales executives and other individuals responsible for the

pricing, marketing and sales of generic drugs at Defendant Teva spoke by phone and/or

exchanged text messages with representatives of every other U.S.-based corporate Defendant

during the same time period.  The following Table (Table 2), which is conservative because it is

based on phone and text message records from only some of the executives and salespeople at

issue, and therefore shows only some of the phone calls and text messages between Teva and the

other Defendants during that period, sheds further light on the frequency with which Defendants

communicate with each other.

---

[1] For example, to date, the Plaintiff States have subpoenaed and received phone records of only one employee of
Defendant Ascend, one employee of Defendant Apotex, and three employees of Defendant Sun during this time
period.

29

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**July 1, 2013 – July 30, 2014**

| | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Jul-13 to Jul-14 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| Apotex | 3 | 4 | | | | | | | | | | | | 7 |
| Ascend | | 3 | | | | | | | | | | | | 3 |
| Aurobindo | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 | | | 5 | 89 |
| Citron | | | | 3 | 3 | 3 | | 1 | | 1 | | 1 | | 12 |
| DRL | 2 | | | | | | | | | 2 | 1 | 3 | 6 | 14 |
| Glenmark | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 | | 3 | | 8 | 94 |
| Heritage | 7 | 10 | | | | | | 5 | 5 | 3 | | 1 | 5 | 36 |
| Lannett | | | | | | | | | 16 | 13 | | 1 | 13 | 43 |
| Mayne | 2 | | 2 | 1 | 1 | 2 | 4 | 5 | | | | 7 | | 24 |
| Mylan | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | 1 | | 88 |
| Par | 0 | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| Sandoz | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| Sun | | | | | | 1 | | | | 1 | | | 2 | 6 |
| Zydus | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1501 |

96.     Defendants actively monitor and track each others' fair share, and discuss it with each other in the context of agreements on specific drugs, as set forth more fully below.

97.     There is no precise method for apportioning each participant's "fair share" because market share is obtained by winning the business of various customers, which is inherently variable in a given year. The shared understanding and goal, instead, is for the competitors in a particular market to reach out to each other with the expectation that they would be able to reach an agreement on "fair share" based on the industry understanding. The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price.

98.     This scheme to minimize competition and allocate fair share is implemented in different ways. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competition on price and, at times, raise price.

99.     Evidence of the larger conspiracy often presents itself as follows: When a competitor needs to obtain one or more customers to reach its fair share, a competitor with more

30

than its "fair share" will identify and "walk away" from a customer or customers by informing them of a significant price increase. The competitor looking to increase its share will then submit a supra-competitive bid at an amount slightly less than the original competitor. The competitors then continue to divide up customers until they reach an artificial equilibrium. This is referred to as a "stable" market. Once the market is "stable," the competitors agree not to compete on price and, at times, significantly raise prices in the absence of competition.

100.    This understanding regarding "fair share" has been particularly effective when a new competitor enters the market – a time when, in a free-functioning competitive market, prices should go down. In today's generic drug markets, a new competitor will either approach or be approached by the existing competitors. Existing competitors will agree to "walk away" from specific customers until the market reaches a new artificial equilibrium. The new competitor's transition into the market is seamless; the new entrant obtains market share and immediately charges a supra-competitive price.

101.    Decisions on "fair share" can, at times, be based on conduct that occurs between competitors across more than one generic drug market. To maintain the artificial equilibrium, customers in one drug market might be traded for customers in another drug market in an effort to arrive at a more global "fair share" outcome. Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs.

102.    For example, as discussed more fully below, when Defendant Heritage was preparing to launch a formulation of the generic drug Zoledronic Acid that was about to come off patent, its Associate Director of National Accounts, N.O., spoke to Dr. Reddy's Vice President of Sales and Marketing, J.A., to "see if he [was] willing to discuss strategy at all." After speaking

31

with J.A., N.O. stated that "[J.A.] views it this way. If they [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

103. Similarly, as discussed more fully below, Defendant Rajiv Malik, the President of Mylan, told the CEO of Heritage that Mylan would "play fair" as Heritage entered the Doxy DR market and agreed that Mylan would give up two large accounts to Heritage. Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would cede share to Heritage in this instance.

104. When a generic manufacturer complies with the scheme, and prices remain high, it is viewed as "playing nice in the sandbox." For example, in December 2014 Defendant Teva was approached by a customer on behalf of one of Teva's competitors. The large retail customer indicated that Teva's competitor was entering the market for a particular drug not identified in this Complaint and was seeking to target specific customers. The customer specifically requested that Teva give up a specific large customer to the new entrant, and indicated that the new entrant – Teva's competitor – "has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell [the competitor] we are playing nice in the sandbox and we will let them have [the targeted customer.]"

105. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal understanding and code of conduct agreed to by Defendants. "Fair share" and "playing nice in the sandbox" have become part of the industry lexicon, and part of the larger understanding between Defendants. Defendants use these terms not only in discussions with each other in order to reach agreement regarding allocation of market share and pricing, but also with their customers.

32

106. These rules about "fair share" apply equally to price increases. As long as everyone in the "sandbox" is playing fair, and the manufacturers believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the rules.

107. The agreement among all of the Defendants to adhere to the rules regarding "fair share" is critical in order to maintain high prices. If even one competitor is not aware of (and behaving in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share", that competitor is viewed as "irresponsible," and is spoken to by competitors.

108. In furtherance of this broader, overarching agreement, Defendants and other generic drug manufacturers routinely communicate and share information with each other about bids and pricing strategy. This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that information.

109. Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of consumers.

### 6. Generic Drug Price Spikes Since 2013

110. Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. According to one report,

"[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."

111.    A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

112.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

### B. The Illegal Schemes

#### 1. Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

113.    When entering a generic drug market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

114.    Some examples of this illegal behavior are set forth below, organized for each generic drug and describing examples of specific agreements as to that drug.

##### a. *Nimodipine*

###### i.    The Heritage/Sun Agreement.

115.    Nimodipine, also known by the brand name Nymalize®, is a calcium channel blocking agent used to reduce problems caused by a bleeding blood vessel in the brain.

34

116.     As of June 2012, Heritage and Defendant Sun, through its division Caraco, were

the only two competitors in the market for Nimodipine.  Defendant Teva had recently left the

market, and Heritage wanted to use Teva's exit as an opportunity to raise prices.

117.     In June, 2012, Jason Malek, Vice President of Commercial Operations at

Heritage, asked A.S. to contact Caraco to discuss raising the price of Nimodipine.  The resulting

conversations reflect an agreement between the two companies to allocate the market and avoid

competing on price, while at the same time making overt efforts to increase pricing market wide.

118.     A.S. subsequently exchanged numerous text messages and participated in

telephone calls with her Caraco contact throughout June 2012.

119.     On June 28, 2012, in an email titled "Caraco," A.S. summarized the state of

conversation between the companies:

> [S.K., Senior Sales Manager at Sun] brought up nimo[dipine] to
> her boss [G.S., President of Sun], his only concern was that they
> get their fair share of the market.  She was not so much help on the
> pricing discussion – because she does not have much control over
> it.  All pricing goes through [G.S.] and [G.S.] sets it.  I do not
> know [G.S.] but [S.K.] mentioned our discussion with him so I can
> only hope the ground work has been set.  I reiterated that we would
> like to see $ go up and we would be fair.

120.     Malek responded: "Thanks for the info.  Not sure what this means 'his only

concern was that they get their fair share of the market.'  They are getting their fair share of the

market at a price they don't need to go to is what I wanted to communicate to them."

121.     In her email response, A.S. agreed:

> That is exactly how I stated it to [S.K.] too!  She made it almost
> seem like he did not care about the price or even this product.  She
> admitted she knew nothing about the item – it is not a big/key item
> for them.  I said it is big for us and with only two players it should
> command more $.

35

I'd like to see if [S.K.] can communicate back to [G.S.] about the Nimo[dipine] on the Cardinal RFP (when it gets closer to the close of the RFP) – specifically mentioning the pricing we are going at so that Caraco can bring their price up too. This could demonstrate how communication can and should work between us to get the $ up.

122.     The same day, A.S. sent an analysis of the upcoming Cardinal RFP to Malek and others at Heritage. The notes section regarding Nimodipine reflected that Heritage should "keep price high for Caraco." The plan for Heritage was that it would bid at a high price, which would be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the Cardinal business.

123.     On July 20, 2012, K.F., a Contract Analyst at Heritage, circulated proposed pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that proposed by A.S. In an email exchange that same day, A.S. and Malek discussed raising prices:

A.S.: "My only concern is Nimodipine – and situation with Caraco and raising our market pricing. If we don't let them increase pricing here – will it always be a fight to the bottom with them?"

Malek: "I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at publix and at GPO's."

A.S.: "I understand – I just think the timing is critical if we want to raise our pricing everywhere. This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date. Ie: I think we could still lowball the Nimo a little later if necessary."

Malek: "If you feel comfortable we can have those conversations and benefit from this then I agree. We can talk off line."

A.S.: "If I don't continue the conversations now (and at NACDS) and if we lowball right of the gate on the RFP, I think we close the door for a long time."

36

> Malek: "Ok, let's give it a shot. So we will increase the price, you
> should tell them that so they can do the same without any comp."

124. That same day, A.S. spoke to S.K. During this and other numerous communications over the coming weeks, by text, phone and in-person at NACDS, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine. Pursuant to the agreement, Heritage provided a cover bid -- i.e., it raised its price on the bid high enough so that Sun would be able to significantly raise its price and still retain the Cardinal business.

125. Heritage and Caraco were both able to significantly raise prices to other customers as well as a result of this agreement.

126. Only a few months later, after awarding the contract for Nimodipine to Sun, Cardinal approached Heritage asking for a "one off bid for Nimodipine." On October 15, 2012, the Cardinal representative explained that "We are not convinced Caraco has there [sic] supply chain right so we are looking for a new partner and I thought I'd come to you first."

127. A.S. immediately forwarded the request to Malek, describing it as a "gift" from Cardinal. A.S. explained: "Please see email below... Cardinal wants a Nimo offer! I don't think this harms our 'understanding' with Caraco because Cardinal is coming to us."

128. A.S. proposed that Heritage provide Cardinal with an offer consistent with price increases it had recently taken with another wholesaler. A.S. explained that Heritage could offer the higher price and still win the business because "I believe Caraco raised pricing on the RFP, from discussions I had at NACDS [in August 2012]." Malek responded: "Yes, if you think that gets us there." A.S. confirmed this understanding the next day, when she spoke to S.K. for more than thirty-eight (38) minutes.

129.    In late 2012 and early 2013, Heritage began to hear that Sun would potentially be subject to an FDA recall for Nimodipine relating to certain problems with manufacturing. On December 17, 2012, Malek emailed A.S. and said "Can you reach out to your friend at caraco and ask about nimo? Looks like they have recalls over some serious issues. Haven't heard them coming back but need to gauge timing they will be back in the market." A.S. later confirmed that she reached out to her contact at Sun, who was "not aware or [sic] any problems/issues and supply was fine."

130.    Subsequently, on April 16, 2013, A.S. reported to Malek that "Caraco has not been bidding Nimo on recent RFPs due to lack of knowledge of when product will be available again. Rep from Caraco says it's not discontinued; they do plan/hope to be back with it soon but [don't] know when."

131.    Malek's first response was "Great feedback, time for next increase!" But he also followed up with some additional instructions about a week later, expressing his willingness to continue the agreement with Sun when it did re-enter the market: "Please feel free to tell your friend generally what has happened in the nimo market and to make sure if/when they are back they talk to us first so we can be smart about it."

132.    On May 23, 2013, A.S. again spoke to S.K., who indicated that Caraco may be returning to the market for Nimodipine in June or July. A.S. immediately reported this news to Malek: "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too hopeful. And there's a small rumor they may not come back with it. A reminder was provided about our recent changes on that item." This resulted in the following email exchange between the two:

Malek: "OK... Where did you hear this from!!"

38

A.S.: "Vendor/friend [S.K.]"

Malek: "Are they raising theirs?"

A.S.: "They are not yet but admit it would be nice to"

Malek: "Well we would follow in one second......"

A.S.: "I did say that!"

Malek: "hahahahahahaha"

133.    During the next year, Caraco did not return to the market.  Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

134.    This agreement between Heritage and Sun was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### ii.    The Heritage/Ascend Agreement.

135.    In April of 2014, Defendant Ascend received FDA approval to begin producing Nimodipine for sale.  Malek informed Heritage employees of the approval on April 8, 2014, instructing them to "be aware of [Ascend] coming to the market."  That same day, Malek sent a message to J.D., the Executive Vice President of Sales and Marketing at Ascend, through the website LinkedIn, asking if J.D. had "time to catch up tomorrow afternoon or Thursday morning."  J.D. responded:  "I would like to catch up."

136.    On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase.  As discussed more fully below, a large majority of the price increases were to be achieved through collusive efforts.  During a "Price Increase

39

Discussion" conference call with members of the Heritage sales team, led by Malek, Heritage noted that Ascend was going to launch Nimodipine. Malek took responsibility within Heritage to communicate with Ascend about market shares. Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

137. Malek took this responsibility to communicate with Ascend because he already had a relationship with J.D. The pair had previously met in February 2013. Malek had also been communicating frequently with J.D. through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

138. Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014, Malek called J.D. and the two spoke for nineteen (19) minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

139. On May 9, 2014 Heritage had another internal conference to discuss price increases. After obtaining buy-in from Ascend during the April 22 telephone call between Malek and J.D., Heritage confirmed that it would be raising prices of Nimodipine across the board. Heritage also identified specific customers that it would "let go" to the "new entrant into market," Ascend.

140. In June 2014, Malek sought to continue his conversations with J.D. regarding Nimodipine. He emailed J.D. on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, J.D. suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

141.    At the end of June, Heritage implemented the price increase.  Heritage raised the price of Nimodipine to at least twelve customers.

142.    Malek emailed J.D. on October 29, 2014, again asking to "catch up."  The two spoke by phone for ten minutes the next day.  On November 4, 2014, Malek emailed J.D. to "[l]et me know when we can re-connect to continue our discussions from the other day."  Instead of communicating specifics over email, Malek and J.D. made plans to have lunch together when Malek returned from India.

143.    Two weeks later, on November 18, 2014, Malek emailed J.D., stating:  "[J.D.], [j]ust sent you a text.  Fresh back from India.  Wanted to pick up discussions.  Let me know if you can chat."  On November 25, 2014, Malek emailed J.D. again asking if J.D. "had a few minutes to connect."

144.    On January 22, 2015, Malek asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse.  Malek stressed that this inquiry should be kept confidential.

145.    R.S. reached someone at Ascend.  By January 24, 2015, Malek was able to inform his sales team that Ascend had Nimodipine in its warehouse.

146.    By May 1, 2015, Ascend had fully launched Nimodipine.  Instead of trying to compete with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

147.    Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

148.     This agreement between Heritage and Ascend was part of an overarching

conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in

the generic pharmaceutical industry.

### b. *Zoledronic Acid*

149.     Zoledronic Acid, also known by the brand names Zometa® and Reclast®, is a

biophosphate drug used for treatment of certain bone diseases. Given intravenously, Zoledronic

Acid treats high blood calcium levels that may occur with cancer.

150.     Heritage began selling a 5mg formulation of Zoledronic Acid in the spring of

2013, when the product was first coming off patent. The brand manufacturer, Novartis, had

previously marketed two formulations of the drug: a 5mg injection called Reclast®, and a 4mg

injection called Zometa®. Heritage initially sought to launch only on the 5mg formulation.

Even before the product was officially launched, Heritage began communicating with its

potential competitors in order to divvy up the market and avoid price competition.

151.     For example, on January 21, 2013, Malek sent an email to N.O., Associate

Director of National Accounts at Heritage, asking N.O. to reach out to Dr. Reddy's, the only

other competitor that Malek believed would be selling the product on the first day it could be

made available. The email read:

> NO:
>
> Would like you to have a call with [J.A., Vice President, Sales &
> Marketing at Dr. Reddy's], on Zoledronic.
>
> Right now, only us and DRL have a tentative on the 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's
> willing to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need
> to lock in our strategy.

42

> The information from customers and competitors will be key in our
> pricing and bidding decisions.

152.     The next day, N.O. attempted to contact J.A., but J.A. was on a conference call.

N.O. informed Malek that J.A. would call him back later that morning.  Malek then outlined

exactly what he wanted N.O. to say when J.A. called him back:

> Ok.  Here are the questions if you would..
>
> Are they going to be there day one (March 4)
>
> Have they heard of any others there say [sic] one?
>
> Are they launching the 4mg (zometa) at risk?[2]
>
> Have they heard of anyone else launching the 4mg at risk?
>
> What's their market share goal?

153.     N.O. immediately called J.A. and they spoke for ten (10) minutes.  N.O. then

reported his findings to Malek that Dr. Reddy's would be launching on day one for the 4mg

product, but that it was not yet certain about the 5mg.  In response to Heritage's questions about

market share, N.O. generally described J.A.'s willingness to divide the market: "he views it this

way. If they are first and others come out after, he deserves 60%.  If he launches with others on

day [one], he considers fair share 2-50%, 3-33%, 4-25% etc."  Less than an hour later, J.A. called

N.O. and they spoke again for nearly nine (9) minutes.

154.     N.O. spoke to J.A. again on January 24, 2013 for nearly twenty-four (24) minutes.

155.     Even though he believed that Dr. Reddy's would be Heritage's only competition

for Zoledronic Acid, Malek did not take anything for granted.  On January 22, 2013, Malek also

asked A.S. to reach out to several individuals, including her "friend at caraco", S.K., to see "if

---

2  An "at risk" generic launch refers to a scenario where a generic manufacturer launches product sales after the
FDA has reviewed and approved its ANDA, but while patent litigation is still ongoing.

they are launching zoledronic day one?"  He provided A.S. with the same list of questions to ask S.K. that he had provided to N.O.

156.    Malek also asked A.S. to contact a large wholesaler and ask whether the wholesaler was aware of any other manufacturers that would be entering the market for Zoledronic Acid on "day one."  Lastly, Malek asked A.S. to reach out to a representative at a company not identified as a coconspirator in this Complaint.  A.S. reached out to each of those competitors, and confirmed that they would not be entering the market for Zoledronic Acid.

157.    As the launch approached, Heritage continued to communicate with Dr. Reddy's to refine their agreement on market share and initial pricing for Zoledronic Acid, acutely aware that what they were doing was illegal.  For example, on March 1, 2013, N.O. emailed Malek informing him that N.O. had left J.A. a message "to have him call me back.  Did not leave anything that would incriminate me—very generic."  N.O. then spoke to J.A. for almost eight (8) minutes on March 4, 2013.

158.    At the same time, M.E., a Senior National Account Manager at Heritage, was communicating with his counterpart at Dr. Reddy's.  M.E. called his counterpart and left a message on March 3, 2013.  Two days later, the Dr. Reddy's National Account representative returned the call and the two spoke for fifteen (15) minutes.

159.    Malek was concerned that Dr. Reddys' initial pricing to at least one customer appeared to be lower than he hoped.  On March 6, 2013, he emailed N.O. expressing this concern and asking "[a]ny chance you can talk to them and educate them on supply and demand economics?"  N.O.'s response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

44

160.    Malek also asked M.E. to speak again with his counterpart at Dr. Reddy's about Zoledronic Acid while they were attending a customer conference together in March 2013. They spoke by phone twice and exchanged numerous text messages on March 12, 2013. On March 13, 2013, Malek emailed M.E. asking "Did you talk zoledronic with anyone?" M.E.'s response was: "There were a bunch of people around us before and during dinner. After dinner I was supposed to go gamble with him but I started talking to [a customer representative] and ended up talking to him for an hour. By that time it was late and I went to bed." M.E. indicated that he had called his counterpart at Dr. Reddy's and they would "talk about it soon." M.E. spoke with his counterpart at Dr. Reddy's on April 3, 2013 and confirmed that Dr. Reddy's had just begun shipping the 5mg product that day, and would be pricing "in the 500 range." The two continued to speak numerous times throughout the rest of that month.

161.    As Heritage continued to discuss the matter internally, Malek sent a text message to his entire sales team on April 19, 2013, reminding them to keep their discussions out of writing: "Team: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line. We will have a call today with Jeff [Glazer, CEO of Heritage] to discuss."

162.    Whenever there were challenges between Heritage and Dr. Reddy's for specific customers, those disagreements were resolved through direct communications between the companies. For example, in November 2013, Dr. Reddy's offered a lower price to one of Heritage's customers. When Malek learned of this, he immediately emailed M.E., saying "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied: "He told me that he was going to speak to their injectable people and let them know that they should chill."

45

163.     Despite these occasional challenges, the general agreement regarding market share allocation between Heritage and Dr. Reddy's continued.  For most of 2013 and 2014, the market remained stable with Dr. Reddy's maintaining roughly 60 percent market share to Heritage's 40 percent for the 5mg Reclast® formulation.

164.     This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### c.  *Meprobamate*

165.     Meprobamate, also known by the brand-names Miltown® and Equanil®, is a generic pharmaceutical drug used to treat short-term anxiety, tension and insomnia.

166.     In 2013, Heritage and Dr. Reddy's were the only manufacturers in the market for Meprobamate.  The two companies had an agreement in place to allocate market share between them and not compete on price.

167.     Heritage decided it wanted to increase price significantly.  On March 21, 2013, Malek sent an email to N.O. and M.E. titled "mepro."  In the email, Malek stated "Looking to take a price increase on this.  Only other competition is DRL.  We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price.  Anyone want to reach out to DRL [Dr. Reddy's] and communicate to feel out?"

168.     N.O. responded: "I will try to reach out to [J.A.]."  Malek added: "[M.E.], maybe you can touch base with your buddy too."  M.E. responded:  "Will do."

169.     N.O. spoke with J.A. the next day for nine (9) minutes, and the two companies reached an agreement to raise the price of Meprobamate.  N.O. confirmed the agreement in an email that same day, stating:  "DRL is on board with price increase.  I will fill you in later."

46

170. On March 25, 2013, Malek responded: "Great news. So if we move forward we shouldn't expect any backlash?" N.O. once again confirmed the agreement in his response: "No, they were actually thinking about it as well, but lack of inventory kept them stationary. I think they will follow suit and not pursue others if we raise."

171. Only two days later, on March 27, 2013, Heritage received a request from a large national wholesaler for a bid on Meprobamate. Malek immediately forwarded the email to N.O., asking "This DRL?" In response, N.O. said "Yes, they are on a tight supply schedule, thus the reason they have not increased pricing yet. Due to my conversation with [J.A.] the other day, I think we should tread lightly or else bid a high price to show them where we are going."

172. Malek agreed. His response clearly reflected the agreement that existed between Heritage and Dr. Reddy's, and Heritage's intention to abide by it:

> Unless [the large national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business.
>
> We are taking the price up asap everywhere else.

N.O. then had a four-and-a-half minute conversation with J.A. on March 29, 2013.

173. Subsequently, in April 2013, Dr. Reddy's approached Heritage to discuss its desire to get additional market share on Meprobamate. Dr. Reddy's specifically asked Heritage "to walk from" one large national pharmacy chain. Heritage then sent an email to the large pharmacy chain on April 24, 2013, stating: "Hate to do this, but due to API and manufacturing increases, we are increasing all prices of Meprobamate across the board. Please review and contact me with any questions."

174.     In response, the large pharmacy chain responded that it had "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets." M.E. forwarded the email to Malek stating "We knew this was coming."

175.     On May 17, 2013, after some initial confusion about exactly which business Heritage had agreed to give up to Dr. Reddy's, Malek told M.E. "Please call [your counterpart who was a National Accounts Director at Dr. Reddy's] and tell him we walked from this for them but that's it." Malek then provided M.E. with more detail to convey to Dr. Reddy's:

> This is what you say.
>
> We know you bid at [the large national pharmacy chain] and although we had a ROFR [Right of First Refusal] we decided to walk based on the conversation we had two weeks ago.
>
> This makes the playing field for market share more even and I assume since you were looking for one more customer that you are good now.
>
> Tell him you don't think the team is going to walk from anymore share at this point.

176.     M.E. called his counterpart at Dr. Reddy's that day and left a message. The two subsequently spoke on May 21, 2013 for nearly seven (7) minutes.

177.     Both Heritage and Dr. Reddy's were able to significantly raise prices across the board – nearly simultaneously – as a result of this agreement. Heritage price increases became effective in late April, 2013. Dr. Reddy's price increases became effective May 10, 2013.

178.     Over the next several years, the market for Meprobamate remained very stable as a result of the agreement between Heritage and Dr. Reddy's. Prices and profit margins for the two companies remained very high, due to the lack of competition in the market.

179. This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### d. *Doxy DR*

#### i. The Heritage/Mylan Agreement.

180. Doxycycline Hyclate Delayed Release ("Doxy DR"), also known by the brand-name Doryx®, is a tetracycline-class antimicrobial indicated as adjunctive therapy for severe acne.

181. Heritage entered the market for Doxy DR on or about July 2, 2013. The only other generic manufacturer selling Doxy DR at that time was Defendant Mylan.

182. Even before Heritage began selling Doxy DR, representatives of the company began to communicate with Mylan in an effort to divide the market and refrain from competing with each other on price. Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable.

183. In April 2013, Malek and then-Heritage CEO Jeffrey Glazer traveled to India and met with two executives of Heritage's parent company, Defendant Emcure, to discuss, among other things, their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them. It was decided that Defendant Satish Mehta ("Mehta"), the CEO of Emcure, would reach out first to a high-level counterpart at Mylan, Defendant Rajiv Malik ("Malik"), in order to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

184. In early May, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR.

49

185.     On May 3, 2013, Malek asked N.O. to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan. The next day, N.O. provided Malek with contact information for J.N., a Vice President and Executive Director at Mylan. Malek promptly connected with J.N. through the website LinkedIn.

186.     Similarly, on May 7, 2013, Glazer emailed Defendant Malik, President and Executive Director at Mylan. Glazer stated: "Rajiv: Would like to schedule a time for a call to catch up and discuss some recent Heritage news. Please let me know when you are available and we'll pencil it in." Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

187.     During that phone call, Glazer explained to Malik that Heritage had strong business relationships with two of Mylan's Doxy DR customers – a large wholesaler and a large retail pharmacy – and that Heritage intended to pursue Mylan's business at those two accounts. Heritage's goal was to achieve significant market penetration – the two customers discussed represented approximately thirty-percent (30%) of the market – without aggressive (low) pricing.

188.     Malik responded that Mylan would "play fair" and agreed to give up the two accounts to Heritage. Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would cede share to Heritage in this instance. The competitors understood that this agreement would allow Heritage to gain market share without eroding the lucrative Doxy DR pricing in the market at that time. Malik told Glazer that he would let others at Mylan know of the plan.

189.     Over the coming months, Mylan gave up those two customers to Heritage in accordance with the agreement.

50

## I.    The Large Wholesaler Account ("Wholesaler A")

190.    In June 2013, Malek met at an HDMA conference in Orlando with a senior executive from Wholesaler A to discuss potential product opportunities, including Doxy DR. Very shortly thereafter, Heritage submitted a detailed product proposal to the wholesaler. Over the succeeding days, Malek reiterated the company's keen interest in entering into a supply agreement with Wholesaler A for Doxy DR.

191.    During that same period, Heritage and Mylan executives continued to discuss the market allocation scheme. For example, on June 11, 2013, M.A., a National Account Manager at Mylan called N.O. and the two spoke for nearly ten (10) minutes. Immediately following that call, N.O. called Malek to report his conversation and left him a voicemail. The two connected fifteen (15) minutes later and spoke for seven (7) minutes.

192.    On June 18, 2013, a senior manager at Wholesaler A emailed L.W., a National Account Manager at Mylan, informing him that he had received an unsolicited bid for Doxy DR from a new entrant. The manager asked that Mylan submit a bid to retain the business by close of business on June 21, 2013. This process is a customary practice in the industry and is often referred to as a "Right of First Refusal" ("ROFR"). An ROFR is often included as a term in supply contracts between manufacturers and their customers, giving the incumbent manufacturer the right to beat a competitor's price and retain the business.

193.    In keeping with the agreement Mylan had reached with Heritage to cede Wholesaler A's business, Mylan did not exercise its ROFR and failed to submit a counter bid to retain the Doxy DR business at the wholesaler.

194.     On June 27, 2013, having received no bid from Mylan, Wholesaler A entered into a distribution agreement with Heritage for Heritage to serve as Wholesaler A's primary supplier of Doxy DR.

195.     To date, Heritage has maintained the Doxy DR business at Wholesaler A without any competition from Mylan.

## II.     The Large Retail Pharmacy Account ("The Pharmacy")

196.     On July 8, 2013, Heritage submitted a product proposal letter to The Pharmacy seeking to obtain its Doxy DR business. The next morning, on July 9, 2013, The Pharmacy rejected Heritage's bid because the proposed pricing was too high.

197.     On July 11, 2013, Heritage e-mailed a revised bid to The Pharmacy and lowered its proposed pricing in a continued effort to obtain the Doxy DR business.

198.     At the same time that Heritage was attempting to secure an agreement with The Pharmacy, both Heritage and its parent company Emcure continued to communicate with Mylan to keep its competitor updated on the company's efforts. In particular, Heritage wanted to make sure that Mylan was still committed to the agreement and would cede the very important large retail pharmacy account to Heritage if challenged. To further this effort, Defendant Mehta of Emcure spoke to Defendant Malik of Mylan on July 18, 2013. Shortly thereafter, V.T., the President of Corporate Development and Strategy at Emcure, emailed Glazer stating "Satish spoke to Rajiv. Call me when free."

199.     After speaking to V.T., Glazer e-mailed Malik asking whether the Mylan President had time that day for a call. Malik responded that he could call Glazer later in the evening. That evening, Malik called Glazer and left a voicemail. Fifteen minutes later, Glazer called Malik back and the two spoke for 4 minutes.

200.     During the call, Glazer conveyed Heritage's strategy and position to Malik about The Pharmacy as well as Doxy DR in general. Glazer told Malik directly that Mylan's reaction to Heritage's bid with The Pharmacy would "set the tone of whether this is a high priced item or more erosion." As set forth more fully below, Mylan's reaction was to cede the business to Heritage and avoid price erosion. After speaking to Glazer, Malik immediately spoke to certain Mylan employees.

201.     On August 6, 2013, M.A. of Mylan called N.O. and the two spoke for nearly thirteen (13) minutes.

202.     On August 15, 2013, an executive at The Pharmacy contacted G.T., a National Account Manager at Mylan, to inform him that The Pharmacy had received an unsolicited bid for the Doxy DR business. The executive gave Mylan a very short turnaround time to submit a counter bid to retain the business.

203.     In accordance with the agreement between Mylan and Heritage, Mylan submitted a bid for Doxy DR but lowered its price by only $10, knowing that this price adjustment would not be enough to retain the business.

204.     Later that day, The Pharmacy contacted G.T. notifying him that Mylan's price reduction was not enough to retain the Doxy DR business and offered Mylan a second opportunity to lower its pricing. G.T. responded that he would let The Pharmacy know by the next morning if Mylan intended to submit a revised bid.

205.     Mylan declined to submit a revised bid to retain the Doxy DR business at The Pharmacy. As a result, in September 2013 The Pharmacy awarded the agreement to Heritage to serve as the retailer's primary supplier of Doxy DR.

206.    To date, Heritage has maintained the Doxy DR business at The Pharmacy without encountering any further competition from Mylan.

## III.    Other Customer Accounts

207.    Even after Heritage obtained the Doxy DR business at the two former Mylan accounts, the competitors continued to coordinate their efforts to maintain artificially high prices for Doxy DR. In furtherance of that goal, on several occasions, Heritage walked away and/or refrained from competing with Mylan for the Doxy DR business at other customer accounts so as not to upset the market share understanding between the two companies.

208.    For example, on November 25, 2013, after Mylan sought to protect its business with another large account, Malek sent an email to N.O. asking "can you reach out?" N.O. responded: "I have tried with [M.A., Director of National Accounts at Mylan] and nothing. Will try again."

209.    That same day, Malek also emailed Glazer, saying that "Mylan is trying to protect [the one large account at issue]. We should reach out to rajiv [*sic.*], we need one more account and we are done." Glazer's response made clear the purpose of the agreement with Mylan (maintain high prices) and questioned whether Heritage should take any action that would disrupt that agreement: "We need to look at our market share, current biz and pricing with and without [the one large account at issue] and make a decision. You don't want them retaliating and lowering prices at other accounts."

210.    After conducting the evaluation, Heritage determined not to risk altering the Doxy DR market-share balance between the two companies and, thus, declined to further pursue the Doxy DR business at the large retailer.

211.    Similarly, in February 2014, a new competitor, Defendant Mayne (formerly Midlothian Labs), entered the Doxy DR market.

212.    Shortly thereafter, Heritage was solicited by a large wholesaler requesting a bid for Doxy DR. A.S. learned from the wholesaler that Mayne had provided an unsolicited bid for the Doxy DR business, which prompted the wholesaler to approach the incumbent supplier, Mylan, to see if Mylan would match the price in order to retain the contract. Because the unsolicited Mayne bid essentially re-opened the bid process, the wholesaler asked Heritage if it would like to bid on the Doxy DR as well.

213.    In discussing the issue internally, Malek conceded that Heritage had the Doxy DR supply to fulfill the contract, but wanted "to be careful." Providing a bid would be perceived as an attack on Mylan's business and could have resulted in retaliation. A.S. agreed, adding that "we may want to allow Midlothian to have [the large wholesaler's business] since we have [a different, very large wholesale account], and others, already."

214.    The next day A.S. responded to the wholesaler and declined to provide a bid. The reason A.S. gave to the customer for the inability to provide the bid was that Heritage might not have enough supply to fulfill a contract with the wholesaler. A.S.'s explanation, however, was a lie, because three days later, she solicited a different customer – a pharmacy chain – and asked if Heritage could bid for that company's Doxy DR business, saying "we have the opportunity to add another customer."

215.    Finally, in August 2014, Heritage refused to bid for the Doxy DR business on an RFP issued by yet another Mylan customer. After deciding against submitting a proposal, Malek sent an internal email to N.O. titled "doxy dr." In the email Malek stated "[f]eel free to let your contact at mylan know we are not bidding on the rfp . . . ."

216. As a result of Heritage's unlawful agreement with Mylan, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

217. This agreement between Heritage, Emcure and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

## ii. The Heritage/Mayne Agreement

218. Defendant Mayne entered the market for Doxy DR in or about February 2014. Even before launching the product, Mayne approached Heritage to discuss its plans. For example, on January 7, 2014, G.S., a Director of National Accounts at Mayne, spoke by phone with A.S., a National Accounts Manager at Heritage, for 12 minutes.

219. As a result of that conversation, Mayne's initial strategy was to avoid bidding on Heritage customers and to instead target Mylan, which at the time had roughly 60% of the Doxy DR market. That strategy was not entirely successful, however. In an internal Mayne email discussion on February 21, 2014, after learning from a wholesaler that Mylan had retained its business with that wholesaler, C.S., Executive Vice President of Generic Products at Mayne, gave G.S. his understanding of the situation based on his experience in the industry: "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more. We need to go after business at Heritage also." G.S. replied "Perhaps. . . ."

220. G.S. continued to communicate with A.S. about Doxy DR. They spoke by phone on March 13, 2014 and again four days later on March 17, 2014 for 17 minutes. Later that day, in an email to Malek and others at Heritage entitled "Midlothian intel on Doxy DR," A.S. recounted their latest conversation, as well as her current understanding with G.S.:

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about
> Doxy DR. She is the "one-man" show for that company -- she has

56

all accounts including GPOs. She has not been able to get much share on the product yet, so she says.

She did not bid OneStop, we have that customer.
She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.
She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid); and she was shut down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.

She will be bidding it on the HD Smith RFP.
She will be targeting M&D now. She may go after NC Mutual but the usage is very small there.
She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports).
They are no where near a contract with WAG yet so she feels like that is not an option.

She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up -- and I got the impression she would not target those folks.

221.    Malek responded: "[t]hanks for the notes below. How well do you know

[G.S.]?" A.S.'s response was "I know her pretty well from over the years in the industry."

222.    Only two weeks later, however, Heritage learned that Mayne had made an

unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. On March 31,

2014, Malek emailed A.S. stating that Mayne "[t]ook a shot at our doxy dr [at the large

pharmacy account]. Can you reach out?" A.S. responded: "Yes - I can."

223.    The next day, on April 1, 2014, A.S. spoke with G.S. for 27 minutes.

Immediately thereafter, A.S. sent a text message to Malek stating "[s]poke with [G.S.] of

Midlothian. Said she had to go to [the large pharmacy customer]. Just got declined at

Walgreens and went back a second time to cardinal and got declined again." Malek responded

that Heritage "can't walk from [the large pharmacy customer]. Tell her to try Walmart."

224.    G.S. called A.S. again the next day and they spoke for 11 minutes. Malek also emailed the CEO Glazer, stating "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up the phone for less than 20% difference. In this case, we spoke with Midlothian and they have struck out completely on getting share. They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge. Please let me know your thoughts."

225.    A.S. and G.S. spoke again on April 9, 2014 for 3 minutes. A.S. then reported the conversation to Malek and N.O.: "Just got a call from [G.S.] at Midlothian and she said she has offers in to [McKesson] One Stop and Econdisc."

226.    The next day, A.S. and G.S. exchanged a series of text messages:

> (1:14pm) A.S.: "Hi! It is [A.S.]!  Just getting back to you on our discussion yesterday. I don't have either account but my boss said since we are strategically aligned with both they will probably not move. We will protect.  Sorry – I know it is not the news you wanted to hear."

> (1:16pm) G.S.: "Thanks. Had he given up CVS we would not have gone after the other two. We'll just keep going back as soon as we can."

> (1:18pm)  A.S.: "I am bummed for you. I am keeping my ears open to understand the landscape too.  I will let you know what I find out.  Best bets are the RFPs that are out now."

> (1:19pm) G.S.: "Need volume. Need one Large account."

227.    Mayne continued to look for a large account over the next several months. Heritage did walk away from one account in May, 2014 when Mayne underbid Heritage's price. Upon learning of the unsolicited bid from Mayne, K.F., Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me know what you want me to do on this. Would like

58

to keep, but at the same time, Midlothian will keep going after accounts." To that, Malek responded, "[w]e will walk."

228.     In November 2014, Mayne again put in offers to McKesson One Stop and Econdisc. On November 20, 2014, M.E. sent an email to Malek and others at Heritage stating "Midlothian has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

229.     The next morning, A.S. sent a text message to G.S. stating "Happy Friday! Do you have a minute to talk about Econdisc?"  G.S. responded, "Yes. Call me." A.S. then called G.S. and the two spoke for 15 minutes.

230.     A.S.'s notes reflect that when they spoke, she asked G.S. what her goals were with respect to Doxy DR.  G.S. responded that Mayne was looking for market share; she told A.S. that Mayne had to get a "big customer like Econdisc."  G.S. told A.S. that she had also submitted an offer to McKesson 10 days ago.  A.S. floated the idea that Heritage may be willing to walk from Econdisc if Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson.

231.     Immediately after speaking with G.S., A.S. sent an email to Malek with a subject line "spoke with [G.S.]" and stating "[c]an discuss any time."

232.     After conveying to Malek what she had discussed with G.S., A.S. and G.S. exchanged several voicemails and text messages over the course of the day.

233.     Later in the afternoon on November 21, 2014, N.O. sent an email to Malek and others at Heritage, stating "Midlothian coming after us @ McKesson.  Will discuss with you on Monday."  Malek immediately forwarded the email to A.S. who responded, "[G.S.] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

59

234.    On November 24, 2014, A.S. and G.S. connected by phone and spoke for six (6) minutes. After speaking with G.S., A.S. emailed Malek stating "Just spoke with her ... can you call me anytime?" Within a half hour, after speaking with Malek, A.S. made a formal offer to G.S. by text message: "If you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."

235.    The next day, November 25, 2014, Malek emailed A.S. asking "[d]id you speak with [G.S.]?" A.S. responded "Yes -- told her exactly what we talked about. She is on vacation this week but was going to try to rescind McKesson. . . ." Malek ended the conversation by saying "[s]ounds like we know what we need to do."

236.    In internal email communications in the weeks following this agreement, Heritage CEO Glazer confirmed that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian market share so they stop eroding" the price for Doxy DR.

237.    A.S. and G.S. continued to communicate throughout December 2014, by text message and even in person at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

238.    When Econdisc put the Doxy DR business out to bid again in January 2015, Heritage made sure that it bid a higher price than Mayne (a "cover bid"), which fulfilled Heritage's end of the agreement by "walking" from Econdisc. As one Heritage employee described it in March 2015, "[w]e basically walked from Doxy DR" at Econdisc.

239.    This anticompetitive agreement between Heritage and Mayne continued until at least December, 2015, and the effects were felt for much longer. For example, in September, 2015, Heritage was approached by a large nationwide pharmacy chain requesting a bid on Doxy

DR. A.S., initially excited about the opportunity, confirmed internally that Heritage had the capacity to bid. Malek cautioned, however, that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

240.    After finding out that the incumbent supplier was Mayne, A.S. reached out to G.S. by text message. G.S. confirmed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. In accordance with their agreement not to compete with each other and avoid price erosion, Heritage refused to provide a bid. That same day, A.S. sent another text message to G.S. reiterating Heritage's intent to abide by the agreement, stating: "Confirming we are not bidding." G.S. responded: "Thank you."

241.    As a result of Heritage's unlawful agreement with Mayne, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

242.    This agreement between Heritage and Mayne was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 2.  Agreements to Fix Prices

243.    In addition to reaching agreements with competitors to allocate markets for a number of different generic drugs, Defendants routinely and as part of their regular course of business, sought and obtained agreements with competitors to fix and raise prices.

244.    This was often done by "socializing" a competitor to a price increase. This process involved a generic manufacturer reaching out to its competitors to first raise the possibility of a price increase, and then getting an assurance from the competitors of a willingness or agreement to engage in a price increase of some sort – or an assurance that the competitor would cooperate and not seek to take advantage of the manufacturer's price increase

61

by bidding to take that manufacturer's customers.  Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increases.

245.    Often, a generic manufacturer would identify a potentially larger group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain illegal agreements allowing that company to raise prices for as many of those drugs as possible without the threat of competition.

### a.  Doxycycline Monohydrate (2013)

246.    Doxycycline Monohydrate ("Doxy Mono"), also known by the brand names Acticlate® and Monodox®, among others, is an oral medication used to treat a wide variety of bacterial infections, including those that cause acne.  Doxy Mono is known as a tetracycline antibiotic, and is also used to prevent malaria.

247.    In February 2013, Heritage heard from a customer that there would be a significant increase in demand for Doxy Mono due to a large price increase that had recently occurred with a different form of Doxycycline as well as supply problems that certain manufacturers were experiencing.

248.    Shortly thereafter, Heritage decided to increase the price it charged for Doxy Mono.  Heritage's competitors at that time were Defendants Lannett, Mylan and Par.  In order to ensure a successful increase, Heritage began reaching out to certain competitors.

249.    On March 7, 2013, A.S. spoke to T.S., the Director of National Accounts at Lannett, for fourteen (14) minutes.

250.    On March 13, 2013, A.S. sent an email to T.S. at Lannett stating:  "Hi [T.S.]!  I just had a question for you on Doxycycline Monohydrate.  Would you have a chance to chat

62

today? Or tomorrow? Let me know a convenient time for you..." They spoke later the same day for five (5) minutes and discussed Heritage's intent to increase Doxy Mono prices.

251. On March 17, 2013, Malek created a spreadsheet, which he then forwarded to himself by email, which included various items on which he wanted to follow up. Included was a reference for "Price Increases: Take Doxy Mono up more than 3x asap." On March 21, 2013, Malek emailed Glazer expressing his intention to increase the price for Doxy Mono by as much as four (4) times the current price, and asking for Glazer's thoughts.

252. On March 25, 2013, T.S. sent an email to her boss, the Vice President of Sales at Lannett, titled "Recap." In that email, she indicated that she was "[w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but had heard that "there will be a price increase on Doxycycline from Heritage soon. We are waiting to find out when and why." T.S. continued to communicate with A.S. about Doxy Mono, through numerous phone conversations, text messages and in-person meetings over the next several months.

253. Also on March 25, 2013, Malek sent an email to his sales team indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug.

254. Heritage kept in contact with its Doxy Mono competitors throughout 2013. A.S., in particular, spoke, texted and met in person with several different Lannett employees over the period. She called T.S. on April 25, 2013 and left a message. T.S. returned the call the next day and they spoke for more than eight (8) minutes. They spoke again on May 13, 2013 for almost six (6) minutes.

255.    The next day, A.S. and T.S. attended a conference together, where they again discussed Doxy Mono. During the day on May 14, 2013, they exchanged the following text messages:

> A.S.:  "Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6."
>
> T.S.:  "I have a conference call in a half hour about a market wide increase. I might have to meet you at the bar."
>
> A.S.:  "Ok sounds good – see u there"
>
> A.S.:  "Is it doxy mono?"
>
> T.S.:  "Headed over now."

256.    Similarly, on June 4, 2013, A.S. called and texted with G.W., a Director of National Accounts at Lannett. On June 5, 2013, while at a conference with T.S., A.S. and T.S. exchanged numerous calls and text messages.

257.    Lannett increased its pricing for Doxy Mono effective June 12, 2013. When it was asked by one customer in July 2013 whether Lannett could provide a lower price for Doxy Mono, a Lannett National Account Manager stated:  "We just took a price increase on this item effective 6/12/13. This is our standard pricing across the board going forward. Any pricing you see out there right now will not be that low for long."

258.    During this same time period, the four competitors selling Doxy Mono were all communicating frequently. For example, the day before Lannett raised its price – June 11, 2013 – N.O. of Heritage spoke to M.A. of Mylan for nearly ten (10) minutes. T.S. of Lannett was also communicating with K.O., the Vice President of National Accounts at Par, during this time period. The two were friends who frequently saw each other and spoke in person at trade shows and customer conferences. K.O., in turn, was in frequent communication with M.A. of Mylan

during June and July 2013, speaking numerous times, including several calls on June 7, 2013 and June 13, 2013 – the day after Lannett raised its prices for Doxy Mono. K.O. was also in frequent communication with G.W. at Lannett, exchanging nine (9) text messages on June 11 and 12, 2013.

259.    Heritage was slower to raise its prices for Doxy Mono, due to supply problems throughout 2013. But A.S. continued to keep in frequent communication with Lannett and other competitors. She met in person with T.S. and K.O. from Par during a conference in Arizona on August 1 and 2, 2013. This was followed by a flurry of communications between the four competitors in August 2013.

260.    At some point thereafter, as Heritage was evaluating its planned price increase, Malek asked A.S. to obtain specifics regarding Lannett's price increase for Doxy Mono. That resulted in the following text message exchange between A.S. and T.S. on August 12, 2013, after they had again met in person together at a conference:

> A.S.:   "From our conversation, [i]ncreasing WAC too?"
>
> T.S.:   "Yes"
>
> A.S.:   "When are you guys changing WAC or have u already?"
>
> T.S.:   "Are you free at 4:30?"
>
> A.S.:   "Yes—but still need to hang around for 5pm mtg"
>
> T.S.:   "OK I'll swing by"

261.    The next day, August 13, 2013, while still together at the conference, A.S. texted T.S. saying "Let's connect sometime today—need a little more specifics on the $ we discussed." That same day, A.S. also exchanged several text messages and phone calls with L.C., another

National Accounts Representative at Lannett. G.W. of Lannett also sent a text message to K.O. of Par.

262. Later that evening, the Senior Vice President of Generic Sales at Par sent an internal email to the Vice President of Marketing and Business Analytics, stating: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The email was forwarded internally at Par with the instruction: "FYI...we will follow. . . . No new opps until we see where pricing ends up."

263. One week later, on August 20, 2013, A.S. confirmed via email to Malek that Lannett had "tripled WACs and did/will do similar to contract prices."

264. In October, A.S. informed a customer that "[w]e are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov."

265. On January 23, 2014, A.S. informed a large supermarket chain customer that "I also wanted to let you [know] that we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014."

266. As of March 2014, Heritage increased its price to at least one customer, with an eye toward a much larger, across-the-board increase on Doxy Mono (as well as other drugs) later in 2014, which is discussed more fully below.

267. This agreement between Heritage, Lannett, Par and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

**b.  Heritage 2014 Price Increases**

268.    On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference. Present on the teleconference were members of the Heritage sales team as well as Malek.  Malek ran the call, and dictated the strategy for Heritage.

269.    During the teleconference, Malek identified eighteen (18) different drugs that Heritage would target for price increases.  Prior to the call, Malek had circulated to his sales team a spreadsheet which listed each drug, the competitors for each and their respective market shares.  The list included Acetazolamide ER, Carisoprodol ASA, Cidofovir, Doxy Mono (which was slated for a "big price increase"), Fosinopril-HCI/HCTZ, Glipizide-Metformin HCI, Glyburide, Glyburide-Metformin HCI, Leflunomide, Meprobamate, Methimazole, Nimodipine, Nystatin, Paromomycin, Theophylline ER and Verapamil HCI, among others.  In order to accomplish the price increases, Malek instructed members of the sales team to immediately reach out to their contacts at each competitor for the drugs on the list, and attempt to reach agreement on the price increases.  Different Heritage employees were identified as being primarily, although not exclusively, responsible for communicating with different competitors.

270.    Malek had been working on the price increases for weeks before holding this meeting with his sales team.  He held a meeting with K.F. and D.L. of Heritage during the week of April 14, 2014 and asked them to begin analyzing the impact of the planned price increases.

271.    Malek also began communicating with competitors even before he instructed his sales team to start doing so during the April 22, 2014 price increase discussion.  He was responsible for communicating with Teva, which was a competitor on seven (7) of the drugs on the list:  Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin and Theophylline.  Malek had a direct relationship with N.P., Teva's Director of

67

Strategic Customer Marketing. He called her on April 15, 2014 and they had a seventeen (17) minute phone conversation during which N.P. agreed that if Heritage increased prices for the drugs on the list, Teva would follow or, at a minimum, would not challenge Heritage's price increases by underbidding Heritage.

272.    For two of the drugs – Nystatin and Theophylline ER – Teva had already been planning a price increase and Malek and N.P. agreed that Teva would take the lead on those increases.

273.    In the next few months after April 2014, Malek spoke to N.P. several more times, and Malek kept N.P. informed with more details about when Heritage would be increasing prices for those drugs.

274.    Malek was also responsible for communicating with Defendant Ascend – who, as detailed above, was a new entrant in the market for Nimodipine – and offering Ascend a one-third (1/3) share of the market in exchange for not competing on price. Malek reached out to J.D., the Executive Vice President of Sales and Marketing at Ascend, through LinkedIn earlier in April after learning that Ascend had received approval to sell Nimodipine, and they exchanged several messages. Malek called J.D. on April 22, after the Heritage Price Increase Discussion, and they spoke for nineteen (19) minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

275.    In response to Malek's directive, the Heritage sales team started contacting their competitors immediately. A.S., for example, communicated with three counterparts at different competitors shortly after the call, reaching agreements with all of them to raise prices. First, she

spoke to S.K. at Caraco for forty-five (45) minutes, and they agreed to increase prices for

Nystatin and Paromomycin. She then spoke to M.D., a National Account Manager at Actavis,

for more than nine (9) minutes and they agreed to increase prices for Glyburide-Metformin HCI

and Verapamil. Last, she spoke to T.S. at Lannett for nearly twenty-nine (29) minutes, during

which they agreed to raise prices of Doxy Mono.

276.    Similarly, N.O. was able to reach an agreement the next day with his counterpart

at Mylan to raise prices on at least 3 different drugs: Doxycycline Monohydrate, Glipizide-

Metformin and Verapamil. As he stated to Malek and A.S. in an email titled "Mylan," dated

April 23, 2014: "Just let me know a day before we price adjust on the three Mylan products and

they will put the word out to the reps to leave us alone. They are looking at price increases as

well on a number of products." N.O. had spoken to M.A., a Director of National Accounts at

Mylan, shortly before sending the email.

277.    Over the coming days and weeks, both Malek and Glazer pushed other Heritage

employees to communicate with their competitors and obtain agreements to raise prices. On

April 28, 2014, Malek sent an email to Heritage employee D.L., titled "bindo", referring to

Defendant Aurobindo. In the email Malek stated "Let me know when you speak with [P.M., the

Senior Director of Commercial Operations at Aurobindo.]" On the list of 18 generic drugs

identified for price increases, D.L. had been charged with the responsibility for communicating

about the drug Fosinopril/Hydrochlorothiazide ("Fosi/HCTZ"), of which Aurobindo was a

competitor. Aurobindo was also a competitor with Heritage for the drugs Glyburide and

Glyburide-Metformin. D.L. exchanged several voicemails with P.M. on April 28 and 29, 2014,

but they were unable to connect.

278.    The next day, Glazer followed up with an email to D.L. titled "Aurobindo", stating "JM wanted me to ask you if we are all set so we can implement pricing?" D.L. responded saying "[w]e have been playing phone tag. I have reached someone internally but would like to get it up the ladder." One day later, Malek followed up with D.L. again, asking "[a]ny contact?"

279.    D.L. was finally able to connect with P.M. on May 8, 2014 for a sixteen (16) minute phone call. They also spoke on June 25, 2014 for eighteen (18) minutes, and again on July 7, 2014 for three-and-a-half minutes.

280.    In an email exchange between A.S. and Malek on May 6 and 7, 2014, Malek explained that he had been able to successfully obtain agreements to raise the price of the drug Acetazolamide. Malek had previously asked A.S. to hold off on a price reduction request on Acetazolamide from a large GPO customer. Malek told her "[w]e have buy in from all to go up…" and that Heritage would not agree to reduce its price. As Malek stated: "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

281.    On May 8, 2014, Malek sent an email to N.O. asking "Did you ever to [sic] with [M.B.] at Par?" Par was a competitor with Heritage for two of the drugs on the target list: Doxy Mono and Methimazole. N.O. was identified as a Heritage employee primarily responsible for communicating on both of those drugs. N.O. and M.B. were finally able to communicate by phone on June 2, 2014.

282.    Also on May 8, 2014, Malek sent an email to the Heritage sales team, stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?

70

Need to move forward with the plan asap.

283. M.E. responded immediately: "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]." M.E. had been tasked with communicating with Defendant Dr. Reddy's about Meprobamate and also with Defendant Apotex regarding Leflunomide. He had initially exchanged 6 text messages with his counterpart at Dr. Reddy's, J.A., on April 24, 2014, and then the two spoke briefly on May 6, 2014.

284. A.S. responded with a similar message: "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details." A.S. had been tasked with communicating with Defendants Lannett (a competitor for Doxy Mono), Actavis (Glyburide/Metformin and Verapamil) and Sun (Nystatin and Paromomycin), among others.

285. K.B., an Associate Director of Institutional Sales at Heritage, also replied that she had spoken with two different Mylan individuals about the drug Cidofovir:

> I spoke with my friend who is NA [National Accounts] at Mylan and just alluded to the fact that we may take a price increase on Cidofovir and he said I have no control over these types of things … so I told him to just be on the lookout for it and convey to his internal people that we had taken an increase … he said they would most likely follow. I also talked to one of the Regional Reps at the HCP show and mentioned it to him … he said if it's not already on our 'to do list' it will be.

286. On May 9, 2014, Heritage had another teleconference to discuss the price increases for the 18 targeted drugs. During this teleconference, the Heritage sales team shared their results in seeking agreement from competitors to raise prices on the various drugs.

287. The following week, A.S. met in person and discussed the price increase strategies with a number of different competitors at the MMCAP conference. During that conference she was able to personally reach and/or confirm agreements with at least Defendants

Aurobindo (Fosinopril/HCTZ, Glyburide and Glyburide/Metformin), Sandoz (Carisoprodol and

Fosi-HCTZ) and Lannett (Doxy Mono), among other competitors. She advised Malek of her

success via email on May 15, 2014:

> Hi Jason: At the MMCAP meeting yesterday, spoke with some
> other industry reps and found similar like minding on the pricing
> strategies we discussed. Overall, spoke with Aurobindo ([T.G.]),
> Sandoz ([C.B.]), Perrigo ([P.H.]) (Colistimethate), Xgen ([B.P.])
> (Colistimethate), and Lannett ([T.S.]). . . . I will try to meet with
> the Teva rep, L.P., today. Supposedly, Midlothian is here too --
> but I have not seen G.S. yet. . . .

288.    On June 3, 2014, while at another customer conference, A.S. met in-person for

dinner and drinks with two of Heritage's competitors on Doxy Mono – K.O. of Par and T.S. of

Lannett – as well as other competitors including C.B., a Director of National Accounts at

Sandoz.

289.    On June 23, 2014, Heritage employees had a "Price Change Call", to discuss the

specific percentage amounts by which they would seek to increase the pricing of certain drugs,

including drugs for which they had already obtained agreement from all competitors (or potential

future competitors), and the strategies for doing so. Included on the list were: Acetazolamide

(75% increase); Paromomycin (100% increase); Glyburide (200% increase); Nimodipine (48%

increase); Theophylline (150% increase); and Nystatin (95% increase). It was discussed on the

call that those six increases alone would amount to an additional $16 million in profit per year

for Heritage, assuming no loss in market share.

290.    Malek continued to push Heritage employees to discuss the planned price

increases with competitors, and he continued to do the same. On June 25, 2014, Malek spoke

with N.P. at Teva for nearly fourteen (14) minutes and informed N.P. that Heritage would be

increasing prices for a number of drugs sold by Teva shortly.

291. On June 26, 2014, A.S. sent a text message to a contact at a large wholesaler customer stating that "As of 7/1, [m]arket wide we are increasing prices on: Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases—you have those letters." Moments later, she followed up with another text message: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER . . . 150%."

292. On July 1, 2014, Malek sent an email to the Heritage sales team titled "update - price increase." The email read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

293. Over the next several weeks, Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Ultimately, Heritage was able to increase prices on at least nine (9) of the drugs: Acetazolamide ER; Fosi/HCTZ; Glipizide-Metformin; Glyburide; Leflunomide; Nimodipine; Nystatin; and Paromomycin.

294. Examples are set forth below.

### *i.   Acetazolamide*

295.    Acetazolamide ER, also known by the brand name Diamox®, among others, is an extended-release version of a medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.

296.    Heritage's main competitor for Acetazolamide was Teva.  As of April 2014, Heritage and Teva combined for approximately 78% of the market.  The only other competitor in the market was Zydus.

297.    Jason Malek was responsible for obtaining Teva's agreement to the price increases.  Malek spoke with N.P., his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Acetazolamide and other drugs.  During that phone call, N.P. agreed that if Heritage did raise the price of Acetazolamide (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts.  Malek and N.P. spoke several more times over the next several months and confirmed the agreement to raise prices, and Malek updated N.P. on the progress of the Heritage increases.

298.    The day after Malek spoke to N.P. – April 16, 2014 – N.P. called K.G., the Senior Director of National Accounts at Zydus, and the two spoke for nearly twenty (20) minutes.  K.G. called N.P. back a day later and they spoke again for nearly twelve (12) minutes.   N.P. and K.G. continued to communicate frequently over the next several months.  Other Teva and Zydus employees were also in close communication.  For example, J.P., an Associate Director of National Accounts at Teva, exchanged numerous text messages with K.R., the Vice President of Sales at Zydus, on May 14, 2014.

299.    For Heritage, Malek was also responsible for communicating with Zydus. On April 24, 2014, he contacted K.R., the Vice President of Sales at Zydus through the website LinkedIn, saying: "Hi Kristy, I hope this email finds you doing well. I wanted to see if you have a few minutes to chat. Let me know when you are free." K.R. responded later that day: "Hi Jason – I'm out in Arizona. I can give you a call tomorrow afternoon or call me anytime."

300.    By May 7, 2014, Malek confirmed to A.S. that Heritage had already obtained "buy in from all to go up" on Acetazolamide pricing, which A.S. referred to as "one of our strategic items," and expressed an intention to raise prices within the next week.

301.    During this time period Heritage also avoided bidding on any potential customers to which Zydus was already supplying Acetazolamide, in order to maintain market share among the competitors.

302.    On June 23, 2014, Heritage had a "Price Change Call," during which Malek and members of the Heritage sales team discussed an intention to raise prices for Acetazolamide by 75%.

303.    Three days later, on June 26, 2014, Heritage began sending out price increase notices to its customers of Acetazolamide. That same day, A.S. sent a text message to her contact at a large wholesaler customer informing her that Heritage would be increasing prices on Acetazolamide ER and a number of other drugs "market wide." She informed her contact that Acetazolamide prices would be increasing by 75%.

304.    By July 9, 2014, Heritage was able to raise Acetazolamide prices to at least 17 different customers nationwide.

305.    This agreement between Heritage, Teva and Zydus was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### ii.    *Fosi-HCTZ*

306.    Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ"), also known by the brand name Monopril HCT®, is a combination medicine used to treat hypertension.

307.    As of April 2014, Heritage had a 47% market share for Fosi-HCTZ.  At the time, Heritage's main competitors for that drug were Aurobindo, Sandoz and Glenmark.

308.    On May 2, 2014, M.E. of Heritage was able to connect with J.B., the Vice President of Sales and Marketing at Glenmark, through the website LinkedIN.

309.    D.L. of Heritage was tasked with primary responsibility for communicating with Aurobindo about Fosi-HCTZ price increases.  After several attempts, he spoke by phone with P.M. at Aurobindo on May 8, 2014 for sixteen (16) minutes.  The same day, P.M. called the Executive Vice President of Generics at Glenmark, J.G., and they spoke for more than fourteen (14) minutes.  The next day, May 9, 2014, T.G. of Aurobindo spoke with J.J., the Director of Sales and Marketing at Glenmark, for more than nine (9) minutes.

310.    Also on May 9, 2014, Heritage held another internal call about "Price Increases." Fosi-HCTZ was again on the list of drugs slated for a price increase.

311.    Less than a week later, A.S. spoke to representatives from both Aurobindo and Sandoz about the Heritage "price increase strategies," for Fosi-HTCZ and other drugs, during an MMCAP conference in Minnesota.  In particular, she spoke to T.G., the Director of National Sales at Aurobindo, and C.B., a National Accounts Executive at Sandoz.  After meeting in

76

person with both competitors on May 14, 2014, A.S. reported to Malek that she had found "similar like minding on the pricing strategies we discussed."

312.    The next day, May 15, 2014, T.G. of Aurobindo and C.B. of Sandoz spoke by phone and texted multiple times.

313.    Also on May 15, 2014, Heritage received notification from a large pharmacy customer that Aurobindo had recently provided a lower bid for Fosi-HCTZ.  In discussing internally whether Heritage should reduce its price to retain the business, A.S. recommended that Heritage "walk" from Fosi-HCTZ with this particular customer because, based on her conversation one day prior with T.G., Aurobindo was on board with the price increase strategy. A.S. explained that "[t]he Fosi/HCTZ has some other pricing strategies at work – I spoke with a rep from Aurobindo yesterday and moving forward there should be better synergies; this bid was from earlier this year before new strategies were discussed."

314.    On May 21, 2014, A.S. exchanged text messages with C.B. of Sandoz, confirming that she had his correct cell phone number.

315.    On June 3, 2014, A.S. again exchanged text messages with C.B. and invited him to meet with her and a group of friends and competitors for drinks at the Sandbar Restaurant while at an HDMA conference in Phoenix, AZ.

316.    These approaches by Heritage to Aurobindo and Sandoz sparked a flurry of communications between T.G. of Aurobindo and his counterparts at both Sandoz and Glenmark. In a one-week period between June 3, 2014 and June 10, 2014, T.G. had three (3) phone calls with C.B. at Sandoz, and five (5) phone calls and multiple text messages with J.J. of Glenmark. Other than one phone call with J.J. on August 26, 2014, T.G. did not text or speak with either of

77

them again by phone until April 8, 2015. On June 16, 2014, J.G. of Glenmark called P.M. at Aurobindo and they spoke for more than twenty-two (22) minutes.

317.    D.L. of Heritage also spoke again with P.M. of Aurobindo on June 25, 2014 for eighteen (18) minutes, and on July 7, 2014 for three-and-a-half minutes.

318.    Also on June 25, 2014, A.S. texted her friend K.A. of Citron, inquiring whether Citron would be entering the market for Glyburide. During that text message exchange, A.S. learned that Citron was also entering the market for Fosi-HCTZ in addition to Glyburide. A.S. informed K.A. of Heritage's plan to increase pricing on Fosi-HCTZ, and that Aurobindo was a competitor for that drug.

319.    On June 26, 2014, A.S. informed her contact at a large wholesaler customer that Heritage's prices would be going up for Fosi-HCTZ market wide by 200% as of July 1, 2014.

320.    Shortly after this text message exchange, on July 1, 2014, K.S., the Executive Vice President of Sales & Marketing at Citron, called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan. They spoke for nearly thirteen (13) minutes. According to A.S.'s notes, K.S. told D.L. that Heritage employees should not try to communicate with Citron through email. She also told D.L. that A.S. should not communicate through K.A., but should instead call L.S., Vice President of Sales at Citron, if she had sensitive information to convey about Fosi-HCTZ or the other price increase drugs.

321.    The next day, July 2, 2014, L.S. of Citron called A.S. and they spoke for nearly twenty-two (22) minutes. They continued to speak frequently through July and August 2014 about Fosi-HCTZ and other drugs.

322.    D.L. of Heritage also spoke directly with J.G. at Glenmark on July 18, 2014 for nearly twenty-three (23) minutes, and on July 30, 2014 for more than five (5) minutes.

78

323.    Citron also communicated directly with Aurobindo. On July 28, 2014, L.S. of Citron called and texted P.M. at Aurobindo several times until they were finally able to speak by phone later that day for more than twenty-four (24) minutes. These were the first and only communications ever between the two by phone or text.

324.    Heritage began sending out Price Increase Notices to its customers for Fosi-HCTZ on June 26, 2014. The next day, P.M. of Aurobindo and J.G. of Glenmark spoke twice, with one call lasting almost eighteen (18) minutes. They continued to speak with some frequency over the next several months.

325.    By July 9, 2014, Heritage had successfully been able to increase prices to at least 18 different customers nationwide for Fosi-HCTZ. That same day, Citron confirmed internally that Heritage had increased its WAC prices for Fosi-HCTZ and two other drugs, and that it (Citron) was trying to match those price increases.

326.    On July 14, 2014, K.S. of Citron spoke with J.G. of Glenmark twice – once for seven (7) minutes and again shortly after for more than thirteen (13) minutes. The next day, Citron increased its pricing for Fosi-HCTZ to be in line with the price increases adopted by Heritage.

327.    Sandoz also increased its pricing for Fosi-HCTZ. By early January of 2015, Sandoz was charging twice as much for Fosi-HCTZ as it had been one year before.

328.    This agreement between Heritage, Aurobindo, Citron, Glenmark and Sandoz was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### iii. *Glipizide-Metformin*

329.    Glipizide-Metformin ("Glip-Met"), also known by the brand name Metaglip®, is a combination medicine used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes.

330.    As of April 2014, Heritage's only two competitors for Glip-Met were Defendants Teva and Mylan.

331.    Jason Malek was responsible for communicating with Teva about Glip-Met price increases.  Malek spoke with N.P., his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Glip-Met and other drugs.  During that phone call, N.P. agreed that if Heritage did raise the price of Glip-Met (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts.  Malek and N.P. spoke several more times over the next several months and confirmed the agreement, and Malek updated N.P. on the progress of the Heritage increases.

332.    N.O. was primarily responsible for communicating with Mylan about Glip-Met.  N.O. spoke to M.A. of Mylan on April 23, 2014 and reached an agreement to raise prices for Glip-Met and two other drugs.  Shortly after speaking to M.A., N.O. sent an email to Malek and A.S. titled "Mylan," stating:  "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone.  They are looking at price increases as well on a number of products."

333.    Teva and Mylan were also in frequent communication during this time period.  For example, J.N., Vice President of Sales at Mylan, spoke with D.R., a National Accounts

Director at Teva, multiple times on May 9, 2014, including one call that lasted more than seven (7) minutes. The two continued to stay in close contact throughout the rest of 2014.

334. On May 9, 2014, Heritage held another internal call about "Price Increases." Glip-Met was again on the list of drugs slated for a price increase.

335. On June 26, 2014, A.S. informed her contact at a large wholesaler customer that prices would be going up for Glip-Met market wide by 100% as of July 1, 2014. Heritage began sending out Price Increase Notices to its customers for Glip-Met the same day.

336. By July 9, 2014, Heritage had successfully been able to increase prices nationwide to at least 27 different customers for Glip-Met.

337. As promised, neither Teva nor Mylan significantly challenged Heritage on its price increases. Teva, in fact, increased its bid prices to potential customers, and by November of 2014, K.F. reported to Malek internally that "a majority" of the Heritage price increases for Glip-Met "had stuck up to [that] point."

338. This agreement between Heritage, Mylan and Teva was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### iv. *Glyburide*

339. Glyburide is an oral diabetes medication used to treat Type 2 diabetes. Also known by the brand names DiaBeta® or Micronaise®, it is used to control blood sugar levels.

340. As of April 2014, Heritage's only two competitors for Glyburide were Teva and Aurobindo.

341. Jason Malek was responsible for communicating with Teva regarding Glyburide price increases. Malek spoke with N.P., his contact at Teva, on April 15, 2014 for more than

seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Glyburide

and other drugs.  During that phone call, N.P. agreed that if Heritage did raise the price of

Glyburide (and/or the other drugs), Teva would follow with its own price increase or, at least,

would not challenge Heritage's price increases by seeking to underbid and take Heritage's

accounts.  Malek and N.P. spoke several more times over the next several months and confirmed

the agreement to raise prices, and Malek updated N.P. on the progress of the Heritage increases.

342.    Several different Heritage employees were also able to successfully communicate

with their counterparts at Aurobindo and reach agreements to raise the price of Glyburide.

343.    For example, on May 8, 2014, D.L. of Heritage spoke by phone with P.M. of

Aurobindo for sixteen (16) minutes.

344.    On May 9, 2014, Heritage held another internal call about "Price Increases."

Glyburide was again on the list of drugs slated for a price increase.

345.    Less than a week later, A.S. spoke to T.G. from Aurobindo about the Heritage

"price increase strategies" for Glyburide and other drugs, during an MMCAP conference in

Minnesota.  After meeting with the Aurobindo representative on May 14, 2014, A.S. reported to

Malek that T.G. had expressed "similar like minding on the pricing strategies we discussed."

346.    On June 23, 2014, Heritage employees held a "Price Change Call," where they

discussed the specific percentage amounts by which they would seek to increase certain drugs,

and the strategies for doing so.  Among those included on the list was Glyburide, which was

slated for a 200% increase.

347.    Around this time Heritage also learned that there may be a new entrant in the

Glyburide market.  On June 25, 2014, A.S. texted her friend K.A., a Corporate Account

Specialist at Citron.  A.S. wanted to determine whether Citron would be selling Glyburide in the
near future:

> A.S.:  "Work question: is Citron launching Glyburide anytime
> soon?"
>
> K.A.:  "Yes we currently have the product in our warehouse."
>
> A.S.:  "We are raising the price right now -- just letting you know.
> Teva says they will follow."
>
> A.S.:  "Aurobindo agrees too."
>
> K.A.:  "?"
>
> K.A.:  "You have micronaise brand equivalent."
>
> K.A.:  "And are you also raising your wacs?"
>
> A.S.:  "Sorry -- was on conference call.  Ours is Micronase?  Is
> yours Micro or Diabeta?"
>
> K.A.:  "Micro"
>
> A.S.:  "I don't think we changing WAC - verifying now"
>
> K.A.:  "Okay i talked to [K.S., Executive Vice President, Sales &
> Marketing at Citron] we are def in to raise pricing... are doing this
> immediately, i know she was mentioning teva can take a while to
> raise prices"
>
> A.S.:  "Teva is slow but conversations have been good."
>
> A.S.:  "No change to WAC for us"
>
> A.S.:  "We are raising our customers 200% over current market
> price"
>
> K.A.:  "Okay ill make sure the appropriate people find out"
>
> A.S.:  "Teva has 66% of mkt- great target for share! By [sic] [t]hey
> should play fair.  Aurobindo and us each have about 18% share.
> Good luck!"

K.A.: "Thanks! Is this something you will be doing like this week?"

A.S.: "Letters going out this week! A lot of customers have 30 day notices and price protection so real price will be felt in 30+ days"

K.A.: "Perfect makes sense... Your not doing anything with glyb/met pricing right?"

A.S.: "Not yet- but is on a short list!"

A.S.: "Glyburide and Fosi/HCTZ are increasing too- those are Aurobindo items too"

K.A.: "Okay yeah we have that too... Thanks for the info!"

348. Shortly after this text message exchange, A.S. reported to the Heritage sales team, in an email titled "Citron: Glyburide", that "Citron is launching soon – product is in their warehouse now. They have our version – rated to Micronase. They are on board – communication is good." In a reply the next day, N.O. cautioned that "[t]hey will still need to get some market share. May keep away initially, but we need to be prepared to lose some."

349. On June 26, 2014, A.S. informed her contact at a large wholesaler customer that Heritage's prices would be going up for Glyburide market wide by 200% as of July 1, 2014.

350. On July 1, 2014, K.S. of Citron, called D.L. at Heritage, confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan. They spoke for nearly thirteen (13) minutes. According to A.S.'s notes, K.S. told D.L. that Heritage employees should not try to communicate with Citron through email. She also told D.L. that A.S. should not communicate through K.A., but should instead call L.S., Vice President of Sales at Citron, if she had sensitive information to convey about Glyburide or the other price increase drugs.

351.    The next day, July 2, 2014, L.S. of Citron called A.S. and they spoke for nearly twenty-two (22) minutes. They continued to speak frequently through July and August 2014 about Glyburide and other drugs.

352.    After reaching agreement with competitors Aurobindo, Citron and Teva to raise prices for Glyburide, Heritage began implementing the price increases. Price Increase Notices were sent out to customers beginning on June 26, 2014. By July 9, 2014, Heritage had been able to successfully increase prices for Glyburide to at least seventeen (17) different customers.

353.    The unlawful agreement resulted in specific price increases to customers who sold Glyburide to customers nationwide. For example, on July 9, 2014, Teva was contacted by a large national retail chain requesting a bid on both Glyburide and Nystatin, due to the Heritage price increases. The request was forwarded to N.P., with the questions: "Are you aware of the below? Should we engage?"

354.    N.P. responded by reiterating her understanding of the agreement between Heritage and Teva on the two drugs at issue: "I am aware. Heritage is likely following Teva on the Nystatin. They are likely leading Glyburide Micronase. Per our conversation, please enter in Delphi for tracking purposes, but we will not be bidding. Thanks."

355.    By July 9, 2014, Teva had also increased its WAC pricing on Glyburide. On July 15, 2014, Citron increased its WAC and AWP pricing for Glyburide to be in line with the price increases adopted by Heritage.

356.    After Heritage raised its price to one large wholesaler in July 2014, that wholesaler solicited bids from both Teva and Aurobindo in an effort to obtain lower pricing. On July 25, 2014, for example, the large wholesaler sent an email to N.P. at Teva indicating that

there had been a "change in market dynamics" for Glyburide and certain other drugs and requesting a bid. The same day, the wholesaler sent an identical email to T.G. at Aurobindo.

357.    This sparked immediate communication between the competitors as they tried to ensure uniformity and compliance with the scheme. For example, on July 25, 2014, Malek sent a text message to N.O. with the following direction: "Tell [T.G. at Aurobindo] to stay away from [the wholesaler]." N.O. then called T.G. and they spoke for more than thirteen (13) minutes. During that call N.O. conveyed the direction that Aurobindo should not provide a bid to the wholesaler. After conveying this message, N.O. responded to Malek's text message simply: "Done."

358.    Malek also called N.P. at Teva the same day and they spoke for more than fifteen (15) minutes.

359.    After speaking with Heritage, both Teva and Aurobindo declined to provide a bid to the wholesaler.

360.    By mid-July, Teva also added Glyburide to its list of potential customer price increase items for the third quarter of 2014 and began to evaluate its own price increases.

361.    As Citron entered the market in July 2014, it set a target of less than 10% market share. During this time and over the next several months it remained in frequent contact with Heritage to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share without eroding the price increases.

362.    Citron also communicated directly with Aurobindo. On July 28, 2014, L.S. of Citron called and texted P.M. at Aurobindo several times until they were finally able to speak by phone for more than twenty-four (24) minutes. These were the first and only communications ever between the two by phone or text.

363.     This anticompetitive agreement to avoid competition and unlawfully increase

prices for Glyburide continued until at least December 2015, and the effects continue to this day.

364.     This agreement between Heritage, Teva, Aurobindo and Citron was part of an

overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably

restrain trade in the generic pharmaceutical industry.

### *v.*     ***Glyburide-Metformin***

365.     Glyburide-Metformin, also known by the brand name Glucovance®, is an oral

medication used to treat Type 2 diabetes.

366.     As of April 2014, Heritage's competitors in the market for Glyburide-Metformin

were Teva, Aurobindo and Actavis.  Heritage had only 5% market share at that time, but

nonetheless wanted to raise prices.

367.      Jason Malek was responsible for communicating with Teva regarding Glyburide-

Metformin price increases.  Malek spoke with N.P., his contact at Teva, on April 15, 2014 for

more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of

Glyburide-Metformin and other drugs.  During that phone call, N.P. agreed that if Heritage did

raise the price of Glyburide-Metformin (and/or the other drugs), Teva would follow with its own

price increase or, at least, would not challenge Heritage's price increases by seeking to underbid

and take Heritage's accounts.  Malek and N.P. spoke several more times over the next several

months and confirmed the agreement to raise prices, and Malek updated N.P. on the progress of

the Heritage increases.

368.     A.S. was responsible for communicating with Defendant Actavis about

Glyburide-Metformin and one other drug.  On April 22, 2014, shortly after the initial Heritage

"Price Increase Discussion," A.S. called M.D., Director of National Accounts at Actavis, and

they spoke for more than nine (9) minutes. Upon information and belief, during that call A.S. and M.D. reached an agreement to raise the price of Glyburide-Metformin and the other drug, Verapamil.

369. M.D. conveyed the message internally to the sales and pricing team at Actavis that Heritage was looking to take a price increase on Glyburide-Metformin and the other drug. Immediately after speaking to A.S., M.D. called two different Senior Pricing Managers at Actavis, J.R. and C.K. The information spread quickly throughout the sales and pricing teams at Actavis. In an internal email dated April 28, 2014 regarding potential price increases for a list of different drugs, an Actavis pricing manager added: "[M.D.] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

370. Only a few days later, on May 1, 2014, M.F., the Vice President of Marketing, Pricing and Contracts at Actavis, who had also received the April 28 email discussed above, called D.R. at Teva, and they spoke for five (5) minutes. They spoke three more times on May 6, 2014, with one of the calls lasting fifteen (15) minutes, and continued to communicate frequently over the next several months.

371. Several different Heritage employees were also able to successfully communicate with their counterparts at Aurobindo and reach agreements to raise the price of Glyburide-Metformin.

372. For example, on May 8, 2014, D.L. of Heritage spoke by phone with P.M. of Aurobindo for sixteen (16) minutes. Similarly, on May 14, 2014, A.S. spoke in person with T.G. at Aurobindo, and reported that she had "found similar like minding on the pricing strategies we discussed."

373. On May 8, 2014, Malek also emailed the Heritage sales team asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with price increases discussed during the April 22, 2014 conference call. A.S. responded: "Jason: I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details."

374. On May 9, 2014, Heritage held another internal call about "Price Increases." Glyburide-Metformin was still on the list of drugs slated for a price increase.

375. On May 12, 2014, M.F. of Actavis spoke twice with the CEO of Aurobindo, B.C. Between May 19 and May 22, 2014, M.F. also exchanged thirty (30) text messages with D.R. of Teva.

376. Through at least June 2014, Heritage still planned to increase prices for Glyburide-Metformin. On June 25, 2014, A.S. had a text message exchange with K.A. at Citron about raising prices for Glyburide. After K.A. had agreed to raise prices on Glyburide, she asked A.S. "Your [sic] not doing anything with glyb/met pricing right?" To which A.S. responded: "Not yet- but is on a short list!" Although Citron had approval to sell Glyburide-Metformin, it was not actively selling the drug and had zero market share throughout this time period.

377. Although Heritage did not increase customer prices for Glyburide-Metformin in July 2014, like it did for many other drugs, it did increase its WAC prices. In an internal Citron email dated July 9, 2014, K.S. of Citron noted that both Heritage and Teva had increased their WAC pricing on 3 different drugs, including Glyburide-Metformin. In that same internal conversation, a Citron employee involved in pricing reiterated the company's intent to "match their price increases."

378.     On August 20, 2014, A.S. exchanged text messages with S.K. at Sun.  During this text message exchange, A.S. described agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil:

> S.K.: "Have you heard anything about an Actavis price increase"
>
> A.S.: "I heard they were on board with it.  What item specifically?"
>
> S.K.: "I don't know.  I am just hearing about an increase but no details. What product have you heard about"
>
> A.S.: "We were communicating on Glyburide/Metformin and Verapamil"

379.     This agreement between Heritage, Teva, Aurobindo and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### vi.     *Leflunomide*

380.     Leflunomide, also known by the brand name Arava®, is an immunosuppressive disease-modifying antirheumatic drug used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

381.     As of April 2014, Heritage was a dominant player in the market for Leflunomide, holding a 61% share.  Its main competitors at that time were Defendants Apotex and Teva.

382.     Jason Malek was responsible for communicating with Teva about Leflunomide price increases.  Malek spoke with N.P., his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Leflunomide and other drugs.  During that phone call, N.P. agreed that if Heritage did raise the price of Leflunomide (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's

accounts. Malek and N.P. spoke several more times over the next several months and confirmed

the agreement to raise prices, and Malek updated N.P. on the progress of the Heritage increases.

383.    M.E. was responsible for communicating with Defendant Apotex about

Leflunomide. On May 2, 2014, M.E. placed his first-ever phone call to D.V., a Sales Manager at

Apotex. They spoke for more than thirteen (13) minutes.

384.    On May 6, 2014, A.S. sent an email to Malek about several topics, one of which

was Leflunomide. Heritage had recently learned that Teva might be leaving the market for

Leflunomide. A.S. commented that "the Teva discontinuation of Leflunomide has everyone in a

fuss! Wow – can we take more share???" Malek responded that, with regard to Leflunomide,

"we may give some to apotex and follow our strategy we discussed. Will have clarity by

tomorrow."

385.    That same day, M.E. had two (2) more phone calls with D.V.   Shortly after those

calls M.E. also sent an email to Malek, noting that Apotex "has taken another shot at our

Leflunomide . . . I am waiting for a callback from the VP of Apotex before we do anything."

Malek replied to M.E.'s email and confirmed the strategy he mentioned to A.S., telling M.E.

"Let's walk from leflunomide." B.H., the Vice President of Sales at Apotex, then called M.E.

and left a voicemail. M.E. returned her call and they spoke for more than nine (9) minutes,

followed by another call shortly after that for almost eight (8) minutes. M.E. and B.H. followed

up those phone conversations with two more the next day, May 7, 2014. Upon information and

belief, during these conversations Heritage and Apotex agreed to avoid competition and increase

prices on Leflunomide.

386.    On May 8, 2014, Malek sent an email to the Heritage sales team asking each of

them to confirm which competitors they had been able to speak to because Heritage needed "to

91

move forward with the plan asap." M.E. responded immediately that he had spoken "with everyone" and he was only waiting for feedback from one competitor with regard to the drug Meprobamate.

387.    On May 9, 2014, Heritage held another internal call about "Price Increases." Leflunomide was still on the list of drugs slated for a price increase. On May 27, 2014, Heritage learned that Apotex took a price increase on Leflunomide. When M.E. passed this information along to Malek, Malek confirmed that "we are going to increase."

388.    Heritage began sending out Price Increase Notices to its customers for Leflunomide in late June. By July 9, 2014, Heritage had been able to successfully increase prices to at least fifteen different customers nationwide.

389.    Teva began to exit the market for Leflunomide in or around July 2014, and therefore did not ultimately raise its price, despite its initial agreement to follow the Heritage price increase.

390.    This agreement between Heritage, Teva and Apotex was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### *vii.* *Nystatin*

391.    Nystatin, also known by the brand name Mycostatin®, among others, is a medication used to fight fungal infections.

392.    In 2013 and 2014, Heritage's two main competitors for Nystatin were Teva and Sun, through its division Mutual Pharmaceuticals ("Mutual").

393.    Communications between Heritage, Teva and Mutual/Sun about Nystatin preceded Heritage's "Price Increase Discussion" in April 2014.

394.     In or about June 2013, Teva began to consider raising its price of Nystatin.

Defendant Sun, through its division Mutual, had increased Nystatin prices on April 15, 2013.

When it was suggested internally to N.P. in June 2013 that Teva might want to add Nystatin to

its current list of price increase items, N.P. initially responded negatively.

395.     N.P. began speaking to Malek shortly thereafter. On July 9, 2013, N.P. called

Malek and they spoke for more than twenty-one (21) minutes. This was the first call between

N.P. and Malek since N.P. had been hired by Teva in April 2013 to "run the pricing team." They

spoke again on July 23, 2013 for nearly ten (10) minutes, and twice on July 30, 2013 with the

second of those two calls lasting more than twelve (12) minutes. In the short time between

Malek's two July 30 calls with N.P. of Teva, A.S. of Heritage also spoke to S.K. of Sun/Mutual

for nearly eleven (11) minutes.

396.     Heritage and Mutual/Sun were in close contact, both before and after Mutual took

the Nystatin price increase in April 2013. In fact, the day after Mutual increased its price for

Nystatin – April 16, 2013 – S.K. of Sun called A.S. and they spoke for nearly forty (40) minutes.

They continued to communicate regularly throughout the summer of 2013.

397.     By late July 2013, Nystatin appeared on a list of potential "Price Increase

Candidates," at Teva, created by N.P., with the following comments: "Heritage involved; follow

Mutual."

398.     After these conversations with Teva and Mutual/Sun, Heritage also began

exploring a price increase for Nystatin. On August 1, 2013, Malek sent an internal email to

N.O., M.E. and A.S. stating: "Team: Pricing dynamics may be changing for us for Nystatin.

Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they

kept it." On August 20, 2013, Malek sent an email titled "PRICE INCREASES" to K.F. at

93

Heritage, with a copy to Glazer, stating "KF: We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, one of which was Nystatin.

399.    N.P. went on maternity leave from August 12, 2013 through the end of that year, and the decision to raise Nystatin prices was temporarily put on hold at both Teva and Heritage. But shortly after her return from maternity leave, N.P. and Malek began communicating again. N.P. called Malek on February 4, 2014 and left a message. Malek returned her call the next day, and they spoke for more than one hour. This was the first communication between the two since N.P. went on maternity leave.

400.    On February 7, 2014, N.P. created a spreadsheet titled "PI Candidates". That spreadsheet included Nystatin and Theophylline as candidates for price increases. With regard to Nystatin, the spreadsheet included the comments "Shared with Heritage and Mutual/Caraco" and "WAC increase likely."

401.    Malek and N.P. had a series of several phone calls in February and March 2014. By April 2014, Teva decided to increase prices for both Nystatin and Theophylline – and Heritage planned to follow those price increases to match Teva.

402.    Teva began implementing the price increases for Nystatin with an effective date of April 4, 2014, doubling the WAC price from $47.06 to $100.30.

403.    By the time that Heritage held its "Price Increase Discussion" on April 22, 2014, it already had its agreement with Teva in place with respect to Nystatin and Theophylline, and Teva had already taken the lead on implementing the price increases.

404.     A.S. was responsible for communicating with Defendant Sun about Nystatin.  On April 22, 2014, shortly after the initial Heritage "Price Increase Discussion," A.S. called S.K., her counterpart at Sun, and spoke for more than forty-five (45) minutes.

405.     After this call, A.S. immediately sent an email to Glazer and Malek titled "Conference call follow up."  She reported her agreement with S.K. to her supervisors:  "Caraco notified and on board."  Glazer immediately replied:  "No emails please."

406.     On May 9, 2014, Heritage held another call regarding "Price Increases."  Nystatin was again on the list of drugs slated for a price increase.

407.     On June 23, 2014, Heritage employees held a "Price Change Call," where they discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so.  Nystatin was included on the list and was slated for a 95% increase.  In her notes about the call, K.B., Associate Director, International Sales at Heritage, indicated that Heritage had to increase its WAC pricing for Nystatin, because Teva had "increased WAC already."

408.     On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before those changes were to be implemented.  Nystatin was again on the list of drugs slated for a price increase.

409.     While she was still on the Heritage "Product Price Changes" conference call on June 25, 2014, A.S. exchanged text messages with her contact at competitor Sun, S.K., to let her know the details of the anticipated price increase:

> A.S.:  "Work news: we are raising price on Nystatin.  Just letting you know. :)"
>
> S.K.:  "How much"
>
> A.S.:  "Double the price"

> A.S.: "On conf call- will call you back"
>
> S.K.: "Yes"

410.    Malek also spoke with N.P. the same day for nearly fourteen (14) minutes.
During that call, Malek reported that Heritage would be sending out Price Increase Notices the
next day for Nystatin and several of the other drugs that Heritage and Teva had agreed to raise
prices on.

411.    Heritage began sending out Price Increase Notices to its customers for Nystatin
the next day.  By July 9, 2014, Heritage had been able to successfully increase prices to at least
fourteen different customers nationwide.

412.    In addition to leading the price increases, Teva also refused to bid or challenge the
Heritage price increases when requested by Heritage customers.  For example, on July 8, 2014 a
large retail customer sent an email to a Teva representative requesting a quote for Nystatin given
a price increase from its current supplier.  The Teva representative forwarded that email to N.P.,
asking "Are you aware of the below?  Should we engage?"  N.P. responded that she was aware,
and that Heritage would be "following Teva on the Nystatin" and "leading Glyburide."  She
concluded that "we will not be bidding.  Thanks."

413.    By at least August of 2014, exact dates unknown, Sun also had begun
implementing price increases on Nystatin.

414.    This agreement between Heritage, Teva and Sun was part of an overarching
conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in
the generic pharmaceutical industry.

### *viii.*   ***Paromomycin***

415.    Paromomycin, also known by the brand names Humatin®, Catenulin® and others, is a broad spectrum oral capsule antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

416.    In April 2014, Heritage had approximately 65% market share for Paromomycin. Heritage's only competitor at the time was Defendant Sun, through its division Caraco.

417.    A.S. was responsible for communicating with Defendant Sun about Paromomycin. On April 22, 2014, shortly after the initial Heritage "Price Increase Discussion," A.S. called S.K., her counterpart at Sun, and they spoke for more than forty-five (45) minutes.

418.    After this call, A.S. immediately sent an email to Glazer and Malek titled "Conference call follow up." In that email she advised that "Caraco notified and on board." Glazer immediately responded: "No emails please."

419.    On May 8, 2014, Malek emailed the Heritage sales team asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with the price increases discussed during the April 22, 2014 conference. A.S. responded: "Jason: I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details."

420.    On May 9, 2014, Heritage held another conference call regarding "Price Increases." Paromomycin was again on the list of drugs targeted for a price increase.

421.    On May 20, 2014, A.S. spoke again to S.K. for more than twelve (12) minutes. During that call, S.K. informed A.S. that Sun would be "temporarily discontinuing" production of Paromomycin due to a need to transfer its manufacturing operations to another facility. A.S.

97

immediately informed Malek of the news, and he responded: "Need price increase to go immediately. Jack it up."

422.    Sun continued to sell Paromomycin inventory through at least January 2015, maintaining a market share of almost 40% during that time. Heritage nonetheless felt comfortable raising its prices for Paromomycin knowing that an agreement was already in place with Sun.

423.    On June 23, 2014, Heritage employees held a "Price Change Call," where they discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so. Among those included on the list was Paromomycin, which at that time was slated for a 100% increase.

424.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. Paromomycin was again on the list of drugs slated for a price increase.

425.    Heritage began sending out Price Increase Notices to its customers for Paromomycin the next day. By July 9, 2014, Heritage had been able to successfully increase prices to at least thirteen (13) different customers nationwide.

426.    This agreement between Heritage and Sun was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### ix.    *Theophylline ER*

427.    Theophylline ER, also known by the brand name Theodur®, is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems,

98

such as chronic bronchitis and emphysema. Theophylline ER is an extended release medication, which means that it is released into the body throughout the day.

428.    In 2014, Heritage's primary competitor for Theophylline ER was Teva.

429.    Teva began to consider raising the price of Theophylline ER in early 2014. N.P. called Malek on February 4, 2014 and left a message. Malek returned her call the next day, and they spoke for more than one hour. This was the first communication between the two since before N.P. went on maternity leave in August 2013.

430.    On February 7, 2014, N.P. created a spreadsheet titled "PI Candidates". That spreadsheet included Theophylline as a candidate for a price increase.

431.    Malek and N.P. had a series of phone calls in February and March 2014. By April 2014, Teva had decided to increase prices for Theophylline, and Heritage had planned to follow the price increases to match Teva.

432.    Teva began implementing the price increases across the board for Theophylline with an effective date of April 4, 2014.

433.    Shortly after implementing the price increases, on April 24, 2014, Teva received the following email from a consumer of Theophylline, with the subject line "PLIVA.com [Info] Price Gouging":

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please

99

> respond to me at the above email address. If you prefer you can
> respond to Senator Schumer a New York State representative.

434.     The email was forwarded to a member of the Government Affairs Department at

Teva, who asked: "Can I get some details on the specifics of this product and the price increase.

I'm hoping someone increased the price and we had to follow it up. Or, API or something I can

give the senate." Ultimately, the request was forwarded to N.P. – who had directed and agreed to

the price increases – with the question: "Please let me know the specifics of the price increase.

Anything positive I can say?" N.P. responded: "I don't have a great story. I'll take a closer

look." The real story was that Teva conspired with Heritage to raise market prices.

435.     By the time that Heritage held its "Price Increase Discussion" on April 22, 2014,

it already had its agreement in place with Teva with respect to Theophylline, and Teva had

already taken the lead on implementing the price increases. Malek specifically instructed the

Heritage sales team during that meeting that Heritage would be following the Teva price increase

on Theophylline.

436.     On May 9, 2014, Heritage held another call regarding "Price Increases."

Theophylline was again on the list of drugs slated for a price increase.

437.     On June 23, 2014, Heritage employees held a "Price Change Call," where they

discussed the specific percentage amounts they would seek to increase certain drugs, and the

strategies for doing so. Among those included on the list was Theophylline, which was slated for

a 150% increase.

438.     On June 25, 2014, Heritage held one last call regarding "Product Price Changes"

before the price increases were to be implemented. Theophylline was again on the list of drugs

slated for a price increase.

439.    Malek also spoke with N.P. the same day for nearly fourteen (14) minutes. During that call, Malek reported that Heritage would be sending out Price Increase Notices shortly for Theophylline and several of the other drugs for which Heritage and Teva had agreed to raise prices.

440.    Heritage began sending out Price Increase Notices to its customers for Theophylline the next day.  By July 9, 2014, Heritage had been able to successfully increase prices to at least twenty (20) different customers nationwide, much as Teva had done three months earlier.

441.    On June 30, 2014, N.P. sent an email to Teva employees stating that "[i]t appears that Heritage took an increase [on Theophylline] to follow Teva.  The new pricing looks like it will be effective tomorrow and matches Teva's WACs."  N.P. noted to her Teva colleagues that this activity "will likely trigger some bid requests/activity," but stated that Teva "should not be considering decreases."

442.    This agreement between Heritage and Teva was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### x.    *Verapamil*

443.    Verapamil, also known by various brand names, is a calcium channel blocker used to treat hypertension, angina and certain heart rhythm disorders.  It works by relaxing the muscles of the heart and blood vessels.

444.    In April 2014, Heritage's competitors for Verapamil were Defendants Mylan and Actavis.

101

445.    N.O. was primarily responsible for communicating with Mylan about Verapamil and other drugs. N.O. spoke to M.A. of Mylan on April 23, 2014 and reached an agreement to raise prices for Verapamil and two other drugs. Immediately after hanging up the phone with M.A., N.O. sent an email to Malek and A.S. titled "Mylan," stating: "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

446.    A.S. was responsible for communicating with Defendant Actavis about Verapamil and one other drug. On April 22, 2014, within hours after the initial Heritage "Price Increase Discussion," A.S. called M.D., Director of National Accounts at Actavis, and they spoke for more than nine (9) minutes. Upon information and belief, during that call A.S. and M.D. reached an agreement to raise the price of Verapamil and another drug, Glyburide-Metformin.

447.    M.D. conveyed the message internally to the sales and pricing team at Actavis that Heritage was looking to take a price increase on Verapamil. Immediately after speaking to A.S., M.D. called two different Senior Pricing Managers at Actavis, J.R. and C.K. The information spread quickly throughout the sales and pricing teams at Actavis. In an internal email dated April 28, 2014 regarding potential price increases for a list of different drugs, an Actavis pricing manager added: "[M.D.] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

448.    Just over a week later, on May 6, 2014, M.F., the Vice President of Marketing, Pricing and Contracts at Actavis, who had also received the April 28 email discussed above, called J.N., a Vice President at Mylan, and left a message. J.N. returned the call on May 9, 2014 and the two spoke for just over three (3) minutes. They spoke again on May 19, 2014 for almost seven (7) minutes, and continued to communicate frequently over the next several months.

102

449.     On May 8, 2014, Malek emailed the Heritage sales team asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with price increases discussed during the April 22, 2014 conference. A.S. responded: "Jason: I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details."

450.     On May 9, 2014, Heritage held another conference call regarding "Price Increases." Verapamil was again on the list of drugs targeted for a price increase.

451.     Although Heritage did not increase prices for Verapamil market wide in July, 2014, like it did for many other drugs, it did raise price on Verapamil to at least one customer as part of its price increase initiative.

452.     On August 20, 2014, A.S. exchanged text messages with S.K. at Sun. During this text message exchange, A.S. described agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil:

> S.K.: "Have you heard anything about an Actavis price increase"
>
> A.S.: "I heard they were on board with it. What item specifically?"
>
> S.K.: "I don't know. I am just hearing about an increase but no details. What product have you heard about"
>
> A.S.: "We were communicating on Glyburide/Metformin and Verapamil"
>
> A.S.: "We haven't touched verapamil yet"

453.     This agreement between Heritage, Mylan and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

103

### C. Consciousness of Guilt

454.     The Defendants were aware that their conduct was illegal. They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.

455.     Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of wrongdoing.

456.     None of the email accounts maintained by Heritage had any document retention policy associated with them. Heritage executives were aware of this, and utilized the lack of a company retention policy to routinely destroy emails that memorialized their illegal conduct. Heritage executives were aware that in order to permanently destroy an email, however, the email had to be deleted from more than just the recipient's in box. For example, on June 27, 2012, Heritage CEO Glazer sent an email to Malek titled "Email," instructing: "Clean your sent file out as well."

457.     Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing. In a text message dated June 26, 2014, Glazer sternly warned Malek about his use of email: "No emails about products, price and competitors."

458.     That same day, in an email to the entire sales team at Heritage, Glazer made the point as clearly as possible: "We don't talk about pricing dynamics and competition on emails. If you have questions – you can call JM or me directly and then punch yourself in the face."

459.     Heritage was not alone in its efforts to conceal its illegal activity. For example, in June 2014, shortly after a text message exchange between K.A. of Citron and A.S. from Heritage wherein the two competitors discussed and agreed to raise the price of Glyburide, K.S. from Citron called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan.

According to A.S.'s notes, K.S. told D.L. that Heritage employees should not communicate with Citron through email, but should instead call L.S., the Vice President of Sales at Citron, if they had information to convey.

460.    As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection. For example, on June 2, 2015, after it had become public that Connecticut and the DOJ were investigating the industry, Malek sent A.S. a text message stating: "Just got your email on meprobamate. Let's avoid emailing about other manufacturers and having discussions with them. Can be misconstrued based on what we are hearing elsewhere...." Heritage did not produce the referenced email in response to Connecticut's subpoena, even though the subpoena sought all such documents. Upon information and belief, the referenced email has, along with other relevant documents, been deleted by Heritage.

461.    Upon information and belief, Glazer, Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

462.    G.S. of Mayne, realizing the illegal nature of the agreements she entered into, also deleted from her cell phone several of the most incriminating text messages between her and A.S. before the data on her phone was imaged and produced to Connecticut.

## V.    TRADE AND COMMERCE

463.    At all times relevant to this Complaint, the activities of the Defendants in manufacturing, selling and distributing generic pharmaceutical drugs, including but not limited to Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin,

Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil and Zoledronic Acid, among others, were in the regular, continuous and substantial flow of interstate trade and commerce and have had and continue to have a substantial effect upon interstate commerce. The Defendants' activities also had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States.

## VI.   MARKET EFFECTS

464.   The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the numerous generic pharmaceutical drugs identified herein, and have directly resulted in an increase in consumer prices for those drugs.

465.   By unreasonably and illegally restraining competition for the generic pharmaceutical drugs identified herein, Defendants have deprived the Plaintiff States and their consumers of the benefits of competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve and protect.

466.   As a direct and proximate result of the unlawful conduct alleged above, Plaintiff States and consumers were not and are not able to purchase, or pay reimbursements for purchases of the various generic pharmaceutical drugs identified herein at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior. Instead, they have been and continue to be forced to pay artificially high prices. Consequently, they have suffered substantial injury in their business and property in that, *inter alia*, they have paid more and continue to pay more for the various generic pharmaceutical drugs identified herein than they would have paid in an otherwise competitive market.

467.    As a direct and proximate cause of the unlawful conduct alleged above, the

general economies of the Plaintiff States have sustained injury and the Plaintiff States are

threatened with continuing injury to their business and property unless Defendants are enjoined

from continuing their unlawful conduct.

468.    Plaintiff States do not have an adequate remedy at law.

469.    All conditions precedent necessary to the filing of this action have been fulfilled,

waived or excused.

**COUNT ONE (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST
DEFENDANTS HERITAGE AND SUN, AND ALL OTHER CORPORATE
DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL
CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR THE GENERIC
DRUG NIMODIPINE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

470.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth

herein.

471.    Beginning as early as 2012, Defendants Heritage and Sun knowingly agreed to

allocate and divide the market for the generic drug Nimodipine.  During the course of this

ongoing scheme, Defendants Heritage and Sun also agreed to fix and raise prices, and rig bids,

for Nimodipine.

472.    These agreements are facially anticompetitive because they allocate customers for

the marketing and sale of the generic drug Nimodipine, artificially raise prices, and limit

competition among the Defendants.  These agreements have eliminated any form of price

competition in the market for Nimodipine because at all relevant times, Heritage and Sun were

the only competitors.

473.    The conspiracy substantially affected and still affects interstate commerce.

474.     The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

475.     As a direct and proximate result of these conspiracies, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Nimodipine at supra-competitive prices, and Defendants Heritage and Sun have enjoyed ill-gotten gains from the sales of Nimodipine.

476.     This agreement between Heritage and Sun was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Nimodipine. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT TWO (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE AND ASCEND, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR THE GENERIC DRUG NIMODIPINE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

477.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

478.     Beginning as early as April 2014, Defendants Heritage and Ascend knowingly agreed to allocate and divide the market for the generic drug Nimodipine. During the course of this ongoing scheme, Defendants Heritage and Ascend also agreed to fix and raise prices, and rig bids, for Nimodipine.

108

479.     These agreements are facially anticompetitive because they allocate customers for the marketing and sale of the generic drug Nimodipine, artificially raise prices, and limit competition among the Defendants. These agreements have eliminated any form of price competition in the market for Nimodipine because at all relevant times, Heritage and Ascend were the only competitors.

480.     The conspiracy substantially affected and still affects interstate commerce.

481.     The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

482.     As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Nimodipine at supra-competitive prices, and Defendants Heritage and Ascend have enjoyed ill-gotten gains from the sales of Nimodipine.

483.     This agreement between Heritage and Ascend was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Nimodipine. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT THREE (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE AND DR. REDDY'S, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS FOR THE GENERIC DRUG ZOLEDRONIC ACID IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

484.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

485.    Beginning as early as 2013, Defendants Heritage and Dr. Reddy's knowingly agreed to allocate and divide the market for the generic drug Zoledronic Acid.

486.    This agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Zoledronic Acid, artificially raises prices, and limits competition among the Defendants.  This agreement has eliminated any form of price competition in the market for Zoledronic Acid between Defendants Heritage and Dr. Reddy's.

487.    This conspiracy substantially affected and still affects interstate commerce.

488.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

489.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Zoledronic Acid at supra-competitive prices, and Defendants Heritage and Dr. Reddy's have enjoyed ill-gotten gains from the sales of Zoledronic Acid.

490.    This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Zoledronic Acid.  As participants in the

110

overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT FOUR (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE AND DR. REDDY'S, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR THE GENERIC DRUG MEPROBAMATE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

491.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

492.     Beginning as early as 2013, Defendants Heritage and Dr. Reddy's knowingly agreed to allocate and divide the market and raise prices for the generic drug Meprobamate.

493.     This agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Meprobamate, artificially raises prices, and limits competition among the Defendants. This agreement has eliminated any form of price competition in the market for Meprobamate between Defendants Heritage and Dr. Reddy's.

494.     This conspiracy substantially affected and still affects interstate commerce.

495.     The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

496.     As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Meprobamate at supra-competitive prices, and Defendants Heritage and Dr. Reddy's have enjoyed ill-gotten gains from the sales of Meprobamate.

497.     This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably

111

restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Meprobamate. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT FIVE (BY ALL PLAINTIFF STATES AGAINST DEFENDANTS HERITAGE, EMCURE AND MYLAN, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY[3]) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

498.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

499.     Beginning as early as 2013, Defendants Heritage and Mylan knowingly agreed to allocate and divide the market for the generic drug Doxy DR. Defendant Emcure, through its senior most executives and Board members, took active steps to initiate communications and facilitate the conspiracy between Heritage and Mylan, and benefited from the illegal agreement.

500.     This agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Doxy DR, artificially raises prices, and limits competition among the Defendants. This agreement has eliminated price competition in the market for Doxy DR between Defendants Heritage and Mylan.

501.     This conspiracy substantially affected and still affects interstate commerce.

502.     The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

---

[3] At this time, California is only pursuing claims in Count Five against Defendants Heritage and Mylan.

112

503.     As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Doxy DR at supra-competitive prices, and Defendants Heritage, Emcure and Mylan have enjoyed ill-gotten gains from the sales of Doxy DR.

504.     This agreement between Heritage and Mylan, which was facilitated by Defendant Emcure, was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Doxy DR. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT SIX (BY CERTAIN PLAINTIFF STATES[4] AGAINST DEFENDANTS RAJIV MALIK AND SATISH MEHTA) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

505.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

506.     Beginning in 2013, Defendant Satish Mehta took active steps to facilitate an illegal conspiracy between Defendants Heritage and Mylan to allocate the market for Doxy DR. Defendant Mehta personally communicated with Defendant Rajiv Malik in order to facilitate conspiratorial communications between Malik, the President of defendant Mylan, and the CEO

---

[4]  The following 38 Plaintiff States join in Count Six against Defendants Rajiv Malik and Satish Mehta: Connecticut, Alabama, Alaska, Arkansas, Arizona, Colorado, Delaware, Hawaii, Idaho, Illinois, Iowa, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Jersey, New Mexico, Nevada, North Dakota, Ohio, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Utah, Virginia, West Virginia and Wyoming.

113

of Defendant Heritage, Jeffrey Glazer with the purpose and effect of allocating the market for Doxy DR.

507.    Defendant Malik also participated directly in the conspiracy between Heritage and Mylan.  Malik personally communicated with Mehta and Glazer, and agreed that Mylan would allocate specific customers to Heritage when it was entering the market for Doxy DR.

508.    This agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Doxy DR, artificially raises prices, and limits competition among the Defendants.  This agreement has eliminated price competition in the market for Doxy DR between Defendants Heritage and Mylan.

509.    This conspiracy substantially affected and still affects interstate commerce.

510.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

511.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Doxy DR at supra-competitive prices, and Defendants Mehta and Malik have personally enjoyed ill-gotten gains from the sales of Doxy DR.

## COUNT SEVEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANTS HERITAGE AND MAYNE, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY[5]) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

512.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

_____

[5]  At this time, California is only pursuing claims in Count Seven against Defendants Heritage and Mayne.

114

513.    Beginning in 2014, Defendants Heritage and Mayne knowingly agreed to allocate and divide the market for the generic drug Doxy DR.

514.    The agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Doxy DR, artificially raises prices, and limits competition among the Defendants.  This agreement has eliminated price competition in the market for Doxy DR between Defendants Heritage and Mayne.

515.    This conspiracy substantially affected and still affects interstate commerce.

516.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

517.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Doxy DR at supra-competitive prices, and Defendants Heritage and Mayne have enjoyed ill-gotten gains from the sales of Doxy DR.

518.    This agreement between Heritage and Mayne was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Doxy DR.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT EIGHT (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, LANNETT, PAR AND MYLAN, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG DOXY MONO IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

519.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

520.     Starting as early as March 2013, Heritage began to communicate with Defendant Lannett about increasing the price of Doxy Mono.  Over the course of the next several months, Defendants Heritage, Lannett, Par and Mylan communicated and agreed to raise prices for, or to refrain from competing for, the generic drug Doxy Mono in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

521.     Defendants Heritage, Lannett, Par and Mylan knowingly became a party to the agreement. The agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants.  The agreement has eliminated price competition in the market for Doxy Mono between Defendants Heritage, Lannett, Par and Mylan.

522.     This conspiracy substantially affected and still affects interstate commerce.

523.     The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of this agreement.

524.     As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Doxy Mono at supra-competitive prices, and Defendants Heritage, Lannett, Par and Mylan have enjoyed ill-gotten gains from the sales of Doxy Mono.

525.    This agreement between Heritage, Lannett, Par and Mylan was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Doxy Mono. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT NINE (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, TEVA AND ZYDUS, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG ACETAZOLAMIDE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

526.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

527.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs. Among those was the generic drug Acetazolamide.

528.    Heritage communicated directly with Defendants Teva and Zydus, and obtained agreements with Teva and Zydus to raise prices for, or to refrain from competing for, the generic drug Acetazolamide in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

529.    Defendants Heritage, Teva and Zydus knowingly became a party to the agreement. The agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants. The agreement has eliminated price competition in the market for Acetazolamide between Defendants Heritage, Teva and Zydus.

530.    This conspiracy substantially affected and still affects interstate commerce.

117

531.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

532.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Acetazolamide at supra-competitive prices, and Defendants Heritage, Teva and Zydus have enjoyed ill-gotten gains from the sales of Acetazolamide.

533.    This agreement between Heritage, Teva and Zydus was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Acetazolamide.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT TEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, AUROBINDO, CITRON, GLENMARK AND SANDOZ, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG FOSI-HCTZ IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

534.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

535.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Fosi-HCTZ.

536.    Heritage communicated directly with Defendants Aurobindo, Citron, Glenmark and Sandoz, and obtained agreements with Aurobindo, Citron, Glenmark and Sandoz to raise

118

prices for the generic drug Fosi-HCTZ in direct violation of Section 1 of the Sherman Act, 15
U.S.C. § 1.

537. Defendants Heritage, Aurobindo, Citron, Glenmark and Sandoz knowingly
became a party to this agreement. This agreement is facially anticompetitive because it
artificially raises prices and limits competition among the Defendants. This agreement has
eliminated price competition in the market for Fosi-HCTZ between Defendants Heritage,
Aurobindo, Citron, Glenmark and Sandoz.

538. This conspiracy substantially affected and still affects interstate commerce.

539. The agreement constitutes an unreasonable restraint of trade that is per se illegal
under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to
demonstrate the anticompetitive character of this agreement.

540. As a direct and proximate result of this conspiracy, Plaintiff States, governmental
entities and/or consumers have been injured in their business or property because they have had
to purchase or reimburse for Fosi-HCTZ at supra-competitive prices, and Defendants Heritage,
Aurobindo, Citron, Glenmark and Sandoz have enjoyed ill-gotten gains from the sales of Fosi-
HCTZ.

541. This agreement between Heritage, Aurobindo, Citron, Glenmark and Sandoz was
part of an overarching conspiracy among all of the corporate Defendants named in this
Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to
artificially fix, raise, stabilize and control the prices for generic drugs, including Fosi-HCTZ. As
participants in the overarching conspiracy, the corporate Defendants are jointly and severally
liable for any harm caused as a result of the conspiracy.

## COUNT ELEVEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, MYLAN AND TEVA, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG GLIPIZIDE-METFORMIN IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

542.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

543.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Glipizide-Metformin.

544.    Heritage communicated directly with Defendants Mylan and Teva, and obtained agreements with Mylan and Teva to raise prices for, the generic drug Glipizide-Metformin in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

545.    Defendants Heritage, Mylan and Teva knowingly became a party to this agreement.  The agreement is facially anticompetitive because artificially raises prices and limits competition among the Defendants.  The agreement has eliminated price competition in the market for Glipizide-Metformin between Defendants Heritage, Mylan and Teva.

546.    This conspiracy substantially affected and still affects interstate commerce.

547.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

548.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Glipizide-Metformin at supra-competitive prices, and Defendants Heritage, Mylan and Teva have enjoyed ill-gotten gains from the sales of Glipizide-Metformin.

120

549.     This agreement between Heritage, Mylan and Teva was part of an overarching

conspiracy among all of the corporate Defendants named in this Complaint to unreasonably

restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and

control the prices for generic drugs, including Glipizide-Metformin. As participants in the

overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm

caused as a result of the conspiracy.

## COUNT TWELVE (BY ALL PLAINTIFF STATES AGAINST DEFENDANTS HERITAGE, TEVA, AUROBINDO AND CITRON, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY[6]) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG GLYBURIDE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

550.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth

herein.

551.     In April of 2014, Heritage devised a scheme whereby it would seek out its

competitors and obtain agreements from them to collectively agree to raise prices for a large

number of generic drugs. Among those was the generic drug Glyburide.

552.     Heritage communicated directly with Defendants Teva, Aurobindo and Citron,

and obtained agreements with Teva, Aurobindo and Citron to raise prices for, the generic drug

Glyburide in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

553.     Defendants Heritage, Teva, Aurobindo and Citron knowingly became a party to

this agreement. The agreement is facially anticompetitive because it artificially raises prices and

limits competition among the Defendants. The agreement has eliminated price competition in

the market for Glyburide between Defendants Heritage, Teva, Aurobindo and Citron.

554.     This conspiracy substantially affected and still affects interstate commerce.

---

[6] At this time, California is only pursuing claims in Count Twelve against Defendants Heritage, Teva, Aurobindo, and Citron.

121

555.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

556.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Glyburide at supra-competitive prices, and Defendants Heritage, Teva, Aurobindo and Citron have enjoyed ill-gotten gains from the sales of Glyburide.

557.    This agreement between Heritage, Teva, Aurobindo and Citron was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Glyburide.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT THIRTEEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, TEVA, AUROBINDO AND ACTAVIS, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG GLYBURIDE-METFORMIN IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

558.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

559.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Glyburide-Metformin.

122

560. Heritage communicated directly with Defendants Teva, Aurobindo and Actavis, and obtained agreements with Teva, Aurobindo and Actavis to raise prices for, the generic drug Glyburide-Metformin in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

561. Defendants Heritage, Teva, Aurobindo and Actavis knowingly became a party to this agreement. The agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants. The agreement has eliminated price competition in the market for Glyburide-Metformin between Defendants Heritage, Teva, Aurobindo and Actavis.

562. This conspiracy substantially affected and still affects interstate commerce.

563. The agreement constitutes an unreasonable restraints of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

564. As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Glyburide-Metformin at supra-competitive prices, and Defendants Heritage, Teva, Aurobindo and Actavis have enjoyed ill-gotten gains from the sales of Glyburide-Metformin.

565. This agreement between Heritage, Teva, Aurobindo and Actavis was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Glyburide-Metformin. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT FOURTEEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, TEVA AND APOTEX, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG LEFLUNOMIDE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

566.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

567.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs. Among those was the generic drug Leflunomide.

568.    Heritage communicated directly with Defendants Teva and Apotex, and obtained agreements with Teva and Apotex, to raise prices for the generic drug Leflunomide in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

569.    Defendants Heritage, Teva and Apotex knowingly became a party to this agreement. This agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants. This agreement has eliminated price competition in the market for Leflunomide between Defendants Heritage, Teva and Apotex.

570.    This conspiracy substantially affected and still affects interstate commerce.

571.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of this agreement.

572.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Leflunomide at supra-competitive prices, and Defendants Heritage, Teva and Apotex have enjoyed ill-gotten gains from the sales of Leflunomide.

124

573.     This agreement between Heritage, Teva and Apotex was part of an overarching

conspiracy among all of the corporate Defendants named in this Complaint to unreasonably

restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and

control the prices for generic drugs, including Leflunomide.  As participants in the overarching

conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a

result of the conspiracy

## COUNT FIFTEEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, TEVA, AND SUN, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG NYSTATIN IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

574.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth

herein.

575.     Beginning as early as 2013, Defendants Heritage, Sun and Teva communicated

with each other for the purpose and effect of obtaining an agreement to collectively raise prices

for the generic drug Nystatin.

576.     Defendants Heritage, Teva and Sun agreed to raise prices for the generic drug

Nystatin in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

577.     Defendants Heritage, Teva and Sun knowingly became a party to this agreement.

The agreement is facially anticompetitive because it artificially raises prices and limits

competition among the Defendants.  The agreement has eliminated price competition in the

market for Nystatin between Defendants Heritage, Teva and Sun.

578.     This conspiracy substantially affected and still affects interstate commerce.

125

579.     The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

580.     As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Nystatin at supra-competitive prices, and Defendants Heritage, Teva and Sun have enjoyed ill-gotten gains from the sales of Nystatin.

581.     This agreement between Heritage, Teva and Sun was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Nystatin.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT SIXTEEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE AND SUN, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG PAROMOMYCIN IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

582.     Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

583.     In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Paromomycin.

126

584.    Heritage communicated directly with Defendant Sun, and obtained an agreement with Sun, to raise prices for the generic drug Paromomycin in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

585.    Defendants Heritage and Sun knowingly became a party to this agreement. This agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants. This agreement has eliminated price competition in the market for Paromomycin between Defendants Heritage and Sun.

586.    This conspiracy substantially affected and still affects interstate commerce.

587.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of this agreement.

588.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Paromomycin at supra-competitive prices, and Defendants Heritage and Sun have enjoyed ill-gotten gains from the sales of Paromomycin.

589.    This agreement between Heritage and Sun was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Paromomycin. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT SEVENTEEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE AND TEVA, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG THEOPHYLLINE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

590.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

591.    In early 2014, Teva devised a scheme to communicate with its competitor Heritage and obtain an agreement to raise prices on multiple drugs.  Among those was the generic drug Theophylline.

592.    Teva communicated directly with Defendant Heritage, and obtained an agreement with Heritage, to raise prices for the generic drug Theophylline in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

593.    Defendants Heritage and Teva knowingly became a party to this agreement.  This agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants.  This agreement has eliminated price competition in the market for Theophylline between Defendants Heritage and Teva.

594.    This conspiracy substantially affected and still affects interstate commerce.

595.    The agreement constitutes an unreasonable restraint of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of this agreement.

596.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Theophylline at supra-competitive prices, and Defendants Heritage and Teva have enjoyed ill-gotten gains from the sales of Theophylline.

597.    This agreement between Heritage and Teva was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Theophylline.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT EIGHTEEN (BY ALL PLAINTIFF STATES EXCEPT CALIFORNIA AGAINST DEFENDANTS HERITAGE, MYLAN AND ACTAVIS, AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG VERAPAMIL IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

598.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

599.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Verapamil.

600.    Heritage communicated directly with Defendants Mylan and Actavis, and obtained agreements with Mylan and Actavis to raise prices for, the generic drug Verapamil in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

601.    Defendants Heritage, Mylan and Actavis knowingly became a party to this agreement. The agreement is facially anticompetitive because it artificially raises prices and limits competition among the Defendants.  The agreement has eliminated price competition in the market for Verapamil between Defendants Heritage, Mylan and Actavis.

602.    This conspiracy substantially affected and still affects interstate commerce.

129

603.    The agreement constitutes an unreasonable restraints of trade that is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

604.    As a direct and proximate result of this conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Verapamil at supra-competitive prices, and Defendants Heritage, Mylan and Actavis have enjoyed ill-gotten gains from the sales of Verapamil.

605.    This agreement between Heritage, Mylan and Actavis was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including Verapamil.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT NINETEEN– SUPPLEMENTAL STATE LAW CLAIMS

### Connecticut

606.    Plaintiff State of Connecticut repeats and re-alleges each and every preceding allegation as if fully set forth herein.

607.    Defendants' actions as alleged herein violate the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 35-28, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

608.    Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well being of a substantial portion of the People of the State of Connecticut and its citizens and

130

businesses at large. Plaintiff State of Connecticut seeks recovery of such damages as parens patriae on behalf of the State of Connecticut and the People of the State of Connecticut pursuant to Conn. Gen. Stat. § 35-32(c)(2).

609.    Defendants' acts and practices as alleged herein constitute unfair methods of competition in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

610.    Plaintiff State of Connecticut seeks injunctive relief pursuant to Conn. Gen. Stat. § 35-34, civil penalties pursuant to Conn. Gen. Stat. § 35-38 for each and every violation of the Connecticut Antitrust Act, civil penalties pursuant to Conn. Gen. Stat. § 42-110o of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act, an order pursuant to Conn. Gen. Stat. § 42-110m requiring Defendants to submit to an accounting to determine the amount of improper compensation paid to them as a result of the allegations in the Complaint, disgorgement of all revenues, profits and gains achieved in whole or in part through the unfair methods of competition complained of herein, pursuant to Conn. Gen. Stat. § 42-110m, reasonable attorney's fees pursuant to Conn. Gen. Stat. § 42-110m, and such other and further relief as this Court deems just and equitable.

## Alabama

611.    Plaintiff State of Alabama repeats and re-alleges each and every preceding allegation as if fully set forth herein.

612.    The acts and practices by Defendants constitute unconscionable acts in violation of the Alabama Deceptive Trade Practices Act, Code of Alabama, 1975, § 8-19-5(27) for which the State of Alabama is entitled to relief.

131

## Alaska

613.     Plaintiff State of Alaska repeats and re-alleges each and every preceding allegation as if fully set forth herein.

614.     The aforementioned practices by Defendants are in violation of the Alaska Restraint of Trade Act, AS 45.50.562 et seq., and these violations had impacts within the State of Alaska and have substantially affected the people of Alaska.  Specifically, the defendants conspired to allocate market share and to fix and raise prices of generic pharmaceuticals resulting in a restraint of trade or commerce. Plaintiff State of Alaska is entitled to relief for these violations under AS 45.50.576 - .578.

615.     The aforementioned practices by Defendants are in violation of the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471(b)(11) and (b)(12), and these violations had impacts within the State of Alaska and have substantially affected the people of Alaska. Specifically, the defendants' conduct in allocating market share and in fixing and raising prices, as described in the preceding paragraphs, deceived and damaged Alaskans by causing them to pay increased prices for generic pharmaceuticals.  Further, the defendants deceived and defrauded Alaskans and omitted a material fact, namely their anti-competitive conduct, when selling their product to wholesalers and pharmacies knowing this would increase the cost to consumers. Plaintiff State of Alaska is entitled to relief for these violations under AS 45.50.501, .531, and .537.

## Arizona

616.     Plaintiff State of Arizona repeats and re-alleges each and every preceding allegation as if fully set forth herein.

132

617.    Defendants' actions as alleged herein violate the Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. § 44-1401 et seq.

618.    Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1407 and 1408, and seeks relief, including but not limited to injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and such other relief as this Court deems just and equitable.

619.    Defendants' actions as alleged herein constitute unlawful practices as defined in the Arizona Consumer Fraud Act, A.R.S. § 44-1521 et seq.  Defendants engaged in unfair or deceptive acts or practices in connection with the sale or advertisement of merchandise by, among other things, making misrepresentations and taking steps to conceal their anticompetitive schemes.

620.    Defendants' violations of the Arizona Consumer Fraud Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by A.R.S. §44-1522.

621.    Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1528 and 1531, and seeks relief, including but not limited to injunctive relief, restitution, disgorgement and other equitable relief, civil penalties, fees and costs, and such other relief as this Court deems just and equitable.

## **Arkansas**

622.    Plaintiff State of Arkansas repeats and re-alleges each and every preceding allegation as if fully set forth herein.

623.    Defendants' actions alleged herein violate, and Plaintiff State of Arkansas is entitled to relief under, The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101

et seq., the Unfair Practices Act, Ark. Code Ann. § 4-75-201 et seq., Monopolies Generally, Ark. Code Ann. § 4-75-301 et seq., and the common law of Arkansas.

624.    Plaintiff State of Arkansas seeks relief, including, but not limited to, damages and restitution for Arkansas state entities and for Arkansas consumers for loss incurred, either directly or indirectly.  Plaintiff State of Arkansas also seeks, and is entitled to, maximum civil penalties allowed by law, injunctive relief, attorney's fees, costs, investigative expenses, expert witness expenses, and such other relief as this Court deems just and equitable.

## California[7]

625.    Plaintiff State of California repeats and re-alleges each and every preceding allegation made by California in the First Amended Complaint as repeated in this Consolidated Amended Complaint.

626.    Defendants' actions alleged herein constitute contracts, combinations or conspiracies in violation of the Cartwright Act, California Business and Professions Code Sections 16720 et seq., in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of California and elsewhere.

627.    In addition, as alleged herein, Defendants engaged, and continue to engage, in unlawful, fraudulent or unfair acts or practices, which constitute unfair competition in violation of California Unfair Competition Law ("UCL"), California Business and Professions Code Sections 17200 et seq.

628.    Defendants' actions alleged herein also constitute violations of the California False Advertiing Law ("FAL"), California Business and Professions Code Sections 17500 et

---

[7]  At this time, the California state law claims apply only to Defendants Heritage, Mylan, and Mayne with respect to Doxy DR and to Defendants Heritage, Teva, Aurobindo, and Citron with respect to Glyburide.

seq., in that Defendants made or disseminated, or caused to be made or disseminated, false or misleading statements, and continue to do so with the intent to induce their customers, wholesalers, and consumers to purchase their products at supracompetitive prices when they knew, or by the exercise of reasonable care should have known, that the statements were false or misleading. Statements in violation of the FAL include, but are not limited to, false or misleading bids and/or offers made by Defendants to their customers and wholesalers as well as false or misleading statements made by Defendants to their customers and wholesalers as to their supply capacity and/or their reasons for bidding or not bidding.

629. Plaintiff State of California is bringing these state claims as well as the federal claims alleged above in its sovereign capacity only. In bringing its state claims, Plaintiff State of California is entitled to, among other things, injunctive and equitable relief in the form of disgorgement of Defendants' ill-gotten gains under the Cartwright Act (Cal. Bus. & Prof. Code § 16750, et seq.); injunctive, restitution and other equitable relief under the UCL (Cal. Bus. & Prof. Code § 17200, et seq.) and under the FAL (Cal. Bus. & Prof. Code § 17500, et seq.); civil penalties assessed at $2,500 for each violation of the UCL and penalties assessed at $2,500 for each violation of the FAL (Cal. Bus. & Prof. Code §§ 17206 and 17536), and additional penalties for senior citizens and disabled victims of the violation (Cal. Bus. & Prof. Code § 17206.1 and Cal. Civil Code § 3345); costs of suit, including reasonable attorneys' fees, and such other relief as may be just and equitable (Cal. Bus. & Prof. Code §§ 16750, 16754, and 16754.5).

### Colorado

630. Plaintiff State of Colorado repeats and re-alleges each and every preceding allegation as if fully set forth herein.

631.     Defendants' actions violate, and Plaintiff State of Colorado is entitled to relief under, the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat.

632.     Plaintiff State of Colorado seeks equitable relief, the maximum civil penalties allowed by law, attorneys' fees, and costs.

## District of Columbia

633.     Plaintiff District of Columbia, through its Attorney General, repeats and realleges each and every preceding allegation as if fully set forth herein.

634.     The aforementioned practices by Defendants were in violation of the District of Columbia Antitrust Act, D.C. Code § 28-4502.

635.     Plaintiff District of Columbia has been and continues to be injured by Defendants' actions. The District is entitled to all available relief for these violations pursuant to D.C. Code §§ 28-4507 and 28-4509, including injunctive relief, damages as parens patriae on behalf of individuals residing in the District of Columbia, restitution, disgorgement, costs, attorney's fees, and any other appropriate injunctive and equitable relief.

## Delaware

636.     Plaintiff State of Delaware repeats and re-alleges each and every preceding allegation as if fully set forth herein.

637.     The aforementioned practices by defendants constitute violations of Section 2103 of the Delaware Antitrust Act, 6 Del. C. § 2101, et seq.

638.     Plaintiff State of Delaware through the Attorney General brings this action pursuant to Sections 2105 and 2107, and seeks civil penalties and equitable relief pursuant to Section 2107 of the Delaware Antitrust Act, 6 Del. C. § 2101, et seq.

## **Florida**

639.    The State of Florida repeats and re-alleges each and every preceding allegation as if fully set forth herein.

640.    This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, and the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, et seq. The State of Florida is entitled to relief, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, injunctive relief, attorneys' fees and costs resulting from the Defendants' conduct as stated above, for all purchases of pharmaceuticals by the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

641.    Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") purchases pharmaceuticals directly from Defendants and/or has an assignment of antitrust claims from Cardinal Health, Inc. ("Cardinal"). The State of Florida purchases generic drugs from MMCAP and has a similar assignment from MMCAP for any claims MMCAP may have for violations of the antitrust laws. As a result of these assignments, any claims for violations of federal and/or state antitrust laws that MMCAP and/or Cardinal may have had have been assigned to the State of Florida when the claims relate to purchases by the State of Florida.

642.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or stabilize the prices charged for pharmaceuticals during the Relevant Period, continuing through the filing of this Complaint.

643.    Defendants directly and indirectly sold pharmaceuticals to the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

137

644. The State of Florida and its government entities and municipalities, and Florida individual consumers have been injured and will continue to be injured by paying more for pharmaceuticals purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

645. As a direct and proximate result of the Defendants' conduct, the State of Florida and its government entities and municipalities, and Florida individual consumers have been harmed and will continue to be harmed by paying supra-competitive prices for pharmaceuticals that they would not had to pay in the absence of the Defendants' conduct as alleged herein.

646. The sale of pharmaceuticals in the State of Florida involves trade or commerce within the meaning of the Florida Antitrust Act and the Florida Deceptive and Unfair Trade Practices Act.

647. Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

648. The combination, conspiracy, acts, and practices alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, 501. 201, et seq, Florida Statutes.

649. Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to municipalities in the State of Florida, and to consumers in the State of Florida in violation of Section 501.204, Florida Statutes.

## Hawaii

650.    Plaintiff State of Hawaii repeats and re-alleges each and every preceding allegation as if fully set forth herein.

651.    The aforementioned practices by Defendants negatively affected competition by unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets, in violation of Chapter 480, Hawaii Revised Statutes.

652.    Section 480-2, Hawaii Revised Statutes, provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

653.    The aforementioned practices by Defendants were and are deceptive acts or practices because they involve representations, omissions, and/or practices that were and are material, and likely to mislead entities acting reasonably under the circumstances.

654.    The aforementioned practices by Defendants: were and are unfair because they offend public policy as established by statutes, the common law, or otherwise; were and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumer and entities affected by Defendants' practices; and were and are unfair competitive conduct.

655.    The aforementioned practices are unfair or deceptive acts or practices and unfair methods of competition in violation of section 480-2, Hawaii Revised Statutes.

656.    Plaintiff State of Hawaii is entitled to:  injunctive relief pursuant to section 480-15, Hawaii Revised Statutes, and other equitable relief (including but not limited to restitution and disgorgement of Defendants' ill-gotten gains); civil penalties pursuant to section 480-3.1,

Hawaii Revised Statutes; threefold the actual damages sustained by government agencies; as parens patriae on behalf of natural persons residing in the State for threefold damages for injuries sustained by such natural persons to their property by reason of any violation of chapter 480; and reasonable attorney fees and costs.

### Idaho

657.    Plaintiff State of Idaho repeats and re-alleges each and every preceding allegation as if fully set forth herein.

658.    Defendants' actions as alleged herein violate the Idaho Competition Act, Idaho Code § 48-104, in that they have the purpose and/or the effect of unreasonably restraining Idaho commerce, as that term is defined by Idaho Code § 48-103(1).

659.    For each and every violation alleged herein, Plaintiff State of Idaho, on behalf of itself, its state agencies, and persons residing in Idaho, is entitled to all legal and equitable relief available under the Idaho Competition Act, Idaho Code §§ 48-108, 48-112, including, but not limited to, injunctive relief, actual damages or restitution, civil penalties, disgorgement, expenses, costs, attorneys' fees, and such other and further relief as this Court deems just and equitable.

660.    Defendants' actions constitute per se violations of Idaho Code § 48-104.  Pursuant to Idaho Code § 48-108(2), Plaintiff State of Idaho, as parens patriae on behalf of persons residing in Idaho, is entitled to treble damages for the per se violations of Idaho Code § 48-104.

### Illinois

661.    Plaintiff State of Illinois repeats and re-alleges each and every preceding allegation as if fully set forth herein.

662.     Defendants' actions as alleged herein violate sections 3(1), 3(2) and 3(3) of the Illinois Antitrust Act, 740 ILCS 10/1 et seq.

663.     Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS 10/7, seeks relief, including but not limited to damages, for Illinois consumers and Illinois state entities that paid for one or more of the drugs identified in this Consolidated Amended Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Illinois also seeks, and is entitled to, injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and any other remedy available for these violations under sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act.

## **Indiana**

664.     Plaintiff State of Indiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

665.     The aforementioned practices are a violation of Chapter Two of the Indiana Antitrust Act, Ind. Code § 24-1-2-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. § 24-1-2-5.

666.     The aforementioned practices are a violation of Chapter One of the Indiana Antitrust Act, I.C. § 24-1-1-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. § 24-1-1-2.

667.     The aforementioned practices are unfair and/or deceptive acts by a supplier in the context of a consumer transaction in violation of the Indiana Deceptive Consumer Sales Act, I.C. § 24-5-0.5-3.

141

668.     Plaintiff State of Indiana under its authority in I.C. § 24-1-2-5, I.C. § 24-1-1-2, and I.C. § 24-5-0.5-4 seeks relief, including but not limited to damages, for Indiana consumers and Indiana state entities that paid for one or more of the drugs identified in this Consolidated Amended Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Indiana also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), fees and costs and any other remedy available for these violations under the Indiana Antitrust Act and the Indiana Deceptive Consumer Sales Act.

## Iowa

669.     Plaintiff State of Iowa repeats and re-alleges each and every preceding allegation as if fully set forth herein.

670.     The alleged practices by Defendants were in violation of the Iowa Competition Law, Iowa Code Chapter 553.

671.     Iowa seeks an injunction and divestiture of profits resulting from these practices pursuant to Iowa Code § 553.12, and civil penalties pursuant to Iowa Code § 553.13.

672.     Defendants' acts and practices as alleged herein also constitute an unfair practice in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16(1)(n) and a deception pursuant to Iowa Code section 714.16(1)(f).

673.     Pursuant to Iowa Code § 714.16(7), the State of Iowa seeks disgorgement, restitution, and other equitable relief for these violations.  In addition, pursuant to Iowa Code § 714.16(11), the Attorney General seeks reasonable fees and costs for the investigation and litigation.

## Kansas

674.     Plaintiff State of Kansas repeats and re-alleges each and every preceding allegation as if fully set forth herein.

675.     The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101 et seq.

676.     The State of Kansas seeks relief on behalf of itself and its agencies and as parens patriae on behalf of its residents, pursuant to Kan. Stat. Ann. §§ 50-103 and 50-162.

677.     Kansas governmental entities and residents are entitled to money damages regardless of whether they purchased one or more of the drugs identified in this Consolidated Amended Complaint directly or indirectly from Defendants, pursuant to Kan. Stat. Ann. § 50-108(b).

678.     The State of Kansas is entitled to injunctive relief, civil penalties, restitution, treble damages, reasonable expenses and investigative fees, reasonable attorney fees and costs, and any other appropriate relief the court so orders, pursuant to Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, and 50-161.

## Kentucky

679.     Plaintiff Commonwealth of Kentucky repeats and re-alleges each and every preceding allegation as if fully set forth herein.  The aforementioned acts or practices by Defendants violate the Consumer Protection Act, Ky. Rev.Stat.Ann.§ 367.110 et seq. ("KCPA")

680.     Defendants, by distributing, marketing and selling generic pharmaceutical drugs to consumers through wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and otherwise engaging in the conduct described herein with respect to the generic pharmaceutical drugs identified herein, are engaging in trade or

143

commerce that harmed the Commonwealth and consumers within the meaning of Ky.Stat.Ann.
§367.170.

681.    Defendants impaired consumer choice in each generic drug market identified
herein in what should have been a freely competitive marketplace for the generic pharmaceutical
drugs identified herein. Defendants have deprived consumers of being able to meaningfully
choose from the options a competitive market would have provided.

682.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in
each generic drug market identified herein, by affecting, fixing, controlling and/or maintaining at
artificial and non-competitive levels, the prices at which the generic pharmaceutical drugs
identified herein were sold, distributed or obtained. Such conduct has been and is unfair under
the KCPA.

683.    Defendants have misrepresented the absence of competition in each generic drug
market identified herein. By misrepresenting and/or omitting material facts concerning the
absence of competition in each generic drug market identified herein, the Defendants misled the
Commonwealth that prices for the numerous generic pharmaceutical drugs identified herein were
competitive and fair. Defendants' conduct has been misleading and/or had a tendency to deceive.

684.    The Defendants' misrepresentations and omission of material facts had the
following effects: (1) generic drug price competition was restrained, suppressed and eliminated;
(2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels; (3)
the Commonwealth was deprived of free and open markets; and (4) the Commonwealth and
consumers paid supra-competitive, artificially inflated prices for the generic pharmaceutical
drugs identified herein. The Defendants' misrepresentations and omissions of material facts have
caused Commonwealth harm in paying more for generic pharmaceutical drugs identified herein.

144

685.    Defendants violated the KCPA:

a.    Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth above;

b.    Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth above;

c.    Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

d.    Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

e.    Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

f.    Each time a request for reimbursement was made to the Commonwealth for any of the numerous generic pharmaceutical drugs identified herein; and

g.    Each time the Commonwealth or its consumers paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein the Defendants' distributed, marketed or sold.

686.    The above described conduct has been and is willful within the meaning of Ky.Stat.Ann. §367.990.

687.    The Commonwealth states that the public interest is served by seeking a permanent injunction to restrain the acts and practices described herein. The Commonwealth and

145

its citizens will continue to be harmed unless the acts and practices complained of herein are permanently enjoined pursuant to Ky.Stat.Ann. §367.190. Further, the Commonwealth seeks restitution to the Commonwealth and/or disgorgement pursuant to Ky.Stat.Ann.§§ 367.190 -.200. The Commonwealth seeks a civil penalty of up to $2,000 for each such willful violation, or $10,000 for each such violation directed at a person over 60 pursuant to Ky.Stat.Ann.§ 367.990.

### *Unjust Enrichment*

688.    Defendants have been unjustly enriched as a result of the conduct set forth herein. The Commonwealth and consumers were purchasers, reimbursers and/or end-payors of Defendants' generic pharmaceutical drugs identified herein and have paid, at their expense, amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

689.    For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

690.    Defendants knew of, and appreciated and retained the benefits of Commonwealth and consumers' purchases of any of the Defendants' generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price.

691.    Based on Defendants' conduct set for herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value. Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received resulting from the purchase of any of the generic pharmaceutical drugs identified herein by the Commonwealth. The Commonwealth therefore seeks to recover the amounts that unjustly enriched the

Defendants. The Commonwealth is entitled to equitable relief in the form of an injunction and disgorgement, and any other relief the Court deems appropriate.

## Louisiana

692.    Plaintiff State of Louisiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

693.    The practices of Defendants described herein are in violation of the Louisiana Monopolies Act, LSA-R.S. 51:121 et seq., and the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 et. seq.

694.    Plaintiff State of Louisiana is entitled to injunctive relief and civil penalties under LSA-R.S. 51:1407 as well as damages, disgorgement and any other equitable relief that the court deems proper under LSA-R.S. 51:1408.

## Maine

695.    Plaintiff State of Maine repeats and re-alleges each and every preceding allegation as if fully set forth herein.

696.    The aforementioned practices by Defendants are in violation of the Maine Monopolies and Profiteering Law, 10 M.R.S. §§ 1101 and 1102, and Plaintiff State of Maine is entitled to relief for these violations under 10 M.R.S. § 1104.

697.    The aforementioned practices by Defendants are intentional and in violation of the Maine Unfair Trade Practices Act, 5 M.R.S. § 207, and Plaintiff State of Maine is entitled to relief for those violations under 5 M.R.S. § 209.

## Maryland

698.    Plaintiff State of Maryland repeats and re-alleges each and every preceding allegation as if fully set forth herein.

147

699.    The aforementioned practices by Defendants were and are in violation of the

Maryland Antitrust Act, Md. Com. Law Code Ann. §§ 11-201 et seq. These violations

substantially affect the people of Maryland and have impacts within the State of Maryland.

700.    Plaintiff State of Maryland brings this action against Defendants in the following

capacities:

> a.    Pursuant to Md. Com. Law Code Ann. § 11-209(a) in its sovereign
>
> capacity for injunctive relief, civil penalties, restitution, disgorgement and
>
> all other available equitable remedies;
>
> b.    Pursuant to Md. Com Law Code Ann. § 11-209(b)(5) as parens patriae on
>
> behalf of persons residing in Maryland. These persons are entitled to three
>
> times the amount of money damages sustained regardless of whether they
>
> have purchased generic pharmaceuticals directly or indirectly from
>
> Defendants. Md. Health Gen. Code Ann. § 21-1114.

701.    Plaintiff State of Maryland also seeks, pursuant to Md. Com. Law Code Ann.

§ 11-209(b), reimbursement of reasonable attorney's fees, expert fees and costs.

## Massachusetts

702.    Plaintiff Commonwealth of Massachusetts repeats and re-alleges each and every

preceding allegation as if fully set forth herein.

703.    The aforementioned practices by Defendants, including but not limited to

agreements in restraint of trade and/or attempted agreements in restraint of trade, constitute

unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce

in violation of the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 et seq.

148

704.    Defendants knew or should have known that their conduct violated the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 et seq.

705.    Plaintiff Commonwealth of Massachusetts is entitled to relief under M.G.L. c. 93A, § 4, including, without limitation, damages and restitution to Massachusetts consumers and Massachusetts governmental purchasers; civil penalties for each violation committed by the Defendants; injunctive relief and other equitable relief including, without limitation, disgorgement; fees and costs including, without limitation, costs of investigation, litigation, and attorneys' fees; and any other relief available under M.G.L. c. 93A, § 4.

706.    Plaintiff Commonwealth of Massachusetts notified the Defendants of this intended action at least five days prior to the commencement of this action and gave the Defendants an opportunity to confer in accordance with M.G. L. c. 93A, § 4.

## Michigan

707.    Plaintiff State of Michigan repeats and re-alleges each and every preceding allegation as if fully set forth herein.

708.    The State of Michigan brings this action both on behalf of itself, its State Agencies, and as parens patriae on behalf of natural persons, pursuant to Mich. Comp. Laws §14.28, and §14.101, to enforce public rights and to protect residents and its general economy against violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, et seq., the Michigan Consumer Protection Act, Mich. Comp. Laws §445.901 et. seq., and the common law of the State of Michigan.

709.    The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, et seq., the Michigan Consumer Protection Act, Mich. Comp. Laws §445.901 et. seq., and the common law of the State of

149

Michigan. As a result of Defendant's unfair, unconscionable, or deceptive methods, acts, or

practices in the conduct of trade and Defendants' conspiracy to restrain trade for the purpose of

excluding or avoiding competition, all as more fully described above, the Plaintiff State of

Michigan, its agencies, and consumers have suffered and been injured in business and property

by reason of having to purchase or reimburse at supra-competitive prices as direct and indirect

purchasers and will continue to suffer ascertainable loss and damages in an amount to be

determined at trial.

710.    Accordingly, Plaintiff State of Michigan on behalf of itself, its agencies, and as

parens patriae on behalf of its consumers affected by Defendants' illegal conduct, is entitled to

relief including but not limited to injunctive relief and other equitable relief (including but not

limited to disgorgement), civil penalties, damages, costs and attorney fees.

## Minnesota

711.    Plaintiff State of Minnesota repeats and re-alleges each and every preceding

allegation as if fully set forth herein.

712.    Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971,

Minn. Stat. §§ 325D.49-.66. Plaintiff State of Minnesota seeks relief, including but not limited

to:

        a.     damages for itself, its state agencies that paid for the generic
pharmaceutical drugs identified herein, and as parens patriae on behalf of
its consumers. Plaintiff State of Minnesota is entitled to damages under
Minn. Stat. § 8.31, subd. 3a and treble damages under Minn. Stat.
§ 325D.57;

        b.     disgorgement under Minn. Stat. § 325D.59 and Minn. Stat. Ch. 8;

        c.     injunctive relief under Minn. Stat. §§ 325D.58 and Minn. Stat. § 8.31,
subd. 3;

        d.      costs and reasonable attorneys' fees under Minn. Stat. § 325D.57 and Minn. Stat. § 8.31, subd. 3a; and

        e.      civil penalties under Minn. Stat. § 325D.56 and Minn. Stat. § 8.31, subd.

713.    The Defendants deceptively misrepresented to Plaintiff State of Minnesota, its state agencies and Minnesota consumers that Defendants' pricing at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Minnesota was competitive and fair.

714.    The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects: (1) generic drug price competition was restrained, suppressed and eliminated throughout Minnesota; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Minnesota; (3) Plaintiff State of Minnesota, its state agencies and Minnesota consumers were deprived of free and open markets; and (4) Plaintiff State of Minnesota, its state agencies and Minnesota consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

715.    The Defendants' deceptive misrepresentations and failure to disclose material facts have caused Plaintiff State of Minnesota, its state agencies, and Minnesota consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

716.    Defendants violated the deceptive trade practices laws of Minnesota:

        a.      Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

        b.      Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

      c.      Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

      d.      Each time each Plaintiff State of Minnesota, its state agencies and Minnesota consumers paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein; and

      e.      Each time a request for reimbursement was made to Minnesota for any of the numerous generic pharmaceutical drugs identified herein.

717.     The Defendants' conduct is unlawful pursuant to the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48 and Minn. Stat. Ch. 8. The aforesaid methods, acts or practices constitute deceptive acts under this Act, including, but not limited to:

      a.      Representing "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" in violation of Minn. Stat. § 325D.44, subd. 1(5);

      b.      Representing "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" in violation of Minn. Stat. § 325D.44, subd. 1(7); and

      c.      Engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding" in violation of Minn. Stat. § 325D.44, subd. 1(13).

718.     Some or all of these violations by Defendants were willful.

719.     Plaintiff State of Minnesota seeks relief for violations of Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48 including but not limited to:

      a.      damages for itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers under Minn. Stat. § 325D.45, subd. 3 and Minn. Stat. § 8.31, subd. 3a;

      b.      disgorgement under Minn. Stat. § 325D.45, subd. 3, Minn. Stat. Ch. 8, and Minnesota common law;

c.   injunctive relief under Minn. Stat. § 325D.45, subd. 1 and Minn. Stat. § 8.31, subd. 3;

d.   costs and reasonable attorneys' fees under Minn. Stat. § 325D.44 and Minn. Stat. § 8.31, subd. 3a; and

e.   civil penalties under Minn. Stat. § 8.31, subd. 3.

720.   By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein with respect to Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers.

721.   Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers were purchasers, reimbursers and/or end-payors of Defendants' generic pharmaceutical drugs identified herein and have paid amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

722.   Defendants knew of and appreciated, retained, or used, the benefits of Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers' purchases of any of the Defendants' generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price. Defendants engaged in the conduct described herein to allocate or preserve the market share of the numerous generic pharmaceutical drugs identified herein thereby increasing their sales and profits.

723.   For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

724.    Based on Defendants' conduct set forth herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

725.    Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of any of the numerous generic pharmaceutical drugs identified herein by Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers. Plaintiff State of Minnesota, on behalf of itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers, seeks to recover the amounts that unjustly enriched the Defendants.

726.    Plaintiff State of Minnesota seeks relief, on behalf of itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers, and is therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement and any other relief the Court deems appropriate under Minn. Stat. Ch. 8 and Minnesota common law for unjust enrichment.

## Mississippi

727.    Plaintiff State of Mississippi repeats and re-alleges each and every preceding allegation as if fully set forth herein.

728.    Defendants' acts violate Miss. Code Ann. § 75- 21-1 et seq., and Plaintiff State of Mississippi is entitled to relief under Miss. Code Ann. § 75- 21-1 et seq.

729.    The aforesaid conduct was not only anti-competitive but was also unfair and deceptive to the consumers of the State of Mississippi, therefore Defendants' acts violate the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, et seq., and Plaintiff State of

154

Mississippi is entitled to relief under the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, et seq.

730.     Pursuant to Miss. Code Ann. § 75-21-1 et seq., and the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, et seq., Plaintiff State of Mississippi seeks and is entitled to injunctive relief, damages, disgorgement, civil penalties, costs, attorney fees, and any other just and equitable relief which this Court deems appropriate.

### Missouri

731.     Plaintiff State of Missouri repeats and re-alleges each and every preceding allegation as if fully set forth herein.

732.     The aforementioned practices by Defendants violate the Missouri Antitrust Law, Missouri Rev. Stat. §§ 416.011 et seq., and Missouri's Merchandising Practices Act, Missouri Rev. Stat. §§ 407.010 et seq., as further interpreted by 15 CSR 60-8.010 et seq. and 15 CSR 60-9.01 et seq., and the State of Missouri is entitled to an injunction, disgorgement, civil penalties and any other relief available under the aforementioned Missouri statutes and regulations.

733.     The State of Missouri also seeks its costs and attorney fees incurred in the prosecution of this action.

### Montana

734.     Plaintiff State of Montana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

735.     Defendants' acts and practices described in this Complaint violate Montana's Unfair Trade Practices and Consumer Protection Act, Mont Code Ann. § 30-14-101 et seq., including § 30-14-103, and Unfair Trade Practices Generally, Mont. Code Ann. § 30-14-201 et seq., including § 30-14-205.

736.    Mont. Code Ann § 30-14-103 prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Mont. Code Ann. § 30-14-102(8) defines the terms "trade" and "commerce" as meaning "the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state."

737.    Montana's standard for 'unfairness' as prohibited under Mont. Code Ann. § 30-14-103 is articulated in Rohrer v. Knudson, 203 P.3d 759 (Mont. 2009) as an act or practice which "offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

738.    Mont Code Ann. § 30-14-205 states that it is unlawful for a person or group of persons, directly or indirectly:

        (1)    to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce;

        (2)    for the purpose of creating or carrying out any restriction in trade to:  (a) limit productions; (b) increase or reduce the price of merchandise or commodities; (c) prevent competition in the distribution or sale of merchandise or commodities; (d) fix a standard or figure whereby the price of an article of commerce intended for sale, use, or consumption will be in any way controlled.

739.    Defendants' anticompetitive and unfair and/or deceptive acts and practices in the marketing and sale of pharmaceuticals as described in this Complaint occurred in the conduct of "trade" and "commerce" as defined by Montana law.

156

740.    Defendants' anticompetitive and unfair and/or deceptive acts and practices in the
marketing and sale of pharmaceuticals as described in this Complaint offend established public
policy.  Those acts and practices are also unethical, oppressive, and unscrupulous and have
substantially injured and continue to injure Montanans through supra-competitive prices.

741.    Defendants' price-fixing and market allocating conduct as described in this
Complaint violates the plain language of Mont. Code Ann. § 30-14-205(1) and (2).

742.    Defendants' unlawful conduct was willful as defined in Mont. Code Ann. § 30-
14-142(4).

743.    Plaintiff State of Montana is entitled to all equitable relief and the maximum civil
penalties available under Mont. Code Ann. § 30-14-101 et seq. and § 30-14-201 et seq.,
including but not limited to Mont. Code Ann. §§ 30-14-111(4), -131, -142(2), and -222.  Plaintiff
State of Montana also seeks reasonable attorneys' fees and costs.

## Nebraska

744.    Plaintiff State of Nebraska repeats and re-alleges each and every preceding
allegation as if fully set forth herein.

745.    Defendants' actions as alleged herein violate the Unlawful Restraint of Trade Act,
Neb. Rev. Stat. § 59-801 et seq. and the Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et
seq. Specifically, Defendants' actions constitute unreasonable restraints of trade or commerce in
violation of Neb. Rev. Stat. § 59-801 and Neb. Rev. Stat. § 59-1603, and Defendants' actions
constitute unfair methods of competition in violation of Neb. Rev. Stat. § 59-1602. The sale of
pharmaceuticals to the State of Nebraska and its citizens constitutes trade or commerce as
defined in Neb. Rev. Stat. § 59-1601. These violations have had an impact, directly and
indirectly, upon the public interest of the State of Nebraska, for the State of Nebraska, its state

157

agencies, and its citizens have been injured and continue to be injured by paying supra-competitive prices for pharmaceuticals purchased directly and/or indirectly from the Defendants.

746.    Accordingly, Plaintiff State of Nebraska, on behalf of itself, its state agencies, and as parens patriae for all citizens within the state, seeks all relief available under the Unlawful Restraint of Trade Act, the Consumer Protection Act, and Neb. Rev. Stat. § 84-212. Plaintiff State of Nebraska is entitled to relief including, but not limited to: damages, disgorgement, civil penalties, equitable relief, injunctive relief, and its costs and attorney's fees pursuant to Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212.

## **Nevada**

747.    Plaintiff State of Nevada repeats and re-alleges each and every preceding allegation as if fully set forth herein.

748.    As alleged in Sections IV and VI, *supra*, the Defendants' conduct was and is directed at consumers nationwide, including in Nevada, and was overtly deceptive; not merely anticompetitive. Accordingly, the aforementioned acts and practices by Defendants were, and are, in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq., and specifically the following:

> (a)    NRS 598.0915(15), a person engages in a deceptive trade practice by knowingly making a false representation in a transaction;
>
> (b)    NRS 598.0923(2), a person engages in a deceptive trade practice by failing to disclose a material fact in connection with the sale or lease of goods or services; and

        (c)      NRS 598.0923(3), a person engages in a deceptive trade practice by violating a state or federal statute or regulation relating to the sale or lease of goods or services.

749.     As alleged in Sections IV, V and VI, *supra*, the Defendants' anticompetitive conduct produced, and continues to produce, harm across the Plaintiff States, including in Nevada. Accordingly, the aforementioned acts and practices by Defendants were, and are, also in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, et seq., and specifically the following:

        (a)      NRS 598A.060(a), competitors unlawfully restrain trade by engaging in price fixing;

        (b)      NRS 598A.060(b), competitors unlawfully restrain trade by agreeing to division of markets; and

        (c)      NRS 598A.060(c), competitors unlawfully restrain trade by agreeing to allocate customers.

750.     Accordingly, Plaintiff State of Nevada seeks all relief available under the Nevada Deceptive Trade Practices Act, the Nevada Unfair Trade Practices Act, and common law. Plaintiff State of Nevada is entitled to relief including but not limited to: disgorgement, injunctions, civil penalties, damages, and its costs and attorney's fees pursuant to Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250.

### New Hampshire

751.     Plaintiff State of New Hampshire repeats and re-alleges each and every preceding allegation as if fully set forth herein.

752.     The aforementioned collusive actions, practices and conduct by Defendants violate the New Hampshire Antitrust Provisions, N.H. RSA 356:1, et seq., by, among other things, unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets. Defendants impaired the competitive process which deprived New Hampshire consumer and customers of free and open market place for generic products and/or of paying a price for the generic pharmaceutical drugs identified herein which would have been competitive and fair absent agreements to allocate customers, fix prices, and stabilize artificially inflated prices.

753.     The aforementioned actions, practices and conduct by Defendants as suppliers in commercial transactions also violate the New Hampshire Consumer Protection Act, N.H. RSA 358-A:1 et seq. by using unfair or deceptive business acts or practices, or methods of competition, in the conduct of trade or commerce including, among other things, pricing generic health care pharmaceutical goods in a manner that tends to harm competition; making misrepresentations, taking steps to conceal, failing to disclose a material fact, and/or participating in maintaining artificially inflated pricing in connection with the sale or advertisement of such generic products; or otherwise thwarting and harming genuine competition in generic drug markets as identified herein.  Illegal conduct included, agreement to and, in fact, acting to restrain trade or commerce in each generic drug market identified herein, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in the State of New Hampshire; as well as, among other things, submitting false or misleading

160

cover bids and/or offers to the customers and wholesalers, and/or providing false or misleading statements to prospective customers relating to supply capacity or reasons for bidding or not bidding, and/or otherwise engaging in a course of conduct to induce contracting and purchasing of generic products by customers at artificially inflated prices.

754. Defendants' illegal conduct, collectively and individually, all relates to generic products that are intended and expected by consumers, private entities, and public entities to provide great savings for consumers and purchasing entities in the health care industry, offending public policy and comprising deceptive, unfair, immoral, unethical, oppressive or unscrupulous conduct. NH RSA 358-A:2.

755. These violations artificially inflated prices of generic drugs, substantially affecting and harming the people of New Hampshire (consumers, public entities, and private entities, alike) and having various past and ongoing harmful impacts within the state including affecting New Hampshire commerce and affecting the choice of generic drugs available to and/or prices paid by consumers and entities. The State of New Hampshire has reason to believe that Defendants directly and/or indirectly through nationwide or regional distributors, wholesalers, and retailers, sold or marketed the generic drugs at issue to the State of New Hampshire, its agencies and municipalities, to New Hampshire businesses, and to individual consumers, and that such products were received and purchased by such consumers and entities within the state, whether dealing with Defendants directly or indirectly.

756. The State of New Hampshire has reason to believe that Defendants received ill-gotten gains or proceeds as a result of their illegal conduct, and it would be inequitable and unjust for Defendants to retain such profits and benefits without payment of value.

757. Some or all of the violations by Defendants were willful and flagrant.

758.    The State of New Hampshire brings this action in its law enforcement capacity as

a sovereign or quasi-sovereign and in a parens patriae capacity on behalf of state consumers of

generic products, seeking legal and equitable remedies available under the New Hampshire

Antitrust Provisions, under the New Hampshire Consumer Protection Act, and under common

law such as unjust enrichment. New Hampshire seeks restoration to state consumers for

ascertainable loss incurred in making payments and purchases, whether direct or indirect, in

relation to the generic drug products identified herein, through among other things, restitution,

disgorgement, and/or injunctive relief. New Hampshire seeks injunctive relief to prohibit

Defendants from engaging in the unlawful business practices identified herein; civil penalties (in

double/treble multipliers); and recovery for compensable investigation and litigation costs,

expenses and attorney's fees, and other relief as this Court deems just and equitable. See N.H.

RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.

759.    Plaintiff State of New Hampshire notified Defendants of this intended action at

least ten days prior to the commencement of this action and gave Defendants an opportunity to

confer with the attorney general in accordance with NH RSA 358-A:5.

### New Jersey

760.    Plaintiff State of New Jersey repeats and re-alleges each and every preceding

allegation as if fully set forth herein.

761.    Defendants' actions as alleged herein violate the New Jersey Antitrust Act,

N.J.S.A. 56:9-1 et seq., in that they have the purpose and/or effect of unreasonably restraining

trade and commerce within the State of New Jersey and elsewhere. N.J.S.A. 56:9-3. Plaintiff

State of New Jersey seeks relief including but not limited to, treble damages for New Jersey

consumers and state agencies that paid for one or more of the drugs identified in this

162

Consolidated Amended Complaint, injunctive relief, disgorgement, restitution, civil penalties and attorneys' fees and investigative costs.   N.J.S.A. 56:9-10, -12.

762.   Defendants' actions as alleged herein violate the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., in that Defendants' made misleading statements, omitted material facts and engaged in unconscionable commercial practices in connection with the advertising, offering for sale and sale of one or more of the drugs identified in this Consolidated Amended Complaint. N.J.S.A. 56:8-2. Plaintiff State of New Jersey seeks relief including but not limited to, injunctive relief, disgorgement, restitution, civil penalties and attorneys' fees and investigative costs.   N.J.S.A. 56:8-8, -11, -13 and -19.

## New Mexico

763.   Plaintiff State of New Mexico repeats and re-alleges each and every preceding allegation as if fully set forth herein.

764.   The State of New Mexico, through its Attorney General, brings this enforcement action as parens patriae in its sovereign and quasi-sovereign capacity and in its proprietary capacity on behalf of the State, including its agencies and entities, to recover damages to the State, its residents, its economy, and all such other relief as may be authorized by statute or common law.

765.   The aforementioned actions and practices by Defendants were and are a contract, agreement, combination, or conspiracy in an unreasonable restraint of trade or commerce in New Mexico, thus violating the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1 et seq.

766.   The aforementioned actions and practices by Defendants were unfair or deceptive trade practices as they were false or misleading oral or written statements or other representations made in connection with the sale of goods in the regular course of their trade or

163

commerce, that may, tended to or did deceive or mislead consumers. These practices included false or misleading statements of fact concerning the price of drugs and failures to state material facts about the costs of drugs, actions that deceived or tended to deceive consumers. Additionally, Defendants' actions constituted unconscionable trade practices, because they resulted in supra-competitive prices for the aforementioned drugs, resulting in a gross disparity between the prices paid by consumers and the valued received. These practices and actions violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 et. seq.

767.    The aforementioned actions and practices by Defendants also constitute unfair competition and unjust enrichment under New Mexico's common law.

768.    Accordingly, the State of New Mexico is entitled remedies available to it under the New Mexico Antitrust Act, the New Mexico Unfair Practices Act, and New Mexico common law, including injunctive relief, actual, treble, and statutory damages, restitution, disgorgement, civil penalties, costs, attorney's fees, and any other appropriate monetary and injunctive relief. See N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11.

## New York

769.    Plaintiff State of New York repeats and re-alleges each and every preceding allegation as if fully set forth herein.

770.    The aforementioned practices by the Defendants violate New York antitrust law, the Donnelly Act, New York Gen. Bus. Law §§ 340-342c, and constitute both "fraudulent" and "illegal" conduct in violation of New York Executive Law § 63(12).

771.    Plaintiff State of New York seeks relief, including but not limited to damages, for New York consumers and New York state entities that paid for one or more of the drugs identified in this Consolidated Amended Complaint during the relevant period and thereby paid

more than they would have paid but for Defendants' unlawful conduct. Plaintiff State of New York also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), and fees and costs.

## North Carolina

772.    Plaintiff State of North Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

773.    Defendants' acts of distributing, marketing and selling generic pharmaceutical drugs to consumers through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and in otherwise engaging in the conduct more fully described herein with respect to the numerous generic pharmaceutical drugs identified herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed North Carolina consumers pursuant to North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq*.

774.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes North Carolina, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in North Carolina, deprived North Carolina consumers from paying a price for the numerous generic pharmaceutical drugs identified herein which would have been competitive and fair absent the agreement to allocate customers and fix prices.

775.    The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under the North Carolina Unfair and

Deceptive Trade Practices Act, and are injurious to North Carolina consumers and the general economy of the State of North Carolina, including, but not limited to:

a.    Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a market allocation agreement as set forth in the preceding counts;

b.    Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a price-fixing agreement as set forth in the preceding counts;

c.    Engaging in any conduct which causes substantial injury to consumers.

776.    By deceptively misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein to the State of North Carolina and North Carolina consumers, the Defendants misled the State of North Carolina and North Carolina consumers into believing that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair in violation of the North Carolina Unfair and Deceptive Trade Practices Act.

777.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes North Carolina, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in North Carolina.

778.    The Defendants' impairment of choice and the competitive process had the following effects: (1) generic drug price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout North Carolina; (3) the State of North Carolina and North Carolina consumers were deprived of free and open markets; and (4) the State of North Carolina

166

and North Carolina consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

779.    The Defendants' impairment of choice and the competitive process have caused the State of North Carolina and North Carolina consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

780.    The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects: (1) generic drug price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout North Carolina; (3) the State of North Carolina and North Carolina consumers were deprived of free and open markets; and (4) the State of North Carolina and North Carolina consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

781.    The Defendants' deceptive misrepresentations and failure to disclose material facts have caused the State of North Carolina and North Carolina consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

782.    Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act:

        a.    Each time Defendants agreed to participate in the overarching conspiracy within the generic pharmaceutical drug market as set forth in Paragraphs 85 to 106;

167

b.      Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth in Paragraphs 110 to 233;

c.      Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth in Paragraphs 234 to 431;

d.      Each time the State of North Carolina or a North Carolina consumer paid an unfairly or unconscionably inflated price for any of the numerous generic pharmaceutical drugs identified herein;

e.      Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

f.      Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

g.      Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

h.      Each time a request for reimbursement was made to the State of North Carolina for any of the numerous generic pharmaceutical drugs identified herein; and

i.      Each time the State of North Carolina or a North Carolina consumer paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein.

783.  Plaintiff State of North Carolina is entitled to relief pursuant to N.C. Gen. Stat. §

75-1 *et seq.*, including recovery of its costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-

16.1.

## North Dakota

784.  Plaintiff State of North Dakota repeats and re-alleges each and every preceding

allegation as if fully set forth herein.

785.  The aforementioned practices by Defendants are in violation of North Dakota's

Uniform State Antitrust Act North Dakota Century Code (N.D.C.C.) § 51-08.1-01 et seq., and

Plaintiff State of North Dakota is entitled to relief for these violations under N.D.C.C. § 51-08.1-

01 et seq.

786.  The aforementioned practices by Defendants constitute unconscionable or

deceptive acts or practices in violation of the North Dakota Consumer Fraud Law, N.D.C.C. §51-

15-01 et seq., and Plaintiff State of North Dakota is entitled to relief for those violations under

N.D.C.C. §51-15-01 et seq.

## Ohio

787.  Plaintiff State of Ohio repeats and re-alleges each and every preceding allegation

as if fully set forth herein.

788.  The aforementioned practices by Defendants were, and are, a per se illegal

conspiracy against trade in violation of Ohio Revised Code Section 1331.01 et seq, the common

law of Ohio, and void pursuant to Ohio Rev. Code § 1331.06.  The State of Ohio, the general

economy of Ohio, Ohio entities and individuals in Ohio were harmed as a direct result of

Defendants' per se illegal conduct.  Defendants received ill-gotten gains or proceeds as a direct

result of their per se illegal conduct.

169

789.    Plaintiff State of Ohio seeks and is entitled to an injunction, disgorgement and civil forfeiture pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq, including Section 1331.03, which requires a forfeiture of $500 per day that each violation was committed or continued, and any other remedy available at law or equity.

## Oklahoma

790.    Plaintiff State of Oklahoma repeats and re-alleges each and every allegation as if fully set forth herein.

791.    The aforementioned practices by the Defendants are in violation of the Oklahoma Antitrust Reform Act, 79 O.S. § 201 et seq., and Plaintiff State of Oklahoma is entitled to relief under 79 O.S. § 205, including but not limited to: injunctive relief, disgorgement, costs, attorney's fees and any other appropriate relief for those violations.

## Oregon

792.    Plaintiff State of Oregon repeats and re-alleges each and every preceding allegation as if fully set forth herein.

793.    The aforementioned practices by Defendants were, and are, in violation of the Oregon Antitrust Law, Oregon Revised Statutes ("ORS") 646.705, et seq. These violations had impacts within the State of Oregon and substantially affected the people of Oregon.

794.    Plaintiff State of Oregon seeks all relief available under the Oregon Antitrust Act for Oregon consumers and the State of Oregon, including injunctive, civil penalties, other equitable relief including but not limited to disgorgement, the State of Oregon's costs incurred in bringing this action, plus reasonable attorney fees, expert witness fees, and costs of investigation, and any other remedy available at law for these violations under ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780.

## Pennsylvania

795.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges each and every preceding allegation as if fully set forth herein.

### *Pennsylvania Unfair Trade Practices and Consumer Protection Law*

796.    In distributing, marketing and selling generic pharmaceutical drugs to consumers through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and in otherwise engaging in the conduct more fully described herein with respect to the numerous generic pharmaceutical drugs identified herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed the Commonwealth and Pennsylvania consumers in this Commonwealth within the meaning of 73 P. S. § 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL").

### *Unfair Methods of Competition and Unfair Acts or Practices*

797.    By reason of the foregoing, the Defendants have impaired Pennsylvania consumer choice in each generic drug market identified herein.

798.    By impairing choice in what should have been a freely competitive marketplace for the numerous generic pharmaceutical drugs identified herein, the Defendants have deprived Pennsylvania consumers from being able to meaningfully choose from among the options a competitive market would have provided.

799.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes Pennsylvania, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the

171

numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania.

800.     The Defendants impaired the competitive process which deprived Pennsylvania consumers from paying a price for the numerous generic pharmaceutical drugs identified herein which would have been competitive and fair absent the agreement to allocate customers and fix prices.

801.     Regardless of the nature or quality of Defendants' aforementioned acts or practices on the competitive process or competition, Defendants' conduct has been otherwise unfair or unconscionable because they offend public policy as established by statutes, the common law, or otherwise, are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumer.

802.     Defendants' unscrupulous conduct has resulted in the Commonwealth and its consumers to be substantially injured in paying more for or not being able to afford the numerous generic pharmaceutical drugs identified herein.

803.     The Defendants' impairment of choice and the competitive process had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

804.     The Defendants' impairment of choice and the competitive process have caused the Commonwealth of Pennsylvania and Pennsylvania consumers to suffer and to continue to

suffer loss of money or property, real or personal, by means of Defendants' use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

805.    Defendants violated the PUTPCPL:

a.    Each time Defendants agreed to participate in the overarching conspiracy within the generic pharmaceutical drug market as set forth in Paragraphs 89 to 109;

b.    Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth in Paragraphs 113 to 242;

c.    Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth in Paragraphs 243 to 453; and

d.    Each time the Commonwealth of Pennsylvania or a Pennsylvania consumer paid an unfairly or unconscionably inflated price for any of the numerous generic pharmaceutical drugs identified herein.

806.    The Defendants' conduct more fully described herein is unlawful pursuant to 73 P.S. § 201-3.

807.    The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL, including, but not limited to:

a.    Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a market allocation agreement as set forth in the preceding counts;

b.    Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a price-fixing agreement as set forth in the preceding counts;

173

      c.      Violating Pennsylvania antitrust common law through engaging in a market allocation agreement;

      d.      Violating Pennsylvania antitrust common law through engaging in a price-fixing agreement; and/or

      e.      Engaging in any conduct which causes substantial injury to consumers.

808.    The above described conduct substantially injured Pennsylvania consumers and the general economy of the Commonwealth of Pennsylvania.

809.    The above described conduct created the likelihood of confusion and misunderstanding relative to the Commonwealth of Pennsylvania and Pennsylvania consumers seeking to exercise a meaningful choice in a market expected to be free of impairment to the competitive process.

810.    The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the PUTPCPL.

811.    Pursuant to 71 P.S. § 201-4, the Commonwealth believes that the public interest is served by seeking a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restoration, disgorgement and attorneys' fees and costs pursuant to 73 P.S. §§ 201-4 and 4.1 for the Commonwealth of Pennsylvania and Pennsylvania consumers and civil penalties of not exceeding $3,000 for each such willful violation pursuant to 73 P.S. § 201-8 (b). The Commonwealth believes that the Commonwealth and its citizens are suffering and will continue to suffer harm unless the methods, acts and practices complained of herein are permanently enjoined.

174

### *Deceptive Acts or Practices*

812.    By reason of the foregoing, the Defendants have deceptively misrepresented the absence of competition in each generic drug market identified herein to the Commonwealth of Pennsylvania and Pennsylvania consumers in violation of the PUTPCPL.

813.    By deceptively misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein to the Commonwealth of Pennsylvania and Pennsylvania consumers, the Defendants misled the Commonwealth of Pennsylvania and Pennsylvania consumers into believing that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair.

814.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in in each generic drug market identified herein that includes Pennsylvania, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania.

815.    The Defendants deceptively misrepresented to the Commonwealth of Pennsylvania and Pennsylvania consumers that Defendants' pricing at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania was competitive and fair.

816.    Regardless of the nature or quality of Defendants' aforementioned acts or practices on the competitive process or competition, Defendants' conduct has had the tendency or capacity to deceive.

817.    Defendants expressed, implied or otherwise falsely claimed conformance with prescribed bidding practices to their customers and wholesalers in relation to the numerous generic pharmaceutical drugs identified herein.

818.    Defendants expressed, implied or otherwise falsely claimed supply capacity or reasons to prospective customers for bidding or not bidding in relation to the numerous generic pharmaceutical drugs identified herein.

819.    The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

820.    The Defendants' deceptive misrepresentations and failure to disclose material facts have caused Commonwealth of Pennsylvania and Pennsylvania consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

821.    Defendants violated the PUTPCPL:

    a.    Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

    b.    Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

      c.      Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

      d.      Each time a request for reimbursement was made to the Commonwealth of Pennsylvania for any of the numerous generic pharmaceutical drugs identified herein; and

      e.      Each time the Commonwealth of Pennsylvania or a Pennsylvania consumer paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein.

822.    The Defendants' conduct more fully described herein is unlawful pursuant to 73 P. S. § 201-3.

823.    The aforesaid methods, acts or practices constitute deceptive acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL, including, but not limited to:

      a.      "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

      b.      "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii);  and

      c.      "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

824.    The above described conduct has been willful within the meaning of 73 P.S. §
201-8 and is unlawful under the PUTPCPL.

825.    Pursuant to 71 P.S. § 201-4, the Commonwealth believes that the public interest is
served by seeking a permanent injunction to restrain the methods, acts and practices described
herein, as well as seeking restoration, disgorgement and attorneys' fees and costs pursuant to 73
P.S. §§ 201-4 and 4.1 for the Commonwealth of Pennsylvania and Pennsylvania consumers and
civil penalties of not exceeding $3,000 for each such willful violation pursuant to 73 P.S. § 201-8
(b). The Commonwealth believes that the Commonwealth and its citizens are suffering and will
continue to suffer harm unless the methods, acts and practices complained of herein are
permanently enjoined.

### *Common Law Doctrine against Restraint of Trade*

826.    By reason of the foregoing, the Defendants have entered into an agreement in
restraint of trade to allocate markets and fix prices in each generic drug market identified herein
within the Commonwealth of Pennsylvania.

827.    The agreements to allocate customers and to fix pricing as set forth in the
preceding counts constitute an unreasonable restraint of trade in violation of Pennsylvania
antitrust common law.

828.    Unless Defendants' overall anticompetitive scheme is enjoined, the Defendants
will continue to illegally restrain trade in the relevant market in concert with another in violation
of the Pennsylvania common law doctrine against unreasonable restraint of trade.

829.    Defendants' conduct in engaging in a contract to unreasonably restrain trade
concerning the customers to whom and the prices at which the numerous generic pharmaceutical

178

drugs identified herein were sold, distributed or obtained in Pennsylvania threatens injury to the Commonwealth of Pennsylvania and Pennsylvania consumers.

830.     Defendants' anticompetitive and unlawful conduct alleged herein has injured, is injuring and will continue to injure competition in the relevant market by denying consumer choice and otherwise thwarting competition in the relevant market.

831.     The Defendants' contract in restraint of trade had the following effects: (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

832.     The Defendants' illegal conduct has had a substantial effect on the Commonwealth of Pennsylvania and Pennsylvania consumers.

833.     As a direct and proximate result of the Defendants' unlawful conduct, the Commonwealth of Pennsylvania and Pennsylvania consumers have been injured in their business and property.

834.     On behalf of the Commonwealth and its citizens pursuant to 71 P.S. §732-204 (c), Pennsylvania seeks injunctive relief and disgorgement under common law.

### *Common Law Doctrine against Unjust Enrichment*

835.     By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein with respect to the Commonwealth of Pennsylvania and Pennsylvania consumers.

179

836. The Commonwealth of Pennsylvania and Pennsylvania consumers were purchasers, reimbursers and/or end-payors of Defendants' numerous generic pharmaceutical drugs identified herein and have paid amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

837. Defendants knew of, and appreciated and retained, or used, the benefits of Commonwealth of Pennsylvania and Pennsylvania consumers' purchases of any of the Defendants' numerous generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price. Defendants engaged in the conduct described herein to increase the market share of the numerous generic pharmaceutical drugs identified herein thereby increasing their sales and profits.

838. For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

839. Based on Defendants' conduct set for herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

840. Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of any of the numerous generic pharmaceutical drugs identified herein by the Commonwealth of Pennsylvania and Pennsylvania consumers. The Commonwealth of Pennsylvania, on behalf of itself and Pennsylvania consumers, seeks to recover the amounts that unjustly enriched the Defendants.

841. The Commonwealth of Pennsylvania and Pennsylvania consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement and any other relief the Court deems appropriate.

### Puerto Rico

842. Plaintiff Commonwealth of Puerto Rico repeats and re-alleges each and every preceding allegation as if fully set forth herein.

843. The aforementioned practices by Defendants were in violation of Puerto Rico Law No. 77 of June 25, 1964, also known as "Puerto Rico's Antitrust and Restrictions of Commerce Law", 10 P.R. Laws Ann. §§ 257 et seq., and 32 P.R. Laws Ann. § 3341.

844. The Commonwealth of Puerto Rico, through its Attorney General, brings this enforcement action as parens patriae in its proprietary capacity on behalf of the Commonwealth, including its agencies and entities, to recover damages to the Commonwealth and all such other relief as may be authorized by statute or common law.

845. Accordingly, the Commonwealth of Puerto Rico is entitled remedies available under the Puerto Rico's Antitrust and Restrictions of Commerce Law and 32 P.R. Laws Ann. § 3341, including injunctive relief, civil penalties and damages for the Commonwealth agencies and entities and any other appropriate monetary and injunctive relief.

### Rhode Island

846. Plaintiff State of Rhode Island repeats and re-alleges every preceding allegations as if fully set forth herein.

847. Defendants' actions as alleged herein violate the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*

181

848.    Plaintiff State of Rhode Island brings this action pursuant to R.I. General Laws §§ 6-36-10, 6-36-11 and 6-36-12 and seeks relief, including but not limited to injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees, costs, and such other relief as this court deems just and equitable.

849.    Defendants' actions as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices as defined in the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.3-1, *et seq.*

850.    Defendants engaged in unfair or deceptive acts or practices in connection with the sale or advertisement of merchandise by, among other things, making misrepresentations and taking steps to conceal their anticompetitive schemes.

851.    Defendants' violations of the Rhode Island Deceptive Trade Practices Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by R.I. Gen. Laws § 6-13.1-2, as defined by the R.I. General Laws § 6-13.1-1(6).

852.    Plaintiff State of Rhode Island brings this action pursuant to Rhode Island Gen. Laws § 6-13.1-5, and seeks relief, including but not limited to injunctive relief, restitution, disgorgement and other equitable relief, civil penalties, fees, costs, and such other relief as this court deems just and equitable.

## South Carolina

853.    Plaintiff South Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

854.    The aforementioned practices by Defendants constitute "unfair methods of competition and unfair or deceptive acts or practices" under §39-5-20 of the South Carolina Code of Laws. The State of South Carolina asserts claims in a statutory parens patriae capacity

under S.C. Code § 39-5-50 and a common law parens patriae capacity.  Pursuant to common law and S.C. Code § 39-5-50(b), South Carolina seeks that this Court restore any ascertainable loss incurred in purchasing the generic drugs at issue. Pursuant to S.C. Code § 39-5-50(a), South Carolina seeks injunctive relief to prohibit Defendants from engaging in the conduct described in this complaint.

855.    Defendants knew or reasonably should have known that their conduct violated S.C. Code § 39-5-20.  Under S.C. Code § 39-5-110(c), Defendants' conduct therefore constitutes a willful violation of S.C. Code § 39-5-20.  Accordingly, South Carolina seeks an award of civil penalties under S.C. Code § 39-5-110(a) in an amount up to $5,000.00 per violation in South Carolina.

856.    South Carolina seeks attorneys' fees and costs under S.C. Code § 39-5-50(a).

## Tennessee

857.    Plaintiff State of Tennessee repeats and re-alleges each and every preceding allegation as if fully set forth herein.

858.    This is an action that alleges violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

859.    Defendants directly and/or indirectly through nationwide distributors, wholesalers, and retailers, sold or marketed the generic drugs at issue to the State of Tennessee and its agencies, Tennessee businesses, and individual consumers.

860.    Defendants made arrangements or agreements with a view to lessening, or which tend to lessen, full and free competition in the sale in Tennessee of, or which were designed to advance or control the prices charged for, the generic drugs at issue.

861. Defendants' conduct affected Tennessee commerce to a substantial degree and substantially affected the people of Tennessee, by affecting the choice of generic drugs available to, and/or the prices paid by, the State of Tennessee and its agencies, Tennessee businesses, and individual consumers for such generic drugs.

862. The aforementioned conduct by Defendants was in violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

863. As a direct and proximate result of Defendants' illegal conduct, the State of Tennessee and its agencies, Tennessee businesses, and individual consumers have been harmed and will continue to be harmed, by, *inter alia*, paying more for generic drugs purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the illegal conduct.

864. The State of Tennessee is entitled to relief for purchases of affected generic drugs by the State of Tennessee and its agencies, Tennessee businesses, and individual consumers.

865. On behalf of the State and its agencies, Tennessee businesses, and individual consumers, the State of Tennessee seeks all legal and equitable relief available under the Tennessee Trade Practices Act and the common law, including, but not limited to: damages for purchases of the affected generic drugs; equitable relief including disgorgement and injunctive relief; attorneys' fees and costs; and such other and further relief as this Court deems just and equitable.

#### Utah

866. Plaintiff State of Utah repeats and re-alleges each and every preceding allegation as if fully set forth herein.

184

867.     The aforementioned acts by Defendants violate the Utah Antitrust Act, Utah Code §§ 76-10-3101 through 76-10-3118 (the "Act"), and Utah common law.  Accordingly, Plaintiff State of Utah, by and through the Attorney General of Utah, on behalf of itself, Utah governmental entities, and as *parens patriae* for its natural persons, is entitled to all available relief under the Act and Utah common law, including, without limitation, damages (including treble damages, where permitted), injunctive relief, including disgorgement, restitution, unjust enrichment, and other equitable monetary relief, civil penalties, and its costs and reasonable attorneys' fees.

## **Vermont**

868.     Plaintiff State of Vermont repeats and re-alleges each and every preceding allegation as if fully set forth herein.

869.     Defendants' actions alleged herein constitute unfair methods of competition in commerce and thereby violate the Vermont Consumer Protection Act, 9 V.S.A. § 2453.  Plaintiff State of Vermont seeks relief, including damages, for Vermont consumers and state entities that paid for one or more of the drugs identified herein during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Vermont seeks and is entitled to injunctive relief, civil penalties, other equitable relief (including but not limited to restitution and disgorgement), and its costs and fees for these violations pursuant to 9 V.S.A. §§ 2458 and 2465.

## **Virginia**

870.     Plaintiff Commonwealth of Virginia repeats and re-alleges each and every preceding allegation as if fully set forth herein.

185

871.    The aforementioned practices by Defendants are in violation of the Virginia
Antitrust Act, Virginia Code Sections 59.1-9.1, et seq.  These violations substantially affect the
people of Virginia and have impacts within the Commonwealth of Virginia.

872.    Plaintiff Commonwealth of Virginia, through the Attorney General, brings this
action pursuant to the Virginia Antitrust Act, Virginia Code Section 59.1-9.15.  Pursuant to
Sections 59.1-9.15(a) and (d), Plaintiff Commonwealth of Virginia seeks disgorgement,
restitution, and other equitable relief as well as civil penalties for these violations.  In addition,
pursuant to Sections 59.1-9.15(b), the Plaintiff Commonwealth of Virginia seeks reasonable fees
and costs for the investigation and litigation.

## Washington

873.    Plaintiff State of Washington repeats and re-alleges each and every preceding
allegation as if fully set forth herein.

874.    The aforementioned practices by Defendants were, and are, in violation of the
Washington Consumer Protection Act, Wash. Rev. Code 19.86.020 and .030.  Defendants have
also engaged in conduct in violation of RCW 19.82.020 that is not a reasonable business practice
and constitutes incipient violations of antitrust law and/or unilateral attempts to fix prices or
allocate markets.  These violations have impacts within the State of Washington and
substantially affect the people of Washington.

875.    Plaintiff State of Washington seeks relief, including but not limited to damages,
for Washington consumers and Washington state agencies that paid more for the generic drugs at
issue than they would have paid but for the Defendants' unlawful conduct.  Plaintiff State of
Washington also seeks, and is entitled to, injunctive relief, other equitable relief (including but

not limited to disgorgement), civil penalties, and costs and fees under the Consumer Protection
Act, Wash Rev. Code 19.86.080 and 19.86.140.

## West Virginia

876.    Plaintiff State of West Virginia repeats and re-alleges each and every preceding
allegation as if fully set forth herein.

877.    Defendants' acts violate the West Virginia Antitrust Act, see W. Va. Code § 47–
18–1 et seq. These violations substantially affected the State of West Virginia and had impacts
within the State of West Virginia.

878.    West Virginia affirmatively expresses that the State is not seeking any relief in
this action for the federal share of funding for West Virginia's Medicaid Program.

879.    Claims for damages for any federal monies expended by the State of West
Virginia are hereby expressly disavowed.

880.    Plaintiff State of West Virginia is entitled all equitable relief (including injunctive
relief, disgorgement, restitution, and reimbursement), as well as civil penalties under West
Virginia Code § 47–18–1 et seq.

881.    Plaintiff State of West Virginia also is entitled to recover its costs and attorneys'
fees under West Virginia Code § 47–18–9.

## Wisconsin

882.    Plaintiff State of Wisconsin repeats and re-alleges each and every preceding
allegation as if fully set forth herein.

883.    The aforementioned practices by Defendants are in violation of Wisconsin's
Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.  These violations substantially affect the people of
Wisconsin and have impacts within the State of Wisconsin.

884. Plaintiff State of Wisconsin, under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available at law or in equity under Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18.

## Wyoming

885. Plaintiff State of Wyoming repeats and re-alleges each and every preceding allegation as if fully set forth herein.

886. Defendants' actions as alleged herein constitute unlawful practices in violation of The Wyoming Consumer Protection Act, Wyoming Statutes § 40-12-101 *et seq*.

887. In the course of business and in connection with consumer transactions, Defendants knowingly and willfully engaged in deceptive acts or practices by, among other things, misrepresenting or omitting material facts about the price and cost of merchandise, the absence of competition in each generic drug market identified herein, and the existence of Defendants' anticompetitive scheme. Such conduct has the tendency or capacity to deceive.

888. In the course of business and in connection with consumer transactions, Defendants knowingly and willfully engaged in unfair acts or practices by, among other things, entering into agreements or becoming parties to plans to prevent competition or to control or influence prices in each generic drug marketed identified herein. Such conduct offends public policy, substantially injures consumers, interferes with meaningful consumer choice, and offers no countervailing benefit to consumers or competition.

889. Plaintiff State of Wyoming, through the Office of the Wyoming Attorney General, brings this action in the public interest to protect Wyoming's consumers and marketplace by restraining and enjoining Defendants from violating the Wyoming Consumer

Protection Act, recovering statutory civil penalties, and recovering reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

Accordingly, the Plaintiff States request that the Court:

A. Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. Adjudge and decree that the foregoing activities violated each of the State statutes enumerated in this Consolidated Amended Complaint;

C. Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

D. Award to Plaintiff States disgorgement of the Defendants' ill-gotten gains and any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal law or state antitrust and consumer protection laws to restore competition;

E. Award to the Plaintiff States damages, including treble damages, to the extent sought pursuant to applicable state laws as enumerated in Count Nineteen of this Consolidated Amended Complaint;

F. Award to each Plaintiff State the maximum civil penalties allowed by law as enumerated in Count Nineteen of this Consolidated Amended Complaint;

G. Award to each Plaintiff State its costs, including reasonable attorneys' fees; and

H. Order any other relief that this Court deems proper.

190

## **JURY DEMAND**

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, on all issues triable as of right by jury.

PLAINTIFF

GEORGE JEPSEN
ATTORNEY GENERAL

BY: *W. Joseph Nielsen*

Michael E. Cole
W. Joseph Nielsen
Federal Bar No. ct20415
Laura J. Martella
Federal Bar No. ct27380
Assistant Attorneys General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033
Joseph.Nielsen@ct.gov

191

FOR PLAINTIFF STATE OF ALABAMA
STEVEN T. MARSHALL
ATTORNEY GENERAL

Billington M. Garrett
Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Fax: (334) 242-2433
Email: bgarrett@ago.state.al.us

FOR PLAINTIFF STATE OF ALASKA
JAHNA LINDEMUTH
ATTORNEY GENERAL

Margaret Paton Walsh
(Alaska Bar No. 0411074)
Julia Metzger
(Alaska Bar No. 1211120)
Assistant Attorneys General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 269-5100
Fax: (907) 276-3697
margaret.paton-walsh@alaska.gov
Julia.metzger@alaska.gov

FOR PLAINTIFF STATE OF ARIZONA
MARK BRNOVICH
ATTORNEY GENERAL OF ARIZONA

DANA R. VOGEL
(Arizona Bar No. 030748)
Assistant Attorney General
Office of the Attorney General
Civil Litigation Division, Antitrust Unit
1275 West Washington
Phoenix, Arizona 85007
Telephone: (602) 542-7728
Fax: (602) 542-9088
Dana.vogel@azag.gov

New Address in November 2017:
2005 North Central Avenue
Phoenix, AZ 85004-1592

FOR PLAINTIFF STATE OF ARKANSAS

LESLIE RUTLEDGE
ATTORNEY GENERAL

Shawn J. Johnson – AR Bar # 2004181
Senior Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email: shawn.johnson@arkansasag.gov

Suzanne Hixson (Prince) - AR Bar # 80117
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 683-1509
Fax: (501) 682-8118
Email: suzanne.hixson@arkansasag.gov

ATTORNEYS FOR PLAINTIFF
STATE OF ARKANSAS

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA
XAVIER BECERRA
ATTORNEY GENERAL

KATHLEEN FOOTE
Senior Assistant Attorney General

CHERYL JOHNSON (CA SBN 66321)
PAMELA PHAM (CA SBN 235493)
Deputy Attorneys General
300 S. Spring Street, Suite 1700
Los Angeles, CA 90013
Telephone: (213) 897-2688
Fax: (213) 897-2801
E-mail: Cheryl.Johnson@doj.ca.gov;
        Pamela.Pham@doj.ca.gov

FOR PLAINTIFF STATE OF COLORADO
CYNTHIA H. COFFMAN
ATTORNEY GENERAL

Devin M. Laiho
Senior Assistant Attorney General
Colorado Department of Law
Consumer Protection Section
1300 Broadway, Seventh Floor
Denver, Colorado 80203
Telephone: 720-508-6219
Email: Devin.Laiho@coag.gov

FOR PLAINTIFF DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

ROBYN R. BENDER [D.C. Bar # 465117]
Deputy Attorney General
Public Advocacy Division

CATHERINE A. JACKSON [D.C. Bar #1005415]
Chief, Public Integrity Section

ELIZABETH G. ARTHUR [FL Bar #974020]
Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-6514
elizabeth.arthur@dc.gov

Attorneys for the District of Columbia

STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
Fax: (302) 577-6499
Email: Michael.Undorf@state.de.us

FOR PLAINTIFF STATE OF FLORIDA
PAMELA JO BONDI
Attorney General

PATRICIA A. CONNERS
(Florida Bar No. 361275)
Deputy Attorney General
Trish.Conners@myfloridalegal.com
LIZABETH A. BRADY
(Florida Bar No. 457991)
Chief, Multistate Enforcement
Liz.Brady@myfloridalegal.com
TIMOTHY FRASER
(Florida Bar No. 957321)
Assistant Attorney General
Timothy.Fraser@myfloridalegal.com
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134

FOR THE STATE OF HAWAII
RUSSELL A. SUZUKI
ATTORNEY GENERAL OF HAWAII

BRYAN C. YEE
RODNEY I. KIMURA
Deputy Attorneys General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813
Tel: 808-586-1180
Fax: 808-586-1205
Bryan.c.yee@hawaii.gov
Rodney.i.kimura@hawaii.gov

FOR PLAINTIFF STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

Brett T. DeLange
John K. Olson
Deputy Attorneys General
Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho  83720-0010
Telephone: (208) 334-4114
Fax: (208) 334-4151
brett.delange@ag.idaho.gov
john.olson@ag.idaho.gov

FOR PLAINTIFF STATE OF ILLINOIS

LISA MADIGAN
Attorney General

Robert W. Pratt
Antitrust Bureau Chief
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Tel: (312) 814-3722
Fax: (312) 814-4902
rpratt@atg.state.il.us

Respectfully submitted,

CURTIS T. HILL
Attorney General of the State of Indiana

AMANDA JANE LEE
Deputy Attorney General

TAMARA WEAVER
Deputy Attorney General

JUSTIN G. HAZLETT
Section Chief, Consumer Protection
Division

302 West Washington St., 5th Floor
IGCS -5th Floor
Indianapolis, IN 46204

Tel: (317) 233-8297
Fax: (317) 233-4393

ATTORNEYS FOR THE
STATE OF INDIANA

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel: (515) 281-7054
Fax: (515) 281-4902
Layne.Lindebak@iowa.com

ATTORNEYS FOR THE
STATE OF IOWA

FOR PLAINTIFF STATE OF KANSAS
DEREK SCHMIDT
ATTORNEY GENERAL

Lynette R. Bakker
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 368-8451
Fax: (785) 291-3699
Email: lynette.bakker@ag.ks.gov

ANDY BESHEAR
Attorney General of Kentucky

LeeAnne Applegate
Charles W. Rowland
Assistant Attorneys General
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: 502-696-5300
Fax: 502-573-8317
LeeAnne.Applegate@ky.gov
Charlie.Rowland@ky.gov

ATTORNEYS FOR THE STATE OF KENTUCKY

FOR PLAINTIFF
STATE OF LOUISIANA
JEFF LANDRY
Attorney General
State of Louisiana

STACIE L. DEBLIEUX
LA Bar # 29142
Assistant Attorney General
Public Protection Division
1885 North Third St.
Baton Rouge, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
Email: deblieuxs@ag.louisiana.gov

Respectfully submitted,

JANET T. MILLS
Attorney General of Maine

Christina Moylan
Assistant Attorney General
Office of the Attorney General of Maine
6 State House Station
Augusta, ME 04333
Tel:  207-626-8838
Fax: 207-624-7730
christina.moylan@maine.gov

ATTORNEYS FOR THE
STATE OF MAINE

BRIAN E. FROSH
MARYLAND ATTORNEY GENERAL

Ellen S. Cooper
Assistant Attorney General
Chief, Antitrust Division

John R. Tennis
Assistant Attorney General
Deputy Chief, Antitrust Division
Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202
Tel. # (410) 576-6470
Fax # (410) 576-7830
jtennis@oag.state.md.us

Attorneys for the State of Maryland

FOR PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Carol E. Head (MA BBO No. 652170)
Matthew M. Lyons (MA BBO No. 657685)
Michael MacKenzie (MA BBO No. 683305)
Assistant Attorneys General
Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184 (fax)
William.Matlack@state.ma.us
Carol.Head@state.ma.us
Matthew.Lyons@state.ma.us
Michael.Mackenzie@state.ma.us

FOR PLAINTIFF
STATE OF MICHIGAN
BILL SCHUETTE
ATTORNEY GENERAL

DJ Pascoe
Assistant Attorney General
First Assistant, Corporate Oversight
Michigan Department of Attorney General
G. Mennen Williams Building, 6th Floor
525 W. Ottawa Street
Lansing, Michigan 48933
pascoed1@michigan.gov
Telephone: (517) 373-1160
Fax: (517) 335-6755

FOR PLAINTIFF
STATE OF MINNESOTA

LORI SWANSON
ATTORNEY GENERAL

JAMES CANADAY
Deputy Attorney General

JUSTIN ERICKSON
Assistant Attorney General

JOSEPH C. MEYER
Assistant Attorney General
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1433
Fax: (651) 296-9663
Email: Joseph.meyer@ag.state.mn.us

FOR PLAINTIFF STATE OF MISSISSIPPI

JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: Crystal Utley Secoy, MSBN 102132
Special Assistant Attorney General

Consumer Protection Division
Office of the Attorney General
Post Office Box 22947
Jackson, Mississippi 39225
Telephone: 601-359-4213
Fax: 601-359-4231
Email: cutle@ago.state.ms.us

FOR PLAINTIFF STATE OF MISSOURI

JOSHUA D. HAWLEY
Attorney General

Michael Schwalbert, MO Bar No. 63229
Assistant Attorney General
815 Olive Street, Suite 200
Saint Louis, Missouri 63101
Tel: (314) 340-7888
Fax: (314) 340-7957
Michael.Schwalbert@ago.mo.gov

ATTORNEY FOR PLAINTIFF
STATE OF MISSOURI

STATE OF MONTANA
TIMOTHY C. FOX
Attorney General

MARK MATTIOLI
Chief, Consumer Protection
CHUCK MUNSON
Assistant Attorney General

MONTANA DEPARTMENT OF JUSTICE
OFFICE OF CONSUMER PROTECTION
555 Fuller Avenue
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-4500
FAX: (406) 442-1894
cmunson@mt.gov

FOR PLAINTIFF
STATE OF NEBRASKA,
ex rel. DOUGLAS J. PETERSON,
ATTORNEY GENERAL

Collin Kessner
Assistant Attorney General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
Tel: 402-471-3833
Fax: 402-471-4725
collin.kessner@nebraska.gov

FOR PLAINTIFF STATE OF NEVADA

ADAM PAUL LAXALT
Nevada Attorney General

Lucas J. Tucker
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
10791 W. Twain Ave., Suite 100
Las Vegas, Nevada 89135
Nevada Bar No. 10252
ltucker@ag.nv.gov

FOR THE PLAINTIFF
STATE OF NEW HAMPSHIRE
By its attorney,
Joseph A. Foster
Attorney General of New Hampshire

Jennifer L. Foley, NH Bar #10519
Assistant Attorney General
Consumer Protection and Antitrust Bureau
NH Department of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-7987
Jennifer.Foley@doj.nh.gov

Brooksley C. Belanger, NH Bar #17097
Assistant Attorney General
Medicaid Fraud Control Unit
33 Capitol Street
Concord, NH 03301-6397
(603) 271-1246
brooksley.belanger@doj.nh.gov

GURBIR S. GREWAL
Attorney General of New Jersey

Robert N. Holup
Labinot A. Berlajolli
Deputy Attorneys General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Tel: (973) 877-1280
Fax: (973) 648-4887
Robert.Holup@law.njoag.gov
Labinot.Berlajolli@law.njoag.gov

ATTORNEYS FOR THE
STATE OF NEW JERSEY

FOR PLAINTIFF STATE OF NEW MEXICO
HECTOR BALDERAS
ATTORNEY GENERAL

Nicholas M. Sydow
Scott Cameron
Assistant Attorneys General
P.O. Drawer 1508
Santa Fe, NM  87504-1508
Telephone:  (505) 717-3571
Fax:  (505) 490-4881
Email:  nsydow@nmag.gov
Email:  scameron@nmag.gov

Respectfully submitted,

BARBARA D. UNDERWOOD
Attorney General of the State of New York

MANISHA SHETH
Executive Deputy Attorney General for
Economic Justice

BEAU BUFFIER
Chief, Antitrust Bureau

ELINOR R. HOFFMAN
Deputy Chief, Antitrust Bureau

ROBERT L. HUBBARD
EMILY GRANRUD
Assistant Attorneys General

28 Liberty, 20th Floor
New York, New York 10005
Tel: (212) 416-8267
Fax: (212) 416-6015

ATTORNEYS FOR THE
STATE OF NEW YORK

FOR PLAINTIFF
STATE OF NORTH CAROLINA

Respectfully submitted,

JOSH STEIN
Attorney General of North Carolina

Kimberley A. D'Arruda
Special Deputy Attorney General
kdarruda@ncdoj.gov

Jessica V. Sutton
Assistant Attorney General
jsutton2@ncdoj.gov

North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Fax: (919) 716-6050

STATE OF NORTH DAKOTA
Wayne Stenehjem
Attorney General

Parrell D. Grossman, ND ID 04684
Assistant Attorney General
Director, Consumer Protection &
Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste 200
Bismarck, ND  58503--5574
Telephone (701) 328-5570
Facsimile (701) 328-5568
pgrossman@nd.gov

*Attorneys for the State of North Dakota*

Respectfully submitted,

R. MICHAEL DEWINE
Attorney General of Ohio

Jennifer Pratt
Chief, Antitrust Section
Beth A. Finnerty
Assistant Section Chief, Antitrust Section
Edward J. Olszewski
Senior Assistant Attorney General
Office of the Ohio Attorney General
Antitrust Section
150E.Gay St., 22ndFloor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269
edward.olszewski@ohioattorneygeneral.gov

ATTORNEYS FOR THE
STATE OF OHIO

FOR PLAINTIFF STATE OF
OKLAHOMA

MIKE HUNTER
ATTORNEY GENERAL

Rachel Irwin, OBA #31598
Assistant Attorney General
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-1014
Fax: (405) 522-0085
Email: Rachel.Irwin@oag.ok.gov

STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

TIM D. NORD, OSB 882800
Special Counsel
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 373-7067
tim.d.nord@doj.state.or.us

CHERYL F. HIEMSTRA, OSB 133857
Assistant Attorney General
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 373-7067
cheryl.hiemstra@doj.state.or.us

COMMONWEALTH OF
PENNSYLVANIA
Office of the Attorney General

JOSH SHAPIRO
ATTORNEY GENERAL

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: 717-787-4530
Fax: 717-787-1190
twertz@attorneygeneral.gov
jbetsko@attorneygeneral.gov

ATTORNEYS FOR THE
COMMONWEALTH
OF PENNSYLVANIA

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO

WANDA VÁZQUEZ GARCED
Attorney General


Denise Maldonado Rosa
Assistant Attorney General
USDC-PR 301108
PR Bar No. 15652
dmaldonado@justicia.pr.gov

Johan M. Rosa Rodríguez
Attorney
PR Bar No. 16819
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 2600, 2601
Fax: (787) 721-3223
jorosa@justicia.pr.gov

FOR PLAINTIFF STATE OF RHODE ISLAND

Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2401
emurray@riag.ri.gov

ALAN WILSON
Attorney General for the
State of South Carolina
Federal ID No. 10457
Email: awilson@scag.gov

W. JEFFREY YOUNG
Chief Deputy Attorney General
Federal ID No. 6122
Email: jyoung@scag.gov

ROBERT D. COOK
Solicitor General
Federal ID No. 285
Email: bcook@scag.gov

C. HAVIRD JONES, JR.
Senior Assistant Deputy Attorney General
Federal ID No. 2227
Email: sjones@scag.gov

CLARK KIRKLAND, JR.
Assistant Attorney General
Federal ID No. 12410
Email: ckirklandjr@scag.gov

OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street
Rembert C. Dennis Building
Post Office Box 11549
Columbia, South Carolina 29211-1549
Phone: 803.734.3970

Attorneys for Alan Wilson, in his official
capacity as Attorney General of the
State of South Carolina.

FOR PLAINTIFF STATE OF TENNESSEE

HERBERT H. SLATERY III
Attorney General and Reporter of
Tennessee

CYNTHIA E. KINSER
Deputy Attorney General

BRANT HARRELL
Senior Counsel

DAVID MCDOWELL
Assistant Attorney General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-8722
Cynthia.Kinser@ag.tn.gov
Brant.Harrell@ag.tn.gov
David.McDowell@ag.tn.gov


ATTORNEYS FOR THE
STATE OF TENNESSEE

FOR PLAINTIFF STATE OF UTAH

SEAN D. REYES
UTAH ATTORNEY GENERAL
350 North State Street, #230
P.O. Box 142320
Salt Lake City, UT 84114-2320

David Sonnenreich
Deputy Attorney General

Ronald J. Ockey
Assistant Attorney General
Chief, Antitrust Section

Edward Vasquez
Assistant Attorney General

Office of the Attorney General of Utah
Tax, Financial Services and Antitrust
Division
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0874
Tel: 801-366-0375
Fax: 801-366-0378
dsonnenreich@utah.gov
rockey@utah.gov
evasquez@utah.gov

ATTORNEYS FOR THE
STATE OF UTAH

FOR PLAINTIFF STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

Jill S. Abrams
Assistant Attorney General
109 State Street
Montpelier, Vermont 05609
Telephone: (802) 828-1106
Fax: (802) 828-2154
Email: Jill.Abrams@vermont.gov

Respectfully submitted,

MARK R. HERRING
Attorney General of Virginia

Cynthia E. Hudson
Chief Deputy Attorney General

Samuel T. Towell
Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Chief, Consumer Protection Section

Sarah Oxenham Allen
Senior Assistant Attorney General

Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA  23219
Tel:  804-692-0485
Fax: 804-786-0122
thenry@oag.state.va.us

ATTORNEYS FOR THE
COMMONWEALTH OF VIRGINIA

ROBERT W. FERGUSON
Attorney General of Washington State

JONATHAN A. MARK
Senior Assistant Attorney General
Antitrust Division Chief

Erica Koscher
Assistant Attorney General
Office of the Attorney General of
Washington State
800 5th Ave, Ste. 2000
Seattle, WA 98104-3188
(206) 464-7744

Attorneys for Plaintiff State of Washington

FOR PLAINTIFF STATE OF WEST VIRGINIA
PATRICK MORRISEY
ATTORNEY GENERAL

Edward M. Wenger
General Counsel
Douglas L. Davis
Assistant Attorney General
Office of the West Virginia Attorney General
State Capitol
Bldg. 1, Room E-26
Charleston, WV 25305
Telephone: (304) 558-2021
Fax: (304) 558-0140
Email: edward.m.wenger@wvago.gov
Email: douglas.l.davis@wvago.gov

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General

GWENDOLYN J. COOLEY
Assistant Attorney General
State Bar #1053856

Attorneys for the State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-5810
(608) 266-2250 (Fax)
cooleygj@doj.state.wi.us

238

STATE OF WYOMING

PETER K. MICHAEL
ATTORNEY GENERAL

Benjamin M. Burningham
Emily Soli
Assistant Attorneys General
Consumer Protection Unit
Office of the Wyoming Attorney General
2320 Capitol Ave.
Cheyenne, WY 82002
Tel: (307) 777-8962
Fax: (307) 777-3435
ben.burningham@wyo.gov
emily.soli@wyo.gov