**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:  GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | |
| *The State Attorney General Litigation* | Civil Action No. 17-3768 |

**STATES' RESPONSE IN OPPOSITION**
**TO EMCURE PHARMACEUTICALS LTD. AND SATISH MEHTA'S**
**MOTION TO DISMISS THE**
**PLAINTIFF STATES' CONSOLIDATED AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ................................................................................................... 2

III.    ARGUMENT ................................................................................................... 4

A.    This Court Has Personal Jurisdiction over the Emcure Defendants ................................ 4

    1.    Legal Standard ................................................................................................... 4

    2.    The Court Has General Personal Jurisdiction over Emcure ......................................... 6

    3.    The Court Has Specific Personal Jurisdiction over Emcure Pharmaceuticals Ltd. and Satish Mehta...................................................................................................10

    4.    In the Alternative, the Court Should Delay Ruling on Defendants' 12(b)(2) Motion subject to Completion of Jurisdictional Discovery...................................................... 19

B.    States Have Stated Plausible Claims against Emcure Defendants ................................. 20

    1.    Legal Standard................................................................................................... 20

    2.    States Sufficiently Plead a Claim as to Emcure Defendants' Participation in a Conspiracy to Allocate the Market for Doxy DR ...................................................... 20

    3.    States Plead a Claim as to Emcure's Participation in an Overarching Conspiracy to Fix Prices and Allocate Markets for Generic Drugs ................................................... 23

IV.    CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541 (E.D. Pa. 2018) .................... 5, 15, 16

*ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855 (3d Cir. 1994) ................................................. 20

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987) ............................... 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................. 21, 23

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773 (2017) ...................................... 17

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ............................................. 11, 12, 17, 18

*Calder v. Jones*, 465 U.S. 783 (1984) ................................................................. 11, 12

*Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141 (3d Cir. 1992) ........................................... 6, 15

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .......................... 21

*Doe v. Hesketh*, 15 F. Supp. 3d 586 (E.D. Pa. 2014) ................................................. 16

*D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*,
    566 F.3d 94 (3d Cir. 2009) ................................................................. 5, 6, 9, 10, 12, 14

*Erickson v. Pardus*, 551 U.S. 89 (2007) ................................................................. 23

*Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993) ....................... 14

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................................. 11

*IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254 (3d Cir. 1998) ...................................... 15

*In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482 (E.D. Pa. 2005) .............. 12, 17, 19

*In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288 (3d Cir. 2004) ...................... 5, 15, 16

*In re Auto. Refinishing Paint Antitrust Litig.*,
    No. 1426, 2002 WL 31261330 (E.D. Pa. July 31, 2002) .................................................. 16, 20

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*,
    Civ. No. 02–6030 (WHW), 2007 WL 2212713 (D.N.J. July 30, 2007) ........................... 15, 16

*In re Chocolate Confectionary Antitrust Litigation*,
  674 F. Supp. 2d 580 (M.D. Pa. 2009) ........................................................ 6, 8, 19

*In re Fasteners Antitrust Litig.*,
  C.A. No. 08-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ...................................... 15

*In re Generic Pharm. Pricing Antitrust Litig.*,
  315 F. Supp. 3d 848 (E.D. Pa. 2018) ........................................................ 21, 24

*In re Generic Pharm. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ........................................................ 20, 22, 23

*In re Insurance*, 618 F.3d n.24 ........................................................ 23

*In re K-Dur Antitrust Litig.*, Civ. A.,
  No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ........................................ 25

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) ........................ 15

*In re Polyester Staple Antitrust Litig.*,
  No. 3:03-CV-1516, 2008 WL 906331 (W.D.N.C. Apr. 1, 2008) ........................................ 18

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ................... 21

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
  No., 13-MD-2445, 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017) ........................................ 4, 5

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ........................................ 11

*Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290 (3d Cir. 2008) ........................................ 6

*Lucas v. Gulf & W. Indus., Inc.*, 666 F.2d 800 (3d Cir. 1981) ........................................ 6

*Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455 (E.D. Pa. 2019) ........................................ 5, 7, 18

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997) ................... 20

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 846 F.Supp. 374, (E.D. Pa. 1994) ........... 16

*Max Daetwyler Corp. v. Meyer*, 762 F.3d 290 (3d Cir. 1985) ........................................ 17

*McGee v. Int'l Life Ins. Co*, 355 U.S. 220 (1957) ........................................ 12, 18

*Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324 (3d Cir. 2009) ................................ 20

*Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93 (3d Cir. 2004) ........................................ 5, 6

*Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.*,
   64 F. Supp. 2d 448 (E.D. Pa. 1999) .................................................................. 4

*Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628 (E.D. Pa. 2018) ............................ 7

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007) ................................ 6, 14, 17, 18

*Penco Products, Inc. v. WEC Manufacturing, LLC*,
   974 F. Supp. 2d 740 (E.D. Pa. 2013) ........................................................... 4, 14

*Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197 (3d Cir. 1998) ............................... 17

*Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3d Cir. 2002) ............................................ 5, 17, 20

*Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assn*, 819 F.2d 434 (3d Cir. 1987) ..................... 4

*Radio Music License Comm., Inc. v. Global Music Rights, LLC*,
   Civ. No. 16-6076, Slip Op., 2019 WL 1437981 (E.D. Pa. Mar. 29, 2019) ........................... 15

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018) ................................. 5, 6, 7, 20

*SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660 (E.D. Pa. 2011) ........................... 22

*Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446 (2003) ................................... 13, 14, 20

*TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571 (E.D. Pa. 2012) ..................... 4

*United Healthcare Services, Inc. v. Cephalon, Inc.*,
   No. 17-555, 2018 WL 878766 (E.D. Pa. Feb. 13, 2018) ........................................... 16

*United States v. Padilla*, 982 F.2d 110 (3d Cir. 1992) ................................................... 25

*United States v. Perez*, 489 F.2d 51 (5th Cir. 1973) .................................................... 25

*Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977) .................................................. 19

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) .............................. 23

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ...................................... 11, 17

## Rules

Fed. R. Civ. P. 12(b)(2) ................................................................................. 26

Fed. R. Civ. P. 12(b)(6) .......................................................................... 20, 25, 26

Fed. R. Civ. P. 30(b)(6)..................................................................................................... 8

**Other Authorities**

16 Moore's Federal Practice § 108.42[3][b][ii])........................................................... 12

Plaintiff States[1] respectfully submit this memorandum of law in opposition to Defendants Emcure Pharmaceuticals Limited ("Emcure") and Satish Mehta's (collectively, the "Emcure Defendants") Motion to Dismiss the Plaintiff States' Consolidated Amended Complaint (ECF No. 155).

## I.   INTRODUCTION

Emcure Defendants seek to avoid justice in the United States for their unlawful conduct by hiding behind national borders and contrived corporate formalities distinguishing them from their American subsidiaries.  Neither of those obstacles stopped them from reaching out to the United States to allocate markets for their products, thereby unlawfully extracting supra-competitive profits from consumers in this country.  Emcure organized and conducted its market allocation scheme and participation in an overarching conspiracy to restrain trade in the U.S. generic drug markets through communications sent to people in the United States by Defendant Mehta among others.  The effects of those conspiracies were felt in the United States, as Emcure Defendants intended them to be.  Moreover, the corporate separation between Emcure and its American subsidiaries Heritage Pharmaceuticals, Inc. ("Heritage") and Emcure Pharmaceuticals USA, Inc. ("Emcure USA" a/k/a "Heritage Pharma Labs") only superficially masks an alter ego relationship among the entities.  For those reasons, this Court has jurisdiction over Emcure and Satish Mehta.

Emcure Defendants also seek to escape this litigation by asserting that States have failed to state a claim as to Emcure Defendants' participation in drug-specific and overarching

---

[1] Forty-six states, the Commonwealth of Puerto Rico, and the District of Columbia assert claims against Emcure.  Of the plaintiffs in this action, only California has not yet asserted claims against Emcure.  Thirty-seven states (Connecticut, Alabama, Alaska, Arkansas, Arizona, Colorado, Delaware, Hawaii, Idaho, Illinois, Iowa, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Jersey, New Mexico, Nevada, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, Virginia, West Virginia and Wyoming) and the Commonwealth of Puerto Rico assert claims against Satish Mehta.  Collectively, these government plaintiffs are referred to in this opposition memorandum as the "States."

conspiracies.  This Court has already heard the same arguments in this and related litigation and ruled against the defendants.  It should rule no differently now.  Even putting aside the Court's previous decisions, the States have alleged sufficient facts and pleaded plausible claims against Emcure Defendants.

## II.    BACKGROUND

This action stems from an investigation that has uncovered copious evidence of a longstanding campaign by dozens of generic pharmaceutical manufacturers and their executives to illegally allocate markets and fix prices for their products.  The culprits were part of an overarching conspiracy as well as numerous constituent conspiracies to subvert the normal functioning of the generic drug markets in the United States in a successful effort to obtain supra-competitive prices for their products.

Emcure Defendants were active participants in that overarching conspiracy, as well as at least one drug-specific conspiracy aimed at allocating the U.S. market for Doxycycline Delayed Release ("Doxy DR").  Emcure is the sole owner of Heritage and Emcure USA. Defendant Mehta is Emcure's founder, Managing Director, and CEO.  Mehta Decl. (ECF No. 155-4) ¶ 2.  Heritage—as described throughout States' Consolidated Amended Complaint (ECF No. 15), the "Complaint" or "CAC")—was an active player in the overarching conspiracy and multiple drug-specific conspiracies.[2]  Defendant Mehta and another Emcure executive, V.T., constituted—for much of the time period covered in the Complaint—the majority of Heritage's board of directors.[3] Moreover, Defendant Mehta and V.T., along with other Emcure directors, officers, and employees,

---

[2] Heritage recently entered into a Deferred Prosecution Agreement with the U.S. Department of Justice related to its violations of the Sherman Act, and two of its executives, including its founder and former CEO Jeffrey Glazer, have previously pleaded guilty to related federal criminal antitrust violations.
[3] *See* Ex. A, Leff Decl., Att. 1, 59:23 – 60:22; Ex. B, Glazer Decl. ¶ 10.

played an active role in decision making regarding Heritage's sales of pharmaceuticals in the United States.  For example, Emcure manufactured drugs sold by Heritage and submitted Abbreviated New Drug Applications ("ANDAs") allowing Heritage to sell pharmaceuticals in the United States.[4]  Officers and employees of Emcure, Heritage, and Emcure USA often acted on behalf of the three companies interchangeably, ignoring the corporate and geographic formalities separating them.[5]

Beyond their ownership and control of Heritage, Emcure Defendants played an active role in the anticompetitive conspiracies alleged in the Complaint.  For example, in April 2013, Defendant Mehta and V.T. met with Heritage CEO Jeffrey Glazer and Heritage Vice President of Commercial Operations Jason Malek and decided to attempt to reach an agreement with their competitor, Defendant Mylan Pharmaceuticals, Inc. ("Mylan"), to allocate the U.S. market for Doxy DR.  CAC ¶ 183.  Defendant Mehta initiated the outreach to Mylan by contacting a United States-based Mylan executive, Defendant Rajiv Malik.  *Id.*  Defendant Mehta's outreach was successful and led to continued anticompetitive coordination between Heritage and Mylan regarding Doxy DR and other products.  *See, e.g.*, *id.*  ¶¶ 186-89.  After that original outreach to Mylan, Defendant Mehta and Emcure continued to involve themselves in the conspiracy.  For instance, Defendant Mehta called Defendant Malik again on July 18, 2013 to ensure that Mylan would abide by its agreement to allocate customers to Heritage.  *Id.* ¶ 198.  V.T. of Emcure then contacted Mr. Glazer in the United States to inform him of Defendant Mehta's communication with Defendant Malik and to encourage Mr. Glazer to continue to coordinate with Defendant Malik and Mylan.  *Id.*  Mr. Glazer and others at Heritage did so.  *See, e.g.*, *id.* ¶¶ 199-200, 203.  Emcure

---

[4] *See infra* p. 9.
[5] *See infra* pp. 7-9.

Defendants' illegal actions resulted in the maintenance of supra-competitive prices for Doxy DR and other drugs in the United States.

## III.   ARGUMENT

### A.   THIS COURT HAS PERSONAL JURISDICTION OVER THE EMCURE DEFENDANTS

This Court has personal jurisdiction over Emcure and Satish Mehta.  "There are two types of personal jurisdiction: general and specific."  *Penco Products, Inc. v. WEC Manufacturing, LLC*, 974 F. Supp. 2d 740, 746 (E.D. Pa. 2013).  The Court has both general and specific personal jurisdiction over Emcure and has specific personal jurisdiction over Defendant Mehta.

#### 1.   Legal Standard

Once a defendant challenges a court's exercise of personal jurisdiction, the plaintiff must "demonstrate facts that suffice to support an exercise of [the court's] jurisdiction" over that defendant.  *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4642285, at *3 (E.D. Pa. Oct. 17, 2017) (citing *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assn*, 819 F.2d 434, 437 (3d Cir. 1987).  A "plaintiff may meet its *prima facie* burden by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum.'"  *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571, 586 (E.D. Pa. 2012) (quoting *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.*, 64 F. Supp. 2d 448, 450 (E.D. Pa. 1999) (internal quotation marks omitted).  As Emcure Defendants concede, "personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."  *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004); *accord, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4642285, at *3 (E.D. Pa. Oct. 17, 2017).

At the motion to dismiss stage, States "need only" establish "a prima facie case in favor of personal jurisdiction." *Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541, 550 (E.D. Pa. 2018); *accord*, *e.g.*, *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018); *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) ("[P]laintiffs needed only to establish a prima facie case of personal jurisdiction and the plaintiffs were entitled to have their allegations taken as true and all factual disputes drawn in their favor.") (internal brackets and quotation marks omitted) (quoting *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir. 2004)); *Lutz v. Rakuten, Inc.* 376 F. Supp. 3d 455, 463 (E.D. Pa. 2019). Emcure Defendants' assertion that States must establish the existence of personal jurisdiction by a preponderance of the evidence at the motion to dismiss stage is incorrect. *See* ECF No. 155-1. ("Def Mem.") 3.

Plaintiffs may make their prima facie case for jurisdiction by submitting competent evidence or by relying on the allegations in the complaint where defendants have not rebutted those allegations with competent evidence of their own. As the Third Circuit explained in *Miller Yacht Sales*, for a Rule 12(b)(2) motion "the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." 384 F.3d at 97 (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)).[6] "If the moving party fails to submit evidence contravening the allegations of the complaint, the court is bound to accept plaintiff's allegations regardless of whether plaintiff presents further evidence in support thereof." *In re Chocolate Confectionary Antitrust Litigation*, 674 F. Supp. 2d 580, 595, n.21 (M.D. Pa. 2009) (internal citations omitted) (citing *Miller Yacht Sales*, 384 F.3d at 97 and *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141,

---

[6] Emcure Defendants misleadingly cite a footnote in the minority opinion in *Miller Yacht Sales* to incorrectly assert that plaintiffs may never rely on allegations alone to prove their prima facie case for jurisdiction. *See* Def. Mem. 3; *Miller Yacht Sales*, 384 F.3d at 101, n.6.

142 n.1 (3d Cir. 1992)).  Until defendants have countered plaintiffs' allegations with competent evidence, those allegations alone may suffice to make plaintiffs' prima facie case. *See, e.g.*, *Shuker*, 885 F.3d at 780 (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)).

### 2.      The Court Has General Personal Jurisdiction over Emcure

The Court has general personal jurisdiction over Emcure as the alter ego of its U.S. subsidiaries Heritage and Emcure USA.  Third Circuit case law holds that, where "a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise controls the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction . . . exists over the subsidiary."  *Shuker*, 885 F.3d at 781 (citing *D'Jamoos*, 566 F.3d at 108-09 ; *Lucas v. Gulf & W. Indus., Inc.*, 666 F.2d 800, 805-06 (3d Cir. 1981); *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008)) (internal quotation marks and citations omitted).  The Court's general jurisdiction over Heritage and Emcure USA—both based in the United States—is uncontested.  As described below, Emcure controls Heritage and Emcure USA, which act as Emcure's agents in the United States, and therefore the Court has general personal jurisdiction over Emcure as the alter ego of those two entities.

Although "[n]o one aspect of the relationship between two corporations unilaterally disposes of the [alter ego] analysis, and the court may consider any evidence bearing on the corporations' functional interrelationship," *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 598, courts typically "consider ten factors to determine whether a subsidiary is the alter ego of the parent:

> (1) ownership of all or most of the stock of the related corporation; (2) common officers and directors; (3) common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; (9) acting of the related

corporation as marketing arm of the principal corporation, or as an exclusive
distributor; and (10) receipt by the officers of the related corporation of instruction
from the principal corporation.

*Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 471 (E.D. Pa. 2019) (quoting *Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 645 (E.D. Pa. 2018)) (internal quotation marks omitted).[7] Application of these factors to Emcure and its U.S. subsidiaries shows that Emcure is indeed the alter ego of Heritage and Emcure USA.

To begin with, Emcure is the sole owner of both Heritage and Emcure USA.[8]  Patel Decl. (ECF No. 155-3) ¶¶ 5, 7.  The two companies also share common officers and directors.  Emcure asserts that Heritage and Emcure USA "have empowered, functioning boards of directors," Def. Mem. 7, but neglects to mention that for much of the time period addressed in the complaint, two of the three members of the Heritage Board of Directors were Defendant Mehta and V.T., both Emcure executives.[9]   Defendant Mehta is also an Emcure director.  Kumar Decl. (ECF No. 155-2) ¶ 14.  As two-thirds of Heritage's board, the Emcure executives had significant power over Heritage and were frequently involved in Heritage business and operational decisions.[10]  For some period of time, Marvin Samson, an Emcure director, also served as a Heritage director alongside Defendant Mehta, V.T., and Mr. Glazer.[11]  Mr. Glazer and other officers have also played dual roles at Emcure and its U.S. subsidiaries, with Mr. Glazer, for instance, having been considered a

---

[7] The Third Circuit and district courts in this circuit have sometimes referred to other variations of these factors. *See,e.g.*, *Shuker*, 885 F.3d at 781 (alter ego jurisdiction exists where, "the two companies' decisionmaking is integrated, [the foreign defendant] has authority over [the US subsidiary]'s strategic business decisions, [the foreign defendant] pays for the development of [the U.S. subsidiary]'s products, and executives from both companies work together to make decisions regarding [the U.S. subsidiary's products] . . . .").

[8] That Heritage and Emcure USA are technically indirect subsidiaries of Emcure is irrelevant.  Moreover, the intermediate ownership entity, Heritage Pharmaceutical Holdings, Inc., has no employees and carries out no business of its own.  Ex. A, Att. 1, 51:14-18; *see also* Ex. A, Att. 2.

[9] *See* Ex. A, Att. 1, 59:23 – 60:22; Ex. B ¶¶ 9-11.

[10] *See* Ex. A, Att. 3 (describing the power of Emcure representatives on Heritage's board over the latter company's decision making process); *see also* Ex. A, Att. 4, (Heritage and Emcure USA issues to be addressed by Defendant Mehta and V.T. during a visit to the United States.).

[11] *See* Ex. A, Att. 5; Att. 1, 142:12-22; Ex. B ¶ 9.

member of Emcure's Senior Management Team.[12]  The overlaps between Emcure, Emcure USA, and Heritage, most notable at the top, are numerous.  "[D]ual responsibilities of executives provide strong evidence of an alter ego relationship."  *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 615.

In addition to the overlapping roles of directors and officers, the three entities often shared managers and other employees.  Employees of one Emcure entity often acted on behalf of another, regardless of which company employed them. [13]  For instance, for a period of time, Mr. Glazer and another Heritage employee served as the only in-house lawyers for both Heritage and Emcure.[14]  Regulatory and compliance personnel for Emcure also provided the same service for Heritage and Emcure USA and vice versa.[15]  Emcure and Heritage executives jointly recruit new personnel who often perform roles for both entities.[16]  Heritage and Emcure USA act as Emcure's agents for

---

[12] *See* Ex. A, Att. 5.  As another example, William Marth is currently Emcure President & CEO for North America and Europe.  Emcure Website, Leadership Team, https://emcure.com/leadership (last visited July 26, 2019). However, he is also Global President and CEO of the Heritage Group, Regulated Markets. Ex. A, Att. 6; *see also* Emcure Website, About Us - News, https://emcure.com/aboutus (last visited July 26, 2019).  On his LinkedIn page, Mr. Marth describes himself as President and Chief Executive Officer North America & Europe at Emcure/Heritage Pharmaceuticals Holdings Inc.  LinkedIn, William Marth, https://www.linkedin.com/in/william-s-marth-8aaa489/ (last visited July 26, 2019).

[13] Emcure personnel also hold themselves out as Heritage personnel and vice versa. *See, e.g.*, Ex. A, Att. 8 (Defendant Mehta instructing Mr. Glazer to represent Emcure in a meeting with an Indian government official); Att. 9 (Mr. Glazer instructing V.T. to represent himself as a Heritage employee).

[14] *See* Ex. A, Att. 1, 67:6 – 69:11.  Emcure also nominated Messrs. Glazer and Malek on at least one occasion to serve as its corporate representatives in Fed. R. Civ. P. 30(b)(6) depositions. *See id.*, 45:12-16 and 46:16-21; Ex. A, Att. 10, 1 and 64:23-65:4; Ex. B ¶ 14.

[15] *See* Ex. A, Att. 1, 53:10 – 54:15 (explaining that Emcure's global regulatory group—led by an Emcure USA employee—and global compliance group handle compliance and regulatory affairs for Emcure as well as its U.S. subsidiaries); Att. 11 (instructions from Mr. Glazer and Defendant Mehta to an Emcure USA regulatory group employee for work to be done on behalf of both Heritage and Emcure); Att. 12 (reflecting an Emcure USA employee's joint roles for all three entities); Att. 13 (discussing a joint regulatory function for all three entities); Att. 14 (discussion of regulatory issues among personnel of the three entities); Att. 7 (Fakrul Sayeed, an Emcure USA employee, serving as Global Head, Quality, Compliance & Regulatory, and Chief Scientific Officer for Emcure); Att. 8 ██████████████████████████████████████████████████████████████████████████████ ; Att. 7 (personnel from all three entities jointly drafting letter to the FDA regarding Emcure manufacturing issues).

[16] *See* Ex. A, Att. 15 (Mr. Glazer and Defendant Mehta discussing a potential new hire reporting to Dr. Gurjar Mukund of Emcure with a dotted line report to Mr. Glazer); Att. 16 (same); Att. 17 (showing V.T. interviewed a Heritage job candidate and discussed the candidate working for both Heritage and Emcure).

various purposes, including filing ANDAs with the U.S. Food and Drug Administration in order to allow Emcure access to the U.S. market for its products.[17] And Emcure and its U.S. subsidiaries interchangeably file and hold ANDAs for the products they sell.[18]

The Third Circuit has found alter ego jurisdiction to exist where a U.S. subsidiary defendant's "*raison d'être* is to provide completions, marketing, sales, and service for" the foreign parent defendant's product in the United States. *D'Jamoos*, 566 F.3d at 108. Heritage plays that role for Emcure. "Heritage currently serves as the exclusive sales and marketing platform for all of Emcure's products in the United States." Patel Decl. ¶ 19; *see also* Kumar Decl. ¶ 8. ███████

████████████████████████████████████████████████████████████

███████████████████████████████████[19] Emcure and Heritage jointly make decisions regarding the introduction of products into the U.S. market, including investing in manufacturing capacity,[20] seeking regulatory approvals, resolving patent issues, and determining product pricing.[21] Ultimately, Heritage sells any products Emcure wishes it to sell.[22] Emcure products are sold in the United States under the Heritage brand.[23] The two entities work together

---

[17] Ex. B ¶ 15; *see also* Ex. A, Att. 1, 39:10-14 (discussing FDA approved labeling for an Emcure product); *id.*, 49:12-16 and 53:10-17 (stating that Emcure USA was the U.S. agent for Emcure for certain products); Att. 18 (draft letter to the FDA from Heritage as Emcure's agent jointly composed by Heritage and Emcure personnel); *see also* Ex. A, Att. 14 (███████).

[18] *See* Ex. A, Att. 3 (Emcure referring to the different entities' ANDAs interchangeably); Att. 19 (joint report on ANDAs held by Emcure, Emcure USA, and Heritage sent to representatives of all three companies); Att. 20 (discussion among Mr. Glazer and three Emcure executives regarding a deal to license ANDAs from a third party and whether Heritage or Emcure would be the licensee).

[19] Ex. A, Att. 3 (Emcure/Heritage draft joint response to due diligence questions from Citibank). *See also* Ex. B ¶ 8.

[20] *See* Ex. A, Att. 21 (email from Mr. Glazer to Defendant Mehta recommending investment in Emcure facilities).

[21] *See* Ex. A, Att. 1, 76:7 – 77:16 (describing joint decision making among Mr. Glazer and Emcure employees regarding regulatory actions for certain Emcure products to be sold in the United States); *id.*, 142:12-22 and 144:22 – 145:2 (███████████████████████████████████████████

████████████████████████); *id.*, 164:23 – 165:5); Att. 10, 53:13-54:6 (explaining that Messrs. Glazer, Malek, Defendant Mehta, and V.T. jointly decide what Emcure products Heritage will introduce in the U.S.); Att. 3 (describing joint Heritage-Emcure R&D steering team ███████); Att. 22 (showing Defendant Mehta's involvement in Heritage pricing and marketing decisions). *See also* Ex. B. ¶ 12.

[22] Ex. A, Att. 1, 63:4-7; Att. 10, 53:4-19 (stating that Heritage has never declined to sell an Emcure product).

[23] *See, e.g.*, Ex. A, Att. 6.

on an ongoing basis to manage their supply chain and sales operations.[24]  Far from maintaining an arm's length bargaining relationship as Emcure asserts, Def. Mem. 1, the two companies have a standing arrangement whereby Heritage remits the majority of its profits to Emcure for every product it sells, regardless of any other variable.[25] ███████████████████████████

███████████████████████████████[26]  *Cf. D'Jamoos*, 566 F.3d at 108 (finding alter ego jurisdiction where "approximately half of [the foreign defendant's] revenue originated with the [U.S.-based subsidiary]").

 Emcure and its U.S. subsidiaries are integrated in myriad other ways, including utilizing shared IT, financial, and sales management systems,[27] and acting as a single entity in litigation.[28] As seen from the intertwining of their governance, leadership, and operations, Heritage and Emcure USA are no more than U.S. outposts of their Indian parent, and the Court therefore has general personal jurisdiction over Emcure.

   **3.** **The Court Has Specific Personal Jurisdiction over Emcure Pharmaceuticals Ltd. and Satish Mehta**

 The Court has specific jurisdiction over Emcure and Satish Mehta through their communications with co-conspirators in the United States in furtherance of the illegal agreements to manipulate the U.S. generic drug market that underly this action.  Those communications are more than sufficient to pass the courts' "purposeful availment" test, the purpose of which is simply to ensure "that a defendant will not be haled into a jurisdiction solely as a result of 'random,'

---

[24] *See, e.g.*, Ex. A, Att. 23 (showing coordination among Emcure and Heritage personnel in managing global supply chain for multiple products); Att. 24 (Emcure, Emcure USA, and Heritage personnel discussing supply chain).
[25] *See* Ex. A, Att. 3 at 5 ████████████████████████████████████
[26] Ex. A, Att. 8.
[27] *See, e.g.*, Ex. A, Att. 25 (discussing implementation of SAP accounting system across multiple Emcure entities).
[28] *See, e.g.*, Ex. A, Att. 26.

'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)) (internal citations omitted). The Court can find the requisite minimum contacts between Emcure Defendants and the United States through either one of two tests: the traditional purposeful availment test or the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984). Moreover, the Court's jurisdiction over Emcure Defendants is in accordance with "traditional notions of fair play and substantial justice," that courts often use to assess the reasonableness of asserting specific personal jurisdiction.

      a.      <u>Emcure and Mehta Have Minimum Contacts with the United States</u>

            i.      *Emcure Defendants' conduct satisfies the traditional minimum contacts test*

Courts typically assess personal jurisdiction using a three-part test. First, "the defendant must have purposefully directed its activities at the forum." Second, "the litigation must arise out of or relate to at least one of those activities." Finally, "if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice." *D'Jamoos*, 566 F.3d at 102 (quoting *Burger King*, 471 U.S. at 476) (internal quotation marks, citations, and brackets omitted). "The first two parts of the test determine whether a defendant has the requisite minimum contacts with the forum." *D'Jamoos*, 566 F.3d at 102-03.

Emcure Defendants satisfy both elements of the minimum contacts test.[29]   First, they directed activities at the United States that gave rise or relate to this litigation.  In assessing those activities, the Court should put aside Emcure Defendants' imaginative reading of the Complaint in which there are no "allegations that Emcure directed or conducted any of its activities to or in the United States," [30] Def. Mem. 10, and instead look to the Complaint's multiple allegations of conduct by Defendant Mehta and Emcure aimed at illegally manipulating the market for Emcure products in the United States.  In doing so, the Court must ascribe to Emcure the jurisdictional effects of its employees' and officers' actions.  *See In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 491 (E.D. Pa. 2005) ("[The] acts of the corporation's agents and employees therefore are to be attributed to the corporation for jurisdictional purposes, so long as the acts were within the course and scope of the agency or employment.") (quoting 16 Moore's Federal Practice § 108.42[3][b][ii]) (internal quotation marks and alterations omitted).[31]

Emcure Defendants offer no evidence to rebut the Complaint's allegations of their unlawful conduct directed at the United States.[32]  Instead, they resort to attacking the credibility of witnesses to their illegal acts.  *See* Def. Mem. 12, 14.  That attack is misplaced.  At this stage of the litigation the Court must take the Complaint's factual allegations as true.  *E.g.*, *Toys "R" Us, Inc. v. Step*

---

[29] The third element of the personal jurisdiction test, whether jurisdiction "comports with fair play and substantial justice," is addressed *infra* pp. 16-19.

[30] Defendants elsewhere insist that States' claims against Defendant Mehta rest on a single phone call with the United States, *see* Def. Mem. 12-13.  That assertion is not only factually wrong but also legally irrelevant, as "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction."  *Burger King*, 471 U.S. at 476 n.18 (citing *McGee v. Int'l Life Ins. Co*, 355 U.S. 220, 223 (1957)).

[31] Emcure Defendants are correct that the Court cannot assert jurisdiction over Defendant Mehta solely by virtue of his position as CEO of Emcure, *see* Def. Mem. 13-14; however, "[his] status as [an] employee[] does not somehow insulate him from jurisdiction," for his conduct in that capacity.  *Calder*, 465 U.S. at 790 (1984).

[32] The closest Emcure Defendants come to doing so is to claim that Heritage sets product prices independently of Emcure.  *See* Def. Mem. 12.  Even were that assertion true, however, it would not preclude Emcure Defendants from engaging in market allocation, or even agreeing to fix prices without setting the specific prices themselves.  Furthermore, Emcure Defendants' careful assertions that, for instance, "Emcure does not set the price for any products sold by Heritage," Kumar Decl. ¶ 23, belie the degree of influence and control Emcure Defendants have over Heritage prices.  *See supra* p. 9 & n. 21.

*Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).  Defendants can attempt to rebut those allegations with competent evidence of their own but, absent such evidence, the Court must rely on the allegations in the complaint, in addition to any additional evidence submitted by Plaintiffs.[33]

The Complaint alleges, among other things, that Defendant Mehta and V.T. met with Jeffrey Glazer and Jason Malek in India in April 2013 to discuss how "to coordinate how Heritage and Mylan could minimize competition between them."  CAC ¶ 183.  They decided that Defendant Mehta would contact Mylan executive Defendant Malik in order to facilitate the market allocation discussions to be continued between Messrs. Glazer and Malek on one side and Defendant Malik and others at their competitor Mylan on the other.  *Id.*  Defendant Mehta's outreach to Defendant Malik bore fruit, as Mr. Glazer followed up with Defendant Malik and his colleagues at Mylan, who eventually agreed, in violation of the Sherman Act, to give up customers and market share for Doxy DR to Heritage.  *E.g.*, *id.* ¶¶ 186-89.  Even after Mylan agreed to cede customers to Heritage, Defendant Mehta and others at Emcure continued to reach out to Mylan and Heritage to coordinate the execution of their unlawful agreement.  *Id.* ¶ 196.  Defendant Mehta once again called Defendant Malik to confirm that Mylan would abide by the market allocation agreement.  *Id.*  V.T. then emailed Mr. Glazer and spoke with him by phone to inform him about Defendant Mehta's telephone conversations with Defendant Malik and to urge Mr. Glazer to follow up with Defendant Malik to cement the deal with Mylan.  *Id.*  Mr. Glazer did so, and Mylan gave up its customer to Heritage.  CAC ¶¶ 200, 203.

Taking those allegations in the Complaint as true, along with the July 18, 2013 email from V.T. to Mr. Glazer attached here as an exhibit,[34] it is clear that Emcure and Defendant Mehta "purposefully directed activities at" the United States, and that this litigation "arise[s] out of or

---

[33] *See supra* pp. 5-6.
[34] Ex. A, Att. 27.

relate[s] to at least one of those activities." *See D'Jamoos*, 566 F.3d at 102.  Defendant Mehta's

communications to Defendant Malik of Mylan, a resident of Pennsylvania and employee of Mylan

in the United States, were purposefully directed at the United States.  *See* CAC ¶ 34.  So were

V.T.'s emails and calls to Mr. Glazer in New Jersey.  *See, e.g.*, *O'Connor*, 496 F.3d at 317 ("Mail

and telephone communications sent by the defendant into the forum may count toward the

minimum contacts that support jurisdiction.") (quoting *Grand Entm't Grp., Ltd. v. Star Media

Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993)) (internal quotation marks omitted).   Those

communications were made in furtherance of the illegal market allocation scheme for which States

now seek redress.[35]

ii.      *Emcure Defendants' conduct satisfies the Calder effects test*

The Court can also find the requisite minimum contacts viewing Emcure and Defendant

Mehta's actions through the lens of the *Calder* effects test.  "[U]nder *Calder* an intentional tort

directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance

otherwise insufficient contacts with the forum such that . . . 'minimum contacts' . . . is satisfied."

*IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 256 (3d Cir. 1998).  "Under the effects test, a court

may exercise personal jurisdiction over a nonresident defendant who acts outside the forum . . . to

cause an effect upon the plaintiff within the forum . . . ."  *Carteret Sav. Bank*, 954 F.2d at 148.

Under the Third Circuit's version of the test, "the plaintiff must show: (1) the defendant committed

---

[35] Emcure Defendants have numerous other contacts with the United States related to this litigation.  Defendant
Mehta and other Emcure personnel were involved, for instance, in promoting and facilitating the sale of Doxy DR in
the US, including through communications directed to Mr. Glazer and others in the United States and during
Heritage board meetings taking place in the United States.  To determine the relation between defendants' contacts
with the forum and the litigation, courts in this Circuit typically look to see "whether Defendant received benefits
and protection from the forum such that it could reasonably foresee litigation in this forum."  *Penco Products, Inc.*,
974 F. Supp. 2d at 752.  That standard is easily met by Defendant Mehta and other Emcure executives' efforts to sell
Doxy DR and other products in the U.S. market.  *See, e.g.*, Ex. A, Att. 28 (showing V.T.'s involvement in Doxy DR
supply chain issue); Att. 29 (Defendant Mehta email to Mr. Glazer proposing to speak about Doxy DR when they
next meet); Att. 30 (Defendant Mehta email to Mr. Glazer asking about Doxy DR [referred to by the brand name
Doryx] sales results); Att. 31 (V.T email to Mr. Glazer stating his hopes for high Doxy DR sales); Att. 32 (same);
Att. 33 (V.T. offering to help resolve a Doxy DR quality control issue).

an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum . . . ; [and] (3) the defendant expressly aimed his tortious conduct at the forum . . . ." *Aetna Inc.*, 324 F. Supp. 3d at 552 (citing *IMO Indus.*, 155 F.3d at 256).  Emcure and Defendant Mehta's conduct satisfies all three elements.

An antitrust violation is considered an intentional tort for the purpose of the *Calder* effects test. *E.g.*, *Radio Music License Comm., Inc. v. Global Music Rights, LLC*, Civ. No. 16-6076, Slip Op., 2019 WL 1437981, at *25 (E.D. Pa. Mar. 29, 2019); *In re Fasteners Antitrust Litig.*, C.A. No. 08-md-1912, 2011 WL 3563989, at *12 (E.D. Pa. Aug. 12, 2011); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, Civ. No. 02–6030 (WHW), 2007 WL 2212713, at *6 (D.N.J. July 30, 2007); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207-08 (2d Cir. 2003). Therefore, the first element of the effects test is satisfied by States' allegation that Emcure and Defendant Mehta intentionally violated the antitrust laws. *See, e.g.*, CAC ¶¶ 499, 506.

When applying the *Calder* effects test to foreign defendants in an antitrust action, the second and third elements of the test are satisfied by an antitrust violation aimed at the United States. *See Graphite Prods.*, 2007 WL 2212713, at *6 (citing *IMO Indus.*, 155 F.3d at 266; *Auto. Refinishing Paint*, 358 F.3d at 298). In *Graphite Products*, the German executive of a German company who lived there and had little personal contact with the United States was alleged to have participating in fixing prices for graphite electrodes on the international market, including in the United States. *Id.* at *1, *9. The executive moved to dismiss for lack of personal jurisdiction, but plaintiffs defeated his 12(b)(2) motion by establishing, through the *Calder* effects test, that his price-fixing conduct was (i) an intentional tort, (ii) of which plaintiff suffered the brunt of the harm in the United States, and (iii) was expressly aimed at the United States. *Id.* at *9-*10. Here, the case for jurisdiction is even stronger.  Emcure and Defendant Mehta's Doxy DR market allocation

15

scheme and the overarching conspiracy of which it was a part were expressly and solely aimed at the U.S. market for generic drugs, and all or almost all of the harm was suffered by States and their residents in the United States.  *See, e.g.*, CAC ¶¶ 1-2, 10.  Accordingly, the Court should find that it exercises specific personal jurisdiction over Emcure and Defendant Mehta via the *Calder* effects test in addition to the traditional test for minimum contacts.[36]

        b.    <u>Jurisdiction over Emcure Defendants Is Reasonable</u>

Given Emcure Defendants' contacts with the United States, they could only defeat the Court's specific jurisdiction by showing that such an exercise of jurisdiction would be unreasonable or, put differently, not in accordance with "fair play and substantial justice."[37]  "The existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  *O'Connor*, 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477).  "[I]f minimum contacts are present, then jurisdiction will be unreasonable only in 'rare cases.'"  *Id.* (citing *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 207 (3d Cir. 1998)).  Emcure Defendants do not present a "compelling" and "rare" case.

---

[36] The Court can also find specific jurisdiction over Emcure Defendants as co-conspirators of in-forum defendants. "To impute the contacts of a co-conspirator to a defendant, Plaintiffs must plead with particularity that 1) the defendant was a participant in an actionable conspiracy, 2) substantial acts in furtherance of the conspiracy occurred in [the relevant forum], and 3) the non-forum co-conspirator was aware or should have been aware of those acts." *Aetna Inc.*, 324 F. Supp. 3d at 551 (citing *Mass. Sch. Of Law at Andover, Inc.*, 846 F. Supp. at 379); *see also United Healthcare Services, Inc. v. Cephalon, Inc.*, No. 17-555, 2018 WL 878766, *3-4 (E.D. Pa. Feb. 13, 2018) (citing *Doe v. Hesketh*, 15 F. Supp. 3d 586, 589 (E.D. Pa. 2014)) (finding co-conspirator jurisdiction in an antitrust conspiracy); *Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2002 WL 31261330, at *6, 11-12 (E.D. Pa. July 31, 2002) *aff'd* 358 F.3d 288 (3d Cir. 2004) (discussing co-conspirator jurisdiction in the context of a Fifth Amendment national contacts analysis).  States plead that Emcure Defendants were involved in at least two actionable conspiracies.  They also allege that numerous substantial acts in furtherance of the conspiracies (e.g., calls between Mr. Glazer and Defendant Malik, as well as numerous calls, emails, discussions, and pricing and bidding decisions taken by Heritage and other defendants) occurred within the United States.  Finally, Defendant Mehta and V.T. discussed the Doxy DR market allocation conspiracy with Messrs. Glazer and Malek and Defendant Malik and urged those United States-based individuals to continue to conspire, so there can be no doubt that Emcure Defendants were aware that substantial acts in furtherance of the conspiracy would occur in the United States.

[37] Although the reasonableness requirement may not apply in a national contacts case applying the Fifth Amendment Due Process Clause.  *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 370 n.2 (3d Cir. 2002).

The Supreme Court has identified five factors that may be taken into consideration in this analysis: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen*, 444 U.S. at 492) (internal quotation marks omitted). All of those factors favor the Court exercising its jurisdiction over Emcure Defendants in this action.

Emcure Defendants do not present a compelling case for any burden they would face in litigating in this Court. Although it is true courts have sometimes referred to the burden on the defendant as a "primary concern," it is not so important that it outweighs the other factors.[38] The Third Circuit has held that although "the burden on the defendant is a primary concern in any case," 496 F.3d at 324, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* at 325 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987)) (internal quotation marks omitted). "[W]hen minimum contacts exist, due process demands no more than a reasonable forum." *Id.* The burden to Emcure Defendants of litigating in this Court is relatively minimal. More than sixty years ago, the Supreme Court observed that "modern transportation and communications have made it much less burdensome" for a defendant to litigate in a foreign forum.

---

[38] Note also that the Supreme Court decision Emcure Defendants cite for the preeminence of the burden factor, *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773 (2017), analyzed the exercise of personal jurisdiction in a diversity jurisdiction case under the Fourteenth Amendment and placed great emphasis in its analysis on the particular division of power among the states. That is not a concern in this case where the states are seeking redress from Indian defendants for violation of a federal statute with a national service of process provision, an issue properly analyzed under the Fifth Amendment's Due Process Clause. *See In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. at 489 ("Those strictures of fourteenth amendment due process analysis which attempt to prevent encroachment by one state on the sovereignty of another do not apply with equal force to the adjudication of federal claims in a federal court.") (quoting *Max Daetwyler Corp. v. Meyer*, 762 F.3d 290, 293 (3d Cir. 1985)) (internal quotation marks and alterations omitted).

*See McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957).  Courts have also found that the burden on a defendant is reduced where, like Emcure, it is "a sophisticated corporation that has the resources to defend this matter in [the forum]."  *Lutz*, 376 F. Supp. 3d at 465.  Emcure has engaged sophisticated U.S. legal counsel and can direct almost all of this litigation remotely through that counsel, as it has done to date.  Moreover, Emcure has already consented to the Court's jurisdiction in a related case in this multidistrict litigation.[39]  Emcure frequently litigates other matters in the United States and has applied for and held a state drug distributor license,[40] ANDAs,[41] and possibly other U.S. or state government regulatory approvals that should have given it the reasonable expectation of facing litigation here.[42]  Finally, Defendant Mehta and other Emcure executives are frequent visitors to the United States; so, to the extent that they are required to actually be physically present in this forum, it is not a burden that they have been unwilling to undertake before.[43]

Whatever minimal burden Emcure Defendants would face in having to litigate in this forum is outweighed by the interest of the States, the United States, and the judicial system in obtaining

---

[39] In Defendants' stipulation of waiver of service in a related action brought by United HealthCare Services and consolidated in this Multi-District Litigation, Defendants, including Emcure, agreed that, "This Stipulation does not constitute a waiver by Defendants of any defense . . . *except that Defendants do not contest personal jurisdiction*." MDL No. 2724, ECF No. 971, 4 (emphasis added).

Beyond showing the absence of burden on Emcure Defendants, that stipulation arguably waives Emcure Defendants' jurisdictional defense in this action.  A party may consent to a federal district court's personal jurisdiction even if the requirements of jurisdiction would not otherwise be met.  *See Burger King*, 471 U.S. at 473. At least one court has held that allowing a defendant to contest a court's personal jurisdiction where it has already waived that defense in another action in the same MDL would defeat the purpose of the MDL process in promoting judicial efficiency and consistency of pretrial decisions.  *See In re Polyester Staple Antitrust Litig.*, No. 3:03-CV-1516, 2008 WL 906331, at *19 (W.D.N.C. Apr. 1, 2008) (citing Manual for Complex Litigation § 20.131 (4th ed. 2004)).

[40] *See, e.g.*, Ex. A, Att. 34.

[41] *See*, Ex. A, Att. 35.

[42] *Cf.* Ex. A, Att. 26 (Emcure stipulation to jurisdiction in patent litigation in Delaware).

[43] *See, e.g.*, Ex. A, Att. 36 (███████████████████████████████████████ ████████████████████); Att. 4 (discussing a business trip by Defendant Mehta and V.T. to the U.S.); Att. 37 (discussing a visit to Defendant Mehta's sister who lives in New Jersey); Att. 38 (discussing V.T.'s visit to California); *see also* Ex. A, Att. 39 (V.T. seeking to obtain U.S. health insurance for his family through Heritage); Ex. B ¶ 13.

efficient and effective justice under federal and state antitrust laws.  Courts have often found that "both [plaintiff] and the United States have a strong interest in adjudicating matters in a federal forum that arise under the United States antitrust laws." *Decon Labs., Inc. v. Decon Labs. Ltd.*, 703 F. Supp. 2d 481, 487 (E.D. Pa. 2009); *accord In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. at 493 (quoting *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 (1977)); *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 618.  Emcure Defendants assert that States' claims against them are "a shakedown," Def. Mem. 14, and that the States should rather pursue claims against Heritage alone. *Id.* at 13.  However, the only way by which States can obtain justice for Emcure and Defendant Mehta's violations of federal and state antitrust laws is for Emcure Defendants to face justice in this forum.

4.     **In the Alternative, the Court Should Delay Ruling on Defendants' 12(b)(2) Motion subject to Completion of Jurisdictional Discovery**

If the Court does not find it has personal jurisdiction over Emcure Defendants at this stage, it should postpone ruling on Emcure Defendants' motion to dismiss and provide for a period of jurisdictional discovery followed by additional briefing.  Courts in the Third Circuit "ordinarily allow" jurisdictional discovery "when a plaintiff's claim to personal jurisdiction is not clearly frivolous." *Shuker*, 885 F.3d at 781 (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 331, 336 (3d Cir. 2009)) (internal quotation marks omitted); *accord, e.g.*, *Toys "R" Us*, 318 F.3d at 456 ("[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'") (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) and citing *Pinker*, 292 F.3d at 368) (internal citation omitted); *In*

19

*re Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2002 WL 31261330, at *5 (E.D. Pa. July 31, 2002.[44]

B.   **STATES HAVE STATED PLAUSIBLE CLAIMS AGAINST EMCURE DEFENDANTS**

States have stated plausible claims against Emcure Defendants related to their involvement in drug specific and overarching conspiracies.   The Court should therefore deny Emcure Defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

### 1.   Legal Standard

"In determining whether to grant . . . motions to dismiss [pursuant to Fed. R. Civ. P. 12(b)(6)], the Court must ordinarily consider only those facts alleged in the complaints, accepting the allegations as true and drawing all logical inferences in favor of the non-moving parties."  *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 435-36 (E.D. Pa. 2018) (citing *ALA, Inc. v. CCAIR, Inc.* 29 F.3d 855, 859 (3d Cir. 1994)).  "An antitrust complaint is sufficient if it contains 'enough factual matter (taken as true) to suggest that an agreement was made.'  As long as the facts pleaded provide 'plausible ground to infer an agreement,' a well-pleaded complaint may proceed even if it seems that 'actual proof of those facts is improbable….'"  *In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (ellipses in original).

### 2.   States Sufficiently Plead a Claim as to Emcure Defendants' Participation in a Conspiracy to Allocate the Market for Doxy DR

States allege direct evidence of Emcure Defendants' involvement in the conspiracy to allocate the market for Doxy DR, including in-person meetings, telephone calls, and emails

---

[44] States will file a separate motion for an order allowing such targeted discovery in the event the Court finds it cannot yet deny Emcure Defendants' motion.

through which the conspiracy was conceived, entered into, and carried out.  *E.g.*, CAC ¶¶ 183, 198-99.  Emcure Defendants acknowledge as much in their memorandum, ascribing the allegations against them to Messrs. Glazer and Malek, two former Heritage executives who have pleaded guilty to criminal charges of involvement in the conspiracy and who have firsthand knowledge of Defendant Mehta and other Emcure executives' participation in the market allocation agreement with Mylan.  Def. Mem. 12; *see also, e.g.*, CAC ¶ 183.

Nonetheless, by dissecting the Complaint sentence by sentence and ignoring the clear meaning of the allegations in context, Emcure Defendants attempt to deny the plain existence of the allegations against them.  *See* Def. Mem. 16.  But "[t]o evaluate the articulated allegations as to an individual defendant in the context of a multi-defendant, multi-faceted conspiracy, the conspiracy must not be 'compartmentalized.'  The 'character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"  *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)) (brackets in original).  Defendants can only assert that "the Complaint does not describe *at all* the contents of Mr. Mehta's call with Mr. Malik," Def. Mem. 16, and seek to have the claims against them dismissed on that ground by purposefully ignoring the context of the calls between Defendants Mehta and Malik.

Taking the allegations against Emcure Defendants as a whole, it is clear that States plausibly allege that: (i) Defendant Mehta, V.T., and Messrs. Glazer and Malek met in April 2013 to discuss how to avoid competition with Mylan for Doxy DR and agreed that Defendant Mehta would call Defendant Malik of Mylan to begin conspiring; CAC ¶ 183; (ii) the next month, following the initial outreach from Defendant Mehta to Defendant Malik, Heritage personnel

including Messrs. Glazer and Malek began a practice of regular communication and coordination with counterparts at Mylan to negotiate and act on their agreement to illegally avoid competition; *Id.* ¶¶ 184-215; and (iii) Defendant Mehta and V.T. maintained their involvement in this conspiracy, including through at least a call from Defendant Mehta to Defendant Malik on July 18, 2013. *Id.* ¶¶ 198-99. States do not need to go further than that at this stage of the proceeding. *See In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d at 435 (holding that, to survive a motion to dismiss, plaintiffs must only "'state enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement even if the court believes such proof is improbable.'") (quoting *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 669 (E.D. Pa. 2011) *aff'd* 454 F. App'x 64 (3d Cir. 2011)) (internal quotation marks omitted).

In fact, this Court has already rejected the same argument Emcure Defendants make here in a related matter. Plaintiffs made claims against Heritage, Mylan, and a third conspirator, Mayne, related to the same anticompetitive conspiracy to allocate the Doxy DR market alleged here, and defendants protested that plaintiffs failed to state a claim because "there are no details alleged regarding the communications" among the conspirators. *Id.* at 440. In response, the Court held that "[s]uch specific facts are not necessary; the complaints need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks and brackets omitted). The Court concluded that plaintiffs' allegations were "sufficient to give the Doxy DR Defendants notice of the basis for [their] claims. Doxycycline Plaintiffs have plausibly alleged the existence of a Doxy DR conspiracy based on direct evidence . . . ." *Id.* Emcure Defendants present no reason why the

Court should decide the matter any differently in the face of their repetition of the same losing arguments.[45]

### 3.    States Plead a Claim as to Emcure's Participation in an Overarching Conspiracy to Fix Prices and Allocate Markets for Generic Drugs

Emcure asks the Court to dismiss States' claim that it participated in an overarching conspiracy to unreasonably restrain trade in the generic drug market. *See* CAC ¶¶ 217, 504. But the Court has already found, applying the *Twombly* plausibility standard, that, based on "the facts alleged in the CAC," "it is plausible to infer that there was a broader [i.e., overarching] conspiracy." *In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853-54 & n.21 (E.D. Pa. 2018).[46]  The Court should not now reverse that decision.

Emcure's argument that it should not have to even proceed to discovery on the overarching conspiracy claim simply repeats elements of the arguments it already made to that effect in a previous motion. *See* Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims (ECF No. 70).  Those arguments are addressed in Plaintiffs' Joint Response in Opposition

---

[45] Emcure Defendants advance several arguments for why they believe States do not allege claims against them that can be proven through circumstantial evidence.  Def. Mem. 16-17.  Given the direct evidence alleged in the complaint, it is unnecessary to counter those arguments at length.  Nonetheless, States note that—even putting aside the direct evidence—their allegations of market allocation involving Emcure Defendants, Heritage, and Mylan are supported by "a context that raises a suggestion of a preceding agreement, not merely parallel conduct," *Twombly*, 550 U.S. at 557.  For instance, this Court has already found a motive for defendants to manipulate generic drug prices.  *In re Generic Pharm. Pricing Antitrust Litigation*, 338 F. Supp. 3d at 448.  Emcure Defendants had "opportunities to conspire" in their communications with Mylan and in directing Heritage personnel to communicate with Mylan.  *Cf. id.* at 449-50.  Finally, Messrs. Malek and Glazer's guilty pleas and Heritage's deferred prosecution agreement with the U.S. Department of Justice for fixing prices and allocating markets both provide further suggestion that Emcure and Mylan's decisions not to compete for the same customers may not have been "merely parallel conduct."  *See id.* at 452-53.  The Court may take such evidence into account in addition to States' alleged direct evidence in finding that States have stated a claim against Emcure Defendants.  *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two."); *In re Insurance*, 618 F.3d at 324 n.24 ("Sometimes, of course, discovery will uncover both direct and circumstantial evidence of agreement.  We do not imply that a plaintiff must commit to a single method of proof at the pleading stage, but merely that a plaintiff must put forth *some* statement of facts suggestive of unlawful conspiracy.").

[46] Emcure was not party to the briefing on the motion underlying that decision; however, it challenges the exact same claim that the Court found plausible based on the same allegations in the same complaint.

to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims (ECF No. 118) ("Joint Resp."), and States' Response in Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims (ECF No. 119) ("States Resp.").  States incorporate those responses into this opposition memorandum by reference.

States will also briefly address Emcure's two arguments from the instant motion in turn: First, Emcure argues that "the Complaint does not allege that each corporate Defendant knowingly entered into [the] overarching conspiracy."  Def. Mem. 18.  In fact, States specifically allege Emcure's involvement in the overarching conspiracy in the Complaint in addition to alleging the Defendants' joint participation.  *E.g.*, CAC ¶¶ 217, 504.   Plaintiffs also address that argument throughout the Joint and States' Responses, including by explaining how Defendants' common goal and conduct in furtherance of that goal show their participation in the overarching conspiracy. *See, e.g.*, Joint Resp. 8.

Second, Emcure asserts that the Complaint does not make any allegation concerning Emcure's drug portfolio and its overlap with those of other defendants, and alleges Emcure's involvement in no more than a single conspiracy regarding Doxy DR.  Def. Mem. 19.  But this assertion fails to account for the Complaint's allegations that "Emcure has marketed and sold generic pharmaceuticals in this District and throughout the United States."   CAC ¶ 30. Additionally, as explained above and set out in the Complaint, Emcure participated in and directed the activities of Heritage, who sold, and conspired with respect to, multiple products, with the benefits of those sales and agreements flowing to Emcure.   *E.g.*, CAC ¶ 503.  These allegations encompass more than just a single drug. And States' Response describes in detail how the specific Doxy DR conspiracy that Emcure instigated with Mylan fits into the overarching conspiracy.  *See* States Resp. 6-8.  More importantly, as Plaintiffs have previously explained, "no specific amount

of overlap is required as part of an overarching conspiracy recipe," and "overlap is not even a required element."  Joint Resp. 23 & n.11 (citing *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992) and *In re K-Dur Antitrust Litig.*, Civ. A. No. 01-cv-1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016)).  Emcure can be a participant in the overarching conspiracy regardless of how many of the drugs subject to that conspiracy it makes.  *See* States Resp. 12-13 (citing *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973)).

For the reasons stated in the Court's decision on the Motion for Leave to Amend and Plaintiffs responses to Defendants' previous motion to dismiss the overarching conspiracy claims, the Court should deny Emcure's current Fed. R. Civ. P. 12(b)(6) motion.

## IV.    CONCLUSION

For the forgoing reasons, States respectfully request that this Court deny Emcure Defendants' Motion to Dismiss in its entirety or, in the alternative, deny Emcure Defendants' Fed. R. Civ. P. 12(b)(6) motion and delay ruling on their Fed. R. Civ. P. 12(b)(2) motion until after completion of jurisdictional discovery and subsequent briefing.

Dated:  July 26, 2019

PLAINTIFF STATE OF
CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL


BY:      s/ W. Joseph Nielsen
         W. Joseph Nielsen
         Federal Bar No. ct20415
         Assistant Attorney General
         55 Elm Street
         P.O. Box 120
         Hartford, CT 06141-0120
         Tel: (860) 808-5040
         Fax: (860) 808-5391
         Joseph.Nielsen@ct.gov

**Liaison Counsel for the States**

         s/ Rachel O. Davis
         Assistant Attorney General
         55 Elm Street
         P.O. Box 120
         Hartford, CT 06141-0120
         Tel: (860) 808-5040
         Fax: (860) 808-5033
         Rachel.Davis@ct.gov

         Attorney for the State of
         Connecticut

Respectfully submitted,

PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

BY:      s/ Daniel H. Leff
         Daniel H. Leff
         Assistant Attorney General
         William Matlack
         Assistant Attorney General
         Chief, Antitrust Division
         Michael MacKenzie
         Assistant Attorney General
         Deputy Chief, Antitrust Division
         One Ashburton Place, 18th Floor
         Boston, MA 02108
         Tel: (617) 962-2414
         Fax: (617) 722-0184
         Daniel.Leff@mass.gov
         William.Matlack@mass.gov
         Michael.Mackenzie@mass.gov

BRIAN E. FROSH
MARYLAND ATTORNEY GENERAL

BY:      s/John R. Tennis
         John R. Tennis
         Assistant Attorney General
         Chief, Antitrust Division

         Schonette J. Walker
         Assistant Attorney General
         Deputy Chief, Antitrust Division
         Office of the Attorney General
         200 St. Paul Place, 19th Floor
         Baltimore, Maryland 21202
         Tel. # (410) 576-6470
         Fax # (410) 576-7830
         swalker@oag.state.md.us

         Attorneys for the State of Maryland

26

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2019, I caused a redacted version of the foregoing States'
Response in Opposition to Emcure Pharmaceuticals Ltd. and Satish Mehta's Motion to Dismiss
the Plaintiff States' Consolidated Amended Complaint to be filed electronically with the Clerk of
Court by using the CM/ECF system which will serve a copy on all interested parties registered
for electronic filing and is available for viewing and downloading from the ECF system, and I
served an unredacted non-public version by email to counsel for Defendants Emcure
Pharmaceuticals Ltd., Satish Mehta, and Heritage Pharmaceuticals, Inc.


/s/ Daniel H. Leff
Daniel H. Leff
Assistant Attorney General

27