**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724 16-MD-2724** |

_____

**HON. CYNTHIA M. RUFE**

| | |
|---|---|
| **THIS DOCUMENT RELATES TO:** | **Civil Action Nos.** |
| *The State Attorneys General Litigation* | **17-3768** |
| *The Kroger Co. v. Actavis Holdco U.S., Inc.* | **18-284** |
| *1199SEIU Nat'l Benefit Fund v. Actavis Holdco US, Inc.* | **18-2401** |
| *West Val Pharmacy v. Actavis Holdco U.S., Inc.* | **18-2533** |
| *Ahold USA, Inc. v. Actavis Holdco U.S., Inc.* | **18-2641** |
| *Humana Inc. v. Actavis Elizabeth, LLC* | **18-3299** |
| *Marion Diagnostic Center, LLC v. McKesson Corp.* | **18-4137** |

_____

## OPINION

**Rufe, J.**                                                    **August 15, 2019**

This is a multidistrict antitrust litigation involving allegations that certain pharmaceutical companies engaged in an unlawful scheme or schemes to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocations of certain generic pharmaceutical products. In this Opinion, the Court considers Defendants' joint motion to dismiss claims asserting the existence of an overarching multi-drug conspiracy in the following pleadings (collectively, the "Overarching Complaints"):  Direct Purchaser Plaintiffs' First Amended Class Action Complaint

¶¶ 108-121[1]; End Payor Plaintiffs' Amended Class Action Complaint ¶¶ 99-181[2]; Indirect

Reseller Plaintiffs' Amended Overarching Complaint ¶¶ 65-72[3]; Kroger Plaintiffs' Amended

Complaint ¶¶ 813-32[4]; Marion Plaintiffs' Second Amended Complaint, ¶¶ 51-59[5]; Humana

Inc.'s Second Amended Complaint ¶¶ 261-72[6]; and the Plaintiff States' Consolidated Amended

---

[1] The Direct Purchaser Plaintiffs ("DPPs") allege they directly purchased generic pharmaceuticals from Defendants. They include the following drug purchasing cooperatives and retail pharmacy operators: Ahold, USA, Inc.; César Castillo, Inc.; FWK Holdings, LLC; KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc.; and Rochester Drug Co-Operative, Inc. DPP Am. Class Action Compl. ¶¶ 43-47.

[2] The End Payer Plaintiffs ("EPPs") are employee welfare benefits funds, labor unions, and private insurers that allege either that they indirectly purchased generic pharmaceuticals manufactured by one or more Defendants or that they provided reimbursements for some or all of the purchase price for certain generic drugs. Specifically, they are: American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan; Detectives Endowment Association of the City of New York; Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc; Self-Insured Schools of California; Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund; Unite Here Health; 1199SEIU National Benefit Fund; 1199SEIU Greater New York Benefit Fund; 1199SEIU National Benefit Fund for Home Care Workers; and 1199SEIU Licensed Practical Nurses Welfare Fund. EPP Am. Class Action Compl. ¶¶ 37-42.

[3] The Indirect Reseller Plaintiffs ("IRPs") are the following independent pharmacies that allege they acquire drugs indirectly through drug wholesalers rather than directly from drug manufacturers: Chet Johnson Drug, Inc.; Falconer Pharmacy, Inc.; Halliday's & Kovisto's Pharmacy; Russell's Mr. Discount Drugs, Inc.; and WestVal Pharmacy. IRP Am. Overarching Compl ¶¶ 12-16.

[4] The Kroger Plaintiffs are Kroger Co., on its own behalf and as the assignee of Cardinal Health, Inc.; Albertsons Companies, LLC; and H.E. Butt Grocery Company. Kroger Am. Compl. ¶¶ 60-62. Kroger Plaintiffs allege they own and operate retail stores and pharmacies that sell generic drugs and that they purchased generic drugs directly from Defendants and/or Defendants' co-conspirators. Id.

[5] The Marion Plaintiffs are Marion Diagnostic Center LLC and Marion HealthCare, LLC. Marion Second Am. Compl. ¶¶ 12-13. Marion Diagnostic alleges that it "operates a multidisciplinary healthcare facility including an outpatient surgery practice, a diagnostic center, and a walk-in clinic," and that it purchased generic drugs through distributor McKesson-Medical-Surgical, Inc. Id. ¶ 12. Marion HealthCare alleges that it "operates a multi-specialty surgery center" and that it purchased generic drugs through distributor McKesson-Medical-Surgical, Inc. Id. ¶ 13.

[6] "Humana, either directly or through its health plan subsidiaries, insure[s] and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims. Many of these health plan benefits provide members with prescription drug coverage under which claims for drugs manufactured by Defendants were submitted and paid." Humana Second Am. Compl. ¶ 48.

Complaint[7] ¶¶ 89-109.  For the reasons set forth below, the motion will be denied.[8]

## I. BACKGROUND

The first complaints filed in this multidistrict litigation were drug-specific and alleged a scheme or schemes to allocate markets and fix prices for various individual drugs.  In August 2016, the United States Judicial Panel on Multidistrict Litigation ("JPML") transferred actions regarding digoxin and doxycycline to this Court for coordinated or consolidated pretrial proceedings.[9]  When the JPML transferred actions regarding additional generic drugs (clobetasol, desonide, fluocinonide, econazole, levothyroxine, and propranolol) into this MDL in April 2017, it noted that the separate conspiracies alleged in the individual complaints "may overlap significantly" because they "stem from the same government investigation into price fixing, market allocation, and other anticompetitive conduct in the generic pharmaceuticals industry."[10]

After Plaintiff States joined the MDL with a complaint asserting claims regarding two additional drugs (glyburide and doxycycline hyclate delayed release),[11] they moved for leave to

---

[7] The Plaintiff States' claims are brought by and through the Attorneys General for the following 49 jurisdictions:  Connecticut, Arkansas, Alabama, Alaska, Arizona, California, Colorado, Delaware, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.  *See* Plaintiff States' Consol. Am. Compl. (Civ. A. No. 17-3768, Dkt. No. 14).  This Opinion does not address the States' complaint in *Connecticut v. Teva Pharmaceuticals USA* (Civ. A. No. 19-2407), a separate case filed by the State of Connecticut and 43 other jurisdictions that was transferred into this MDL on May 30, 2019.

[8] Certain individual Defendants have filed separate motions seeking to dismiss the claims against them in the Overarching Complaints.  Those motions are not addressed in this Opinion.

[9] *See In re Generic Drug Pricing Antitrust Litig.*, 227 F. Supp. 3d 1402, 1403-04 (J.P.M.L. 2016).

[10] *In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d 1341, 1343 (J.P.M.L. 2017).

[11] *See In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017).  The JMPL explained that the State Action involved "common questions of fact" with the other actions that had been transferred to the MDL, noting that the States' claims "stem from the same government investigation into

file a consolidated amended complaint alleging an overarching conspiracy by manufacturers seeking to minimize or prevent competition across the generic drug industry. Pursuant to Rule 15 of the Federal Rules of Civil Procedure, the Court granted the motion in June 2018, finding that Plaintiff States had "not acted with undue delay, bad faith, or dilatory motives" and that amendment would not be futile and would not prejudice Defendants.[12] The Court explained that Defendants' prejudice arguments, including arguments regarding the imposition of joint and several liability would "be carefully assessed, whether in the context of a consolidated complaint or a single-pharmaceutical complaint."[13]

In October 2018, the Court considered motions to dismiss drug-specific complaints for clobetasol, digoxin, divalproex ER, doxycycline hyclate, econazole, and pravastatin (the "Group 1" drugs) and determined that Group 1 Plaintiffs' individual drug conspiracy allegations were sufficient to permit most of their Sherman Act claims to withstand dismissal.[14] In deciding those motions, the Court declined to consider allegations in the Plaintiff States' then-operative complaint regarding an overarching conspiracy.[15] Thereafter, DPPs, EPPs, IRPs, Humana, Kroger Plaintiffs, and Marion Plaintiffs filed their own Overarching Complaints alleging a multi-drug conspiracy or series of conspiracies involving multiple generic pharmaceuticals and multiple generic pharmaceutical manufacturers. Defendants now ask the Court to decide the sufficiency of Plaintiffs' claims that there was an overarching scheme to fix prices or otherwise

---

anticompetitive conduct in the generic pharmaceuticals industry." *Id.* at *2.

[12] *In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853-54 (E.D. Pa. 2018).

[13] *Id.* at 854.

[14] *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 458 (E.D. Pa. 2018). The Court decided Defendants' motions to dismiss state law claims regarding the Group 1 drugs in a subsequent decision. *See In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 819 (E.D. Pa. 2019)

[15] *In re Generic Pharm.*, 338 F. Supp. 3d at 437.

interfere with the market for generic drugs.

Not every Overarching Complaint names the same Defendants[16] or asserts claims regarding the same individual drugs, drug formulations, and/or dosages.[17] But each of the Overarching Complaints alleges that Defendants pursued a common goal – to achieve artificially-inflated generic drug prices through the allocation of markets and through price-fixing agreements – and that they did so through a wide-ranging "fair share" arrangement.[18] EPPs allege that "subsidiary agreements among the manufacturing Defendants relating to each of the" individual drugs involved sprang from the overarching "fair share" understanding.[19] DPPs allege that the existence of the overarching conspiracy is supported by the sheer number of generic drugs that are a part of this MDL.[20] The claims asserted in the Overarching Complaints would impose joint and several liability on Defendants not just for their participation in any individual drug conspiracy, but also for their participation in the alleged overarching scheme.

"Fair share," as the Plaintiff States allege, approximates "how much market share each competitor is entitled to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of the entry."[21] They allege that the "fair share" scheme has an objective of attaining "a state of equilibrium, where none are incentivized to compete for additional market share by eroding price" and that it is "implemented in different

---

[16] The Defendants in each Overarching Complaint are listed in Appendix A to this Opinion.

[17] The generic drugs identified in each Overarching Complaint are listed in Appendix B to this Opinion.

[18] *See* DPP Am. Class Action Compl. ¶ 9; EPP Am. Class Action Compl. ¶ 122; IRP Am. Overarching Compl. ¶ 66; Plaintiff States' Consol. Am. Compl. ¶ 14; Humana Second Am. Compl. ¶¶ 262-267; Kroger Am. Compl. ¶ 9; Marion Second Am. Compl. ¶¶ 54-59.

[19] EPP Am. Class Action Compl. ¶ 104.

[20] DPP Am. Class Action Compl. Ex. A (table identifying MDL 2724 generic drugs as of December 2018).

[21] Plaintiff States' Consol. Am. Compl. ¶ 90.

ways."[22]  "There is no precise method for apportioning" market share between participants in the alleged scheme "because market share is obtained by winning the business of various customers, which is inherently variable in a given year."[23]

IRPs describe the fair share scheme as

> a system by which each Defendant is allocated its 'fair share' of the market for a certain drug or formulation[ ] based on the number of pre-existing competitors and their seniority.  By making room for new entrants, the Defendants ensure that the newcomers will not attempt to win market share by offering lower prices . . . . The newcomers are therefore able to enter the market at artificially elevated prices, and thereafter, all of the competitors are able to raise their prices, customer by customer, with knowledge that their share is mostly safe from competition.[24]

EPPs allege that "[b]ecause Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a 'fair share' of the market – became the 'rules of the road' that governed their overarching conspiracy."[25]  Kroger Plaintiffs allege that "Manufacturers implemented the 'fair share' agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful."[26]  Plaintiff States allege that the "rules about "'fair share' apply equally to price increases. . . .  [T]he larger understanding dictates that [Defendants] will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business."[27]

> Defendants that "played fair" and maintained a "fair share" would benefit from the overarching conspiracy as a whole, even if Defendants would occasionally

---

[22] *Id.* ¶¶ 97-98.

[23] *Id.* ¶ 97; *see also* Marion Second Am. Compl. ¶ 55.

[24] IRP Am. Overarching Compl. ¶ 66.

[25] EPP Am. Class Action Compl. ¶ 103.

[26] Kroger Am. Compl. ¶ 9.

[27] Plaintiff States' Consol. Am. Compl. ¶ 106.

"lose out" on one specific drug. . . . Defendants who undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor, which was contrary to the "fair share" agreement.[28]

Kroger Plaintiffs explain that "the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented."[29]

Plaintiffs allege that the fair share arrangement necessarily extended beyond any individual drug. For example, Humana alleges that "Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs."[30] Plaintiff States allege that "[d]ecisions on 'fair share' can, at times, be based on conduct that occurs between competitors across more than one generic drug market."[31] Correspondingly, IRPs allege that the

"fair share" scheme was not limited to a specific drug. For example, customers in one generic drug market were sometimes traded for customers in a different generic drug market so that fair shares could be allocated across the industry as a whole. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug.[32]

DPPs allege that "achieving a fair share as to one generic drug could involve horse trading across other generic drugs," noting that "manufacturers were generally aware of each manufacturer's entire portfolio of generic drugs, as well as pending and/or approved Abbreviated New Drug

---

[28] EPP Am. Class Action Compl. ¶ 125.

[29] Kroger Am. Compl. ¶ 822.

[30] Humana Second Am. Compl. ¶ 262.

[31] Plaintiff States' Consol. Am. Compl. ¶ 101.

[32] IRP Am. Overarching Compl. ¶ 70; *see also* EPP Am. Class Action Compl. ¶ 125.

Applications ('ANDAs')."[33]  IRPs allege that "[t]he overarching conspiracy works because, to manufacture a generic drug and sell it in the United States, a manufacturer must have a Food and Drug Administration approval known as an ANDA . . . ."[34]  They contend that "Defendants can buy, trade, or license already-approved ANDAs," meaning that they "are always industry competitors of one another even if they are not product competitors at a certain moment."[35]  Thus, EPPs cite common ANDAs between Defendants[36] as evidence of competitive overlap between the Defendants.[37]  As an example, they allege that Defendants Par, Mylan, and Sun have overlapping ANDAs for at least three generic drug formulations and Defendants "Mylan and Heritage have overlapping ANDAs for at least 7" generic drug formulations.[38]  EPPs contend that the Defendants named in their Overarching Complaint "are actual or potential competitors for all" of the generic drugs identified in their Overarching Complaint because of their overlapping ANDAs and, if all of the drugs in the MDL were taken into consideration, "the web of competitive overlap would be even denser."[39]

DPPs allege that under the fair share arrangement, generic drug manufacturers did not need to compete because they were "playing nice in the sandbox," which "entailed, among other things, getting along with ostensible competitors, communicating with them frequently about customers, new drug launches, prices, bids, and generally not disturbing their share of the

---

[33] DPP Am. Class Action Compl. ¶ 17.

[34] IRP Am. Overarching Compl. ¶ 68.

[35] *Id.*

[36] EPP Am. Class Action Compl. ¶ 115 (table listing the ANDAs owned or licensed by Defendants in EPPs Overarching Complaint).

[37] *Id.* ¶ 117.

[38] *Id.*

[39] *Id.*

generic industry sandbox."[40]  IRPs allege that "[i]mplementation of the overarching conspiracy was accomplished by a series of overlapping bilateral calls, emails, texts, and online messages and by multilateral meetings at industry conferences, private dinners, cocktails, and similar social outings."[41]  Plaintiff States allege that, "[f]or example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person."[42]  DPPs similarly allege that "[p]laying nice in the sandbox was facilitated by generic manufacturer employees frequently communicating and socializing both in-person at near constant trade association events, via telephone and texting, or via other electronic means (e.g., email, social media platforms, LinkedIn, WhatsApp)."[43]  DPPs also allege that generic drug manufacturers' employees had opportunities for interaction "in less formal settings such as happy hours, events for women in the industry, dinners, lunches, golf outings, . . . etc."[44]

EPPs allege that

Defendants implemented their conspiracy through numerous meetings and communications between and among their representatives, including at industry events such as [gatherings of] the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance) ("HDA"), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").[45]

---

[40] DPP Am. Class Action Compl. ¶¶ 10-11.

[41] IRP Am. Overarching Compl. ¶ 69; *see also* EPP Am. Class Action Compl. ¶ 100 ("Defendants facilitated their conspiracy through personal connections formed through frequent movement within the industry, through frequent in-person meetings at various happy hours, dinners, lunches, golf outings, trade shows, and industry conferences, and through frequent direct communications in person, via chat and email, and on the telephone (both voice and text).").

[42] Plaintiff States' Consol. Am. Compl. ¶ 91.

[43] DPP Am. Class Action Compl. ¶ 12.

[44] *Id.*; *see also* Plaintiff States' Consol. Am. Compl. ¶ 12.

[45] EPP Am. Class Action Compl. ¶ 13.

DPPs' Overarching Complaint alleges that generic drug manufacturers had extensive contacts through "almost constant trade association meetings," and, as an exhibit, includes a 49-page list of "Trade Association Contacts as to the Named Generic Drugs" identifying trade group meetings, their dates and locations, individual representatives of Defendants in attendance and their job titles.[46]  Kroger Plaintiffs allege that "[t]he frequent trade association meetings provided an ideal mechanism through which Defendants could and did meet in person and reach agreements with their competitors to increase prices on the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States."[47]

Plaintiffs also allege that "the interwoven, cooperative generic drug industry culture" was furthered by movement of generic drug manufacturers' employees and executives between various generic drug manufacturers.[48]  IRPs allege that the fair share scheme was often implemented by "salespeople at the rank of 'National Account Manager' (NAM) or equivalent."[49]  They allege that

> [m]ost of these NAMS had had several years of experience in the generic drug industry and personal connections that facilitated the overarching conspiracy. NAM Susan Knoblauch worked at Caraco (Defendant Sun) for nearly ten years before moving to a different sales position at Defendant Citron. NAM Beth Hamilton worked at Defendant Apotex before moving to Defendant Mayne. NAM Daniel Lukasiewicz began his career at Defendant Aurobindo, moved to Defendant Zydus, and currently works at Defendant Heritage. These individuals all reached back to their prior employers in order to allocate markets and agree to

---

[46] DPP Am. Class Action Compl. ¶ 480(3) (citing *id.*, Ex. A); *see also* Plaintiff States' Consol. Am. Compl. ¶¶ 77-80.

[47]  Kroger Am. Compl. ¶ 147.

[48] DPP Am. Class Action Compl. ¶ 13; *see also* EPP Am. Class Action Compl. ¶ 128 ("[M]any of the [National Account Managers ("NAMs")] and other marketing and sales personnel employed by Defendants have worked at multiple companies – including other Defendants – during their careers.  These employees maintained contact with people at their prior employers.").

[49] IRP Am. Overarching Compl. ¶ 71.

higher prices.[50]

DPPs cite the following examples of employee movement:

> [Rajiv] Malik[51] worked at Ranbaxy (now Defendant Sun) and Defendant Sandoz before working at Defendant Mylan; Dan Lukasiewicz worked at Defendants Aurobindo and Zydus before working at Defendant Heritage; Susan Knoblauch worked at Defendant Sun before leaving to work as a NAM at Citron; Jan Bell worked at Defendant G&W before working at Defendant Mylan; Joseph Papa left Defendant Perrigo to become Chairman and CEO of Defendant Valeant; Carole Ben-Maimon who worked in different roles at Defendants Impax, Par, and Teva; and Bhaskar Chaudhuri who was the General Manager of the Dermatology Division at Defendant Mylan before later becoming President of Defendant Valeant and a member of MDL Defendant Teligent's board of directors.[52]

EPPs also cite several examples of employee movement and continuing relationships, including

the allegation that:

> Teva's Director of Strategic Customer Marketing Nisha Patel met Heritage's then-Sr. Vice President [Jason] Malek when she worked at [drug wholesaler] Amerisource Bergen, which was a Heritage customer that Malek managed. When Patel Moved to Defendant Teva in April 2013, she contacted Malek to determine which generic drug products Teva sold that overlapped with generic drugs sold by Heritage so that they could coordinate pricing.[53]

Illustrating the alleged consequences of the overlap between Defendants' employees,

IRPs allege that Patel (then at Teva) and Malek (Heritage) had a "series of phone calls discussing

price increases for multiple drugs, including at least Nystatin [tablets] and Theophylline" in

February and March 2014, including a call from Malek to Patel on February 5, 2014 where they

"spoke for more than an hour and discussed a price increase for at least the drugs Nystatin and

Theophylline."[54] They also allege that Malek and Patel "had a seventeen-minute phone

---

[50] *Id.*

[51] Malik is named as a Defendant in the DPP, EPP, IRP and Plaintiff States' actions.

[52] DPP Am. Class Action Compl. ¶ 130.

[53] EPP Am. Class Action Compl. ¶ 132.

[54] IRP Am. Overarching Compl. ¶ 77.

conversation" on April 15, 2014 where "they discussed at least seven different drugs," including acetazolamide, and agreed "that Teva would lead the price increases for Nystatin and Theophylline, and that if Heritage increased prices for the other five drugs . . . Teva would increase its prices for these drugs, or at a minimum, would not challenge Heritage's price increase."[55] Humana alleges that this phone conversation was part of "Heritage's attempt to impose industry-wide price increases simultaneously on eighteen drugs," an effort that "involved reaching out to competitors as to each of the drugs in an attempt to agree on price increases."[56] IRPs contend that effective April 4, 2014, Teva more than doubled its list price for nystatin tablets.[57] They allege that Teva began implementing price increases for theophylline on the same day and that it held to its price increase even though a customer emailed Teva seeking price relief.[58] IRPs also allege that by July 9, 2014, "Heritage increased Theophylline prices to at least 20 different customers."[59]

IRPs allege that Heritage's communications regarding nystatin tablet prices also extended to Defendant Sun. They assert that Ann Sather (Heritage) called Knoblauch (then at Sun) on April 22, 2014, to discuss an agreed upon price for nystatin tablets and other drugs.[60] IRPs

---

[55] *Id.* ¶ 79; *see also* DPP Am. Class Action Compl. ¶ 125 ("[D]uring an April 15, 2014 telephone conversation, Heritage President Jason Malek and Nisha Patel of Teva coordinated regarding price increases for several drugs, including acetazolamide capsules, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, and nystatin tablets."); Plaintiff States' Consol. Am. Compl. ¶ 271 (citing a seventeen-minute phone conversation between Malek and a Teva employee "during which [the Teva employee] agreed that if Heritage increased prices for [seven drugs], Teva would follow or, at a minimum, would not challenge Heritage's price increases by underbidding Heritage").

[56] Humana Second Am. Compl. ¶ 272.

[57] IRP Am. Overarching Compl. ¶ 78.

[58] *Id.* ¶¶ 299, 301.

[59] *Id.* ¶ 303.

[60] *Id.* ¶ 81.

allege that Sather then emailed colleagues at Heritage "to report that Sun was 'on board.'"[61] Glazer responded to Sather's email with an email telling her "not to write such emails."[62]

EPPs allege that on April 16, 2014, one day after her seventeen minute conversation with Malek, Patel spoke on the phone for "nearly twenty minutes" with a Zydus employee to discuss acetazolamide pricing.[63] They allege that "Malek believed it was important to 'socialize' the idea of an Acetazolamide price increase with competitors before implementing it" and therefore, "he and the Heritage NAMs contacted Teva and Zydus to discuss pricing and customers either via phone, text or email, or in person, often through industry trade association meetings and conferences."[64] IRPs allege that Malek sent emails on May 6 and 7, 2014 explaining "that he had obtained agreements to raise the price of acetazolamide."[65] Plaintiff States allege that Heritage raised its acetazolamide prices to at least 17 different customers by July 19, 2014.[66] EPPs allege that Teva and Zydus employees "were also in close contact with each other about Acetazolamide" during the same timeframe, citing an exchange of "numerous text messages between Teva and Zydus employees on May 14, 2014.[67] Plaintiff States contend that because of Defendants' collective agreement to raise prices for generic drugs, they eliminated price

---

[61] *Id.*

[62] *Id.* Plaintiff States allege that Defendants "all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made." Plaintiff States' Consol. Am. Compl. ¶ 454.

[63] EPP Am. Class Action Compl. ¶ 439; *see also* IRP Am. Overarching Compl. ¶ 180.

[64] EPP Am. Class Action Compl. ¶ 439.

[65] IRP Am. Overarching Compl. ¶ 183.

[66] Plaintiff States' Consol. Am. Compl. ¶ 304.

[67] EPP Am. Class Action Compl. ¶ 446.

competition between Heritage, Teva, and Zydus for acetazolamide.[68]

Other allegations in the Overarching Complaints demonstrate overlapping points of contact between Defendants and their employees. For example, DPPs allege that on May 14, 2014 (the same day as the above-referenced alleged text messages between Teva and Zydus employees), "executives from Heritage, Aurobindo and Sandoz met in person to discuss a fosi-HCTZ price increase at a MMCAP conference in Minnesota."[69] They allege that executives from Aurobindo and Sandoz continued discussions regarding the intended price increase via text message and telephone the next day.[70] DPPs allege that additional calls and text messages between executives for Aurobindo, Glenmark, and Sandoz regarding a planned fosi-HCTZ price increase continued into June 2014.[71] A Heritage executive is alleged to have had an 18 minute phone call with an Aurobindo executive on June 25, 2014 – the day before Heritage issued price increase letters for numerous drugs, including fosi-HCTZ . . . ."[72] After further alleged internal and external discussions, Citron began implementing its own fosi-HCTZ price increases on July 15, 2014.[73] DPPs allege that "[b]y early 2015, Defendants Heritage, Aurobindo, Citron, Glenmark, and Sandoz" had each increased their prices for fosi-HCTZ and "[n]o non-collusive market factors (e.g., product shortages) can explain Defendants' artificially inflated prices."[74]

---

[68] Plaintiff States' Consol Am. Compl. ¶ 529.

[69] DPP Am. Class Action Compl. ¶ 200. "Aurobindo was also a competitor with Heritage for the drugs Glyburide and Glyburide-Metformin." Plaintiff States' Consol Am. Compl. ¶ 277.

[70] DPP Am. Class Action Compl. ¶ 200.

[71] *Id.* ¶ 202.

[72] *Id.* ¶ 204.

[73] *Id.* ¶¶ 207-210.

[74] *Id.* ¶¶ 213-214.

More broadly, the States allege that from "July 1, 2013 through July 30, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Heritage spoke to representatives of every other U.S.-based corporate Defendant [in the Plaintiff States' action] by phone and/or text on multiple occasions."[75]  Taking their allegations as true, Heritage had at least 513 phone or text contacts with alleged co-conspirators during that one year period.[76]  The States also allege that "senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke by phone and/or exchanged text messages with representatives of every other U.S.-based corporate Defendant [in the Plaintiff States' action] during the same period."[77]  Again, taking their allegations as true, Teva had at least 1,501 phone or text contacts with alleged co-conspirators that year.[78]

Some Overarching Complaints also specifically include allegations linking Defendants with portfolios that did not include the same generic drugs.  In their Overarching Complaint, EPPs contend that the overarching nature of the conspiracy is underscored by alleged communications such as those between Teva and Defendants that did not concurrently sell any Teva-manufactured drug (Dr. Reddy's, Glenmark, Lannett, Mayne, Par and Sandoz).[79]  EPPs also note that during one of the alleged text exchanges between Heritage's Sather and Sun's Knoblauch, "Sather informed Knoblauch of Heritage's pricing discussions with Actavis on

---

[75] Plaintiff States' Consol. Am. Compl. ¶ 94.

[76] Id.

[77] Id. ¶ 95.

[78] Id.

[79] EPP Am. Class Action Compl. ¶ 110.

Glyburide-Metformin and Verapamil, two drugs that Sun did not sell."[80]

The Overarching Complaints allege that the market for generic drugs is conducive to collusive activity between generic drug manufacturers.[81]  For example, DPPs allege that "[a]bsent collusion, individual Defendants and co-conspirators could not have increased their prices to the high levels they did (or maintain high prices in the face of a competitor's significantly lower price) without incurring the loss of a significant volume of sales."[82]  Kroger Plaintiffs allege that "each Price-Fixed Generic Drug has commodity-like characteristics, there are barriers to entry of a new competitor, the demand is highly inelastic, and the market for the sale of each generic drug is relatively concentrated.  These economic conditions make the market for the manufacture and sale of the Price-Fixed Generic Drugs conducive to cartelization."[83]  EPPs allege that "[b]ecause purchasers choose whose generic pharmaceutical product to buy

---

[80] EPP Opp. Br. at 21 (citing EPP Second Am. Compl. at ¶ 555).  Plaintiff States also allege that a Heritage employee exchanged text messages with a Sun employee "describ[ing] agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil."  Plaintiff States' Consol. Am. Compl. ¶ 452.

[81] *See also* EPP Am. Class Action Compl. ¶ 10 ("The markets for the Drugs at Issue were controlled by Defendants, and are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Each generic drug described in this Complaint is a commodity product, for which reasonable substitutes are not available and demand is highly inelastic.  Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement."); IRP Am. Overarching Compl. ¶ 66 ("Generic drugs are commodity products.  In a competitive commodity market, a new manufacturer must offer prices lower than the competition in order to win customers."); Plaintiff States' Consol. Am. Compl. ¶ 50 ("As generic drugs enter the market, competition typically leads to dramatic reductions in price. Generic versions of brand name drugs are priced lower than the brand-name versions") and ¶ 57 ("[A] generic drug is a commodity. Consequently, competition is dictated by price and supply."); Humana Second Am. Compl. ¶ 136 (citing high level of industry concentration, sufficient numbers to drive competition, high barriers to entry, high inelasticity of demand and lack of substitutes, commoditized market, absence of departures from the market, absence of non-conspiring competitors, opportunities for contact and communication among competitors, the size of price increases, and the generic reimbursement system).

[82] DPP Am. Class Action Compl. ¶ 107 ("Defendants had the capacity to dictate the market price and to influence the [Maximum Allowable Cost] prices set by [Pharmacy Benefits Managers], but only if they acted collectively.").

[83] Kroger Am. Compl. ¶ 16.

based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to raise its prices without assurance that its competitors either would also increase prices or at least not compete on pricing."[84] DPPs assert that "as the industry grew more comfortable with the Fair Share Agreement, generic drug manufacturers became bolder and would, at times, substantially raise generic drug prices."[85] Humana contends that the alleged "increases are not 5% or even 10% jumps— they are of far greater magnitude."[86] DPPs allege that during the time relevant to their claims the "pricing dynamics in the generic drug industry changed"[87] from what would have been expected given the characteristics of the generic drug market.[88]

Alleged price changes across a broad range of generic drugs "prompted close scrutiny of the industry,"[89] including: (1) a criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") that has "resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage" – Chief Executive Officer Jeffrey Glazer and President Jason Malek – "relating to the sale of Glyburide and Doxycycline Hyclate;"[90] (2) an "ongoing"

---

[84] EPP Am. Class Action Compl. ¶ 11.

[85] DPP Am. Class Action Compl. ¶ 19; *see also* Plaintiff States' Consol. Am. Compl. ¶7 ("At some point, that price dynamic changed for many generic drugs. Prices for dozens of generic drugs have risen – while some have skyrocketed, without explanation . . . .").

[86] Humana Second Am. Compl. ¶ 136(i); *see also* Kroger Am. Compl. ¶ 12 (alleging "abrupt and substantial price increases" during the alleged conspiracy for 20 drugs with price jumps ranging from 75% to as high as 3,400%).

[87] DPP Am. Class Action Compl. ¶ 1.

[88] *See* Plaintiff States' Consol. Am. Compl. ¶ 5 ("Typically, when the first generic manufacturer enters a market for a given drug, the manufacturer prices its product slightly lower than the brand-name manufacturer. . . . As additional generic manufacturers market the product, the prices continue to fall slowly.").

[89] EPP Am. Class Action Compl. ¶ 15.

[90] EPP Am. Class Action Compl. ¶ 16; *see also* Humana Second Am. Compl. ¶¶ 144-158 (allegations regarding DOJ criminal investigation and DOJ subpoenas served on defendants).

investigation initiated by the State of Connecticut and joined by other states;[91] and (3) various congressional inquiries.[92]  DPPs allege that many generic drug manufacturers have publicly reported that they have received investigative subpoenas regarding pricing and other information relevant to their generic drug portfolios – subpoenas reaching beyond any individual drug.[93] Humana alleges that "subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation."[94]  For example, it cites a quarterly report that Defendant Lannett filed with the Securities and Exchange Commission which reported that Lannett's Senior Vice President of Sales and Marketing had been "served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical company into possible violations of the Sherman Act" and explained that the subpoena was "not specifically directed to any particular product and is not limited to any time period."[95]  EPPs allege that "DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, have uncovered numerous inter-competitor communications."[96] Plaintiffs' claims that Defendants engaged in an overarching multi-drug conspiracy rely on allegations arising from these investigations.

---

[91] Plaintiff States' Consol. Am. Compl. ¶ 1; *see also* Humana Second Am. Compl. ¶¶ 164-72.

[92] *See* DPP Am. Class Action Compl. Ex. B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); *id.* Ex. C. (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry); *see also* Humana Second Am. Compl. ¶¶ 139-43 (allegations regarding congressional investigation into generic drug price increases).

[93] DPP Am. Class Action Compl. ¶¶ 27-33; *see also* EPP Am. Class Action Compl. ¶ 657.

[94] Humana Second Am. Compl. ¶ 136(h).

[95] *Id.* ¶ 151.

[96] EPP Am. Class Action Compl. ¶ 657.

## II.    STANDARD OF REVIEW

Defendants seek to dismiss the overarching conspiracy claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6), which provides for dismissal of a complaint for failure to state a claim when a plaintiff's "plain statement" lacks enough substance to show that it is entitled to relief.[97]  "[J]udging the sufficiency of a pleading is a context-dependent exercise."[98] On a motion to dismiss, the Court "consider[s] plausibility, not probability . . . ."[99]  Plaintiffs must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[100]  "Speculative or conjectural assertions are not sufficient."[101]  However, Plaintiffs are not required "to plead facts that, if true, definitively rule out all possible innocent explanations."[102]  "[I]t is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible."[103]  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[104]

---

[97] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[98] *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

[99] *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 260 (3d Cir. 2017); *see also Twombly*, 550 U.S. at 570 (holding that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

[100] *Twombly*, 550 U.S. at 556.

[101] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

[102] *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014).

[103] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017).

[104] *Twombly*, 550 U.S. at 556 (internal quotation marks and citation omitted; *see also In re Capacitators Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ("[T]he task of the district court is not to sustain or dismiss a complaint based on whether the Court feels it is a winner or has curb appeal.  The Court's task is to determine whether the facts alleged in the complaint rise above mere speculation, even if the Court has doubts about them, . . . and whether they plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.") (citations and internal quotation marks omitted).

## III. DISCUSSION[105]

In this Opinion, the Court does not consider any Defendant's challenge to the sufficiency of allegations regarding any drug-specific conduct. Instead, the Court considers whether Plaintiffs have sufficiently alleged the existence of a conspiracy that extends beyond the boundaries of any individual drug. "So long as an alleged conspiracy is supported by enough facts to make it plausible, . . . it is of no matter whether it involves three conspirators or a score or more."[106] As EPPs argue, "the question here goes to the scope of each Defendants' anticompetitive agreement, not its existence" and, based on the facts alleged in the Overarching Complaints, discovery will be required to answer the question.[107]

### A. TWOMBLY

To state a claim for a Sherman Act conspiracy, Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made."[108] In the absence of allegations of direct evidence of such an agreement, Plaintiffs may allege parallel conduct plus "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[109] The necessary context may be shown through allegations of "plus factors" that "serve as proxies for direct evidence of an agreement."[110] "Plaintiffs are not required to plead simultaneous price increases – or that the price increases were identical – in

---

[105] The Court elects to bifurcate Defendants' separate motions regarding their individual defenses.

[106] *In re Capacitors*, 106 F. Supp. 3d at 1064; *see also id.* at 1063 ("[M]ere size or breadth alone is not a reason to peremptorily jettison a conspiracy allegation.").

[107] EPP Opp. Br. at 3.

[108] *Twombly*, 550 U.S. at 556.

[109] *Id.* at 557.

[110] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

order to demonstrate parallel conduct."[111]  At least three "plus factors" support a finding that there is a suggestion of a preceding agreement: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."[112]  "[T]he conspiracy must not be compartmentalized.  The character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[113]

For purposes of alleging an overarching conspiracy, plaintiffs have alleged parallel conduct in the form of price increases across the market for generic drugs that are "reasonably proximate in time and value."[114]  Also, Plaintiffs have alleged that the structure of the market for generic drugs motivated Defendants to enter into an antitrust conspiracy and undertake actions against self interest in the form of pricing and bidding decisions that would be irrational in a competitive market for generic drugs.  Plaintiffs' Overarching Complaints also allege facts implying the existence of a traditional conspiracy:  inter-defendant communications, trade association leadership, membership, and meeting attendance, and ongoing state and federal investigations into generic drug pricing.  Plaintiffs' allegations are not mere "labels and conclusions," "allegation[s] of parallel conduct and . . . bare assertion[s] of conspiracy."[115]

In support of their motion to dismiss the overarching conspiracy claims, Defendants cite a

---

[111] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999).

[112] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010) (internal quotation marks and citations omitted).

[113] *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011) (internal quotation marks and citations omitted).

[114] *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383, 392 (3d Cir. 2015).

[115] *Twombly*, 550 U.S. at 556.

2016 decision in *In re: Automotive Parts Antitrust Litigation* that denied a motion seeking to

consolidate claims and amend complaints in order to assert an overarching conspiracy.[116]  There,

the court declined to allow the plaintiffs to file an amended complaint alleging an overarching

conspiracy for certain auto parts sold to Original Equipment Manufacturers, explaining that the

plaintiffs were required to "allege facts creating at least an inference as to each Defendant's

knowing participation in a conspiracy to raise, fix, maintain, or stabilize the price of auto parts,

not just the parts it makes or sells."[117]  The court determined that the plaintiffs alleged "multiple,

separate, and product-specific" conspiracies rather than a single overarching conspiracy because

the plaintiffs made "no allegations . . . of deals between makers of different component parts"

and declined to make an inference of the defendants' knowledge outside their "own specific

deals."[118]

Here, however, the Overarching Complaints allege that Defendants engaged in conduct

that reached beyond their individual drugs (e.g., attendance at trade association events that "were

not partitioned into drug-specific conclaves").[119]  The facts in the Overarching Complaints are

more like those alleged in a 2018 decision in the A*uto Parts* MDL, which determined that the

plaintiffs had sufficiently stated a broad conspiracy among multiple defendants to rig bids and fix

prices of air conditioning systems where the plaintiffs alleged defendants who manufactured

different component parts of the systems (similar to Defendants here, who manufacture different

---

[116] *See* Defs.' Mem. in Support of Joint Mot. to Dismiss Pls.' Overarching Conspiracy Claims at 21 (citing *In re Auto. Parts Antitrust Litig.*, No. 12-MD-2311, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016); *see also* Defs' Reply Br. at 6 (citing *In re Auto. Parts*, 2016 WL 8200512, at *4).

[117] *In re Auto. Parts*, 2016 WL 8200512, at *4.

[118] *Id.*

[119] EPP Opp. Br. at 18.

drugs) "participated in trade meetings involving the AC Systems market, in which they discussed the market generally" and also alleged some admissions of guilt by certain defendants and "market conditions conducive to a price-fixing conspiracy."[120] Those allegations, combined with the plaintiffs' allegations that "employees attended automotive air conditioning industry meetings and discussed with employees of other Defendants the status of their respective companies' negotiations with [Original Equipment Manufacturers]," and "allegations about industry conditions supporting an inference that the market was susceptible to collusion," were sufficient to satisfy *Twombly*.[121]

The allegations in Plaintiffs' Overarching Complaints plausibly allege that Defendants engaged in a conspiracy regarding the broader market for generic drugs, and not just the market for any individual drug. The connective tissue Plaintiffs have alleged in their Overarching Complaints gives credence to a claim that Defendants engaged in "behavior that would probably not result from chance, coincidence, independent response to common stimuli, or mere interdependence unaided by an advance understanding among the parties."[122] Plaintiffs make plausible claims that the alleged individual drug conspiracies were connected by common goals, methods, or actors so as to form a broader overarching conspiracy.[123] Defendants' arguments

---

[120] *In re Auto. Parts Antitrust Litig.*, No. 12-MD-2311, 2018 WL 1138422, at *4 (E.D. Mich. Jan. 16, 2018).

[121] *Id.* at *5.

[122] *Twombly*, 550 U.S. at 556 n.4 (quoting 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425 (2d ed. 2003) at 167-85) (internal quotation marks omitted).

[123] *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08- 0042, 2011 WL 7053807, at *30 (E.D.N.Y. Jan. 4, 2011) (holding that the plaintiffs sufficiently alleged an overarching conspiracy where their complaint "brought together actors, methods and markets" through allegations that a group of defendants allegedly involved in earlier conspiracies met at industry meetings where they conspired to "collectively impose surcharges"), *report and recommendation adopted*, No. 08-0042, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

that there are plausible alternative explanations for the overarching conspiracy should be tested by discovery. They are not a matter for decision at this stage of the proceedings.

**B.    UNITED STATES V. KELLY**

To determine whether Plaintiffs' allegations are enough to state an overarching conspiracy claim, Defendants argue the Court should apply the three-factor test set forth in *United States v. Kelly.*[124] They argue that **"**plaintiffs must plead facts showing that (1) each alleged conspirator was aware of, and committed to, a common goal that transcended individual agreements in which it is specifically alleged to have participated; (2) the alleged agreement contemplated a result 'that will not continue without the cooperation of the conspirators,' – i.e., that the individual conspiracies were interdependent; and (3) there was sufficient overlap among the participants in the individual conspiracies."[125]

In *Kelly*, the Third Circuit considered whether there was enough evidence to support the conclusion that a drug-dealer's criminal activities were part of a larger illegal drug distribution operation in the context of a post-trial appeal of a criminal conviction. Obviously, the circumstances here are different. This is not a criminal matter[126] and there has not yet been a trial – or even full discovery. Instead, the Court has been asked to consider the sufficiency of Plaintiffs' overarching conspiracy allegations in the context of motions to dismiss and the Court

---

[124] 892 F.2d 255, 258-59 (3d Cir. 1989).

[125] Defs.' Mem. in Support of Joint Mot. to Dismiss Pls.' Overarching Conspiracy Claims at 6 (citations omitted).

[126] In the criminal context, "[t]he issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). Also, the question of whether a criminal defendant may be charged with participation in a single overarching conspiracy or multiple independent conspiracies raises questions under the Double Jeopardy Clause, which protects against successive prosecutions and punishments for the same criminal offense. *Cf. United States v. Becker*, 892 F.2d 265, 268 (3d Cir. 1989). ("[T]he double jeopardy clause prohibits [the government] from splitting one conspiracy into several prosecutions."). That concern is not implicated here.

is required to accept all facts alleged in the complaints as true.[127]  Defendants do not cite any

binding precedent that would require the Court to apply the *Kelly* factors at the pleading stage in

the context of an alleged civil conspiracy.[128]

Twombly sets the bar for Plaintiffs' overarching conspiracy allegations, not *Kelly*.  But

even if *Kelly* were the proper measuring stick for Plaintiffs' Overarching Complaints, their

allegations plead an overarching conspiracy.  *Kelly* requires consideration of the totality of the

circumstances.[129]  No one allegation must prove Plaintiffs' overarching conspiracy claims.  And

"the absence of one [*Kelly*] factor does not necessarily defeat an inference of the existence of a

single conspiracy."[130]  The allegations that permit Plaintiffs' overarching conspiracy claims to

withstand a challenge under *Twombly* also permit them to withstand a challenge under *Kelly*.

---

[127] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (holding that a "complaint must contain sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face") (emphasis added, internal quotation marks and citation omitted).

[128] In their joint response, Plaintiffs state that "the parties agree that *Kelly* supplies the substantive law with which Plaintiffs' overarching conspiracy allegations should be evaluated."  Pls.' Joint Opp. Br. at 7-8.  However, like Defendants, Plaintiffs do not cite any binding precedent that would require the court to apply *Kelly* in the context of a motion to dismiss civil antitrust conspiracy claims where Plaintiffs' allegations must be taken as true.  *See id.*  In the nearly 30 years since *Kelly* was decided, the Third Circuit has not cited it in a civil case, and except for the decision in *In re K-Dur Antitrust Litig.*, No. 01-1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016), cited by the parties, *Kelly* has not been featured in civil antitrust cases.  *See, e.g., In re Processed Egg,* 821 F. Supp. 2d 709 (not citing *Kelly* in evaluating claims of an overarching civil antitrust conspiracy).  Moreover, in the criminal context, *Kelly* applies to post-trial motions.  *Cf. United States v. Keystone Biofuels*, 350 F. Supp. 3d 310, 320 (M.D. Pa. 2018) (holding that the *Kelly* "test cannot be dispositive of whether a defendant's pre-trial motion to dismiss based upon the purported duplicity of a conspiracy count in an indictment should be granted . . . because, at the pretrial stage of prosecution, t[he] Court's standard of review requires us to accept as true all of the allegations in the Superseding Indictment").

[129] To determine whether conspiracy defendants are part of a single conspiracy or multiple conspiracies in the context of a double jeopardy claim arising from criminal conspiracy charges, the Third Circuit applies a "totality of the circumstances" test.  *See United States v. Travillion*, 759 F.3d 281, 295 (3d Cir. 2014).  Factors considered are whether the alleged conspiracies occurred in the same place, had a significant degree of temporal overlap or an overlap of personnel, and whether the defendants' roles and actions in the alleged conspiracies were similar.  *Id.*  But the "factors need not be applied in a rigid manner, as different conspiracies may warrant emphasizing different factors."  *Id.* (citation omitted).

[130] *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

### 1. COMMON GOAL

The "common goal" required under *Kelly* need not be complex or detailed to state a claim. In *Kelly*, the common goal "was simply to make money selling 'speed.'"[131] In the Overarching Complaints, Plaintiffs have alleged that Defendants shared the common goal of increasing and stabilizing the prices of generic drugs. For example, DPPs allege that Defendants had a "common understanding and goal . . . to achieve artificially inflated prices" by disincentivizing competition for additional market share through price erosion.[132] EPPs allege that "[t]he purpose of Defendants' unlawful "fair share" allocation was to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug."[133] Humana alleges that "Defendants' shared understanding and goal is for the competitors in a particular market to discuss amongst themselves an agreement on 'fair share' with the objective of attaining a state of equilibrium where no competitor is incentivized to compete for additional market share by eroding price."[134] Kroger Plaintiffs allege that Defendants' common goal was "to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits."[135] Plaintiff States allege that Defendants' "overarching goal" was "to avoid price erosion and maintain inflated pricing within and across their respective broad product portfolios and, at times, increase pricing for targeted

---

[131] *Kelly*, 892 F.2d at 259 (noting that what mattered for the determination of whether a conspiracy had a "common goal" was that the conspiracy's "central purpose was common and pervasive" even though its "various personnel changed" during its existence).

[132] DPP Am. Class Action Compl. ¶ 10.

[133] EPP Am. Class Action Compl. ¶ 132.

[134] Humana Second Am. Compl. ¶ 268.

[135] Kroger Am. Compl. ¶ 814.

products without triggering a 'fight to the bottom' among existing competitors."[136]  No more is required to allege a common goal at this stage of the case.[137]

Defendants argue that the Overarching Complaints should be dismissed because Plaintiffs have not alleged facts "showing that each Defendant shares the common goal of an overarching conspiracy involving other drugs sold by other Defendants."[138]  But *Kelly* does not require proof "that each defendant knew all the details, goals or other participants in order" for the Court to find there was a single conspiracy.[139]  "[A] common goal may exist even when conspirators individually or in groups perform different tasks in pursuing the common goal, and a single conspiracy may attract different members at different times or involve different sub-groups committing acts in furtherance of the overall plan."[140]  "[A] defendant need not be accused of having engaged in all activities alleged to have advanced the conspiracy."[141]  In other words, "one conspiracy can involve multiple subsidiary schemes."[142]  That is what Plaintiffs have alleged in their Overarching Complaints:  a single conspiracy with a common goal, facilitated by multiple schemes specific to various individual generic drugs.

### 2. INTERDEPENDENCE

The second *Kelly* factor asks the Court to consider whether Defendants' conduct was

---

[136] Plaintiff States' Consol. Am. Compl. ¶ 12.

[137] *See United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019) (holding that to determine whether conspirators shared a common goal, a Court should consider the purpose of the alleged conspiracy "in a fairly broad sense").

[138] Defs.' Mem. in Support of Joint Mot. to Dismiss Pls.' Overarching Conspiracy Claims at 12.

[139] *Kelly*, 892 F.3d at 260 (internal quotation marks and citation omitted).

[140] *Fattah*, 914 F.3d at 168 (internal quotation marks, alterations and citation omitted).

[141] *In re Generic Pharm.* 338 F. Supp. 3d at 450 (quoting *In re Processed Egg*, 821 F. Supp. 2d at 742).

[142] *Fattah*, 914 F.3d at 169 (citation omitted).

intended to "bring to pass a continuous result that w[ould] not continue without the continuous cooperation of the conspirators."[143] "To evaluate interdependence, the court engages in an inquiry focused on 'the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other.'"[144] Courts "consider how helpful one individual's contribution is to another's goals."[145] Interdependence "helps establish whether the alleged coconspirators are all committed to the same set of objectives in a single conspiracy."[146]

Defendants argue that Plaintiffs' Overarching Complaints should fail because they "fail to allege facts demonstrating why an agreement as to all drugs would be necessary to reach agreement on one drug."[147] Responding to Defendants, Plaintiffs explain that "[w]hile Defendants' massive web of interlocking market allocation and price-fixing agreements might not have completely unraveled if one strand had to come apart, the Complaints contain multiple examples of how the agreements fit together and reinforced each other, allowing for easy collaboration and policing."[148] Further, by connecting multiple single-drug conspiracies, Defendants were able to better conceal their overarching conspiracy by "varying the leader of the price increase across drugs."[149]

Defendants argue that Plaintiffs' interdependence allegations make no economic sense –

---

[143] *Kelly*, 892 F.2d at 259.

[144] *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *21 (quoting *United States v. Macchia*, 35 F.3d 662, 671 (2d Cir. 1994)).

[145] *United States v. Kemp*, 500 F.3d 257, 289 (3d Cir. 2007)

[146] *Id.* (internal quotation marks and citation omitted).

[147] Defs.' Mem. in Support of Joint Mot. to Dismiss Pls.' Overarching Conspiracy Claims at 24.

[148] Pls.' Joint Opp. Br. at 20.

[149] Humana Opp. Br. at 9-10.

that individual Defendants had no incentive to increase prices for products that they did not sell. But in the Overarching Complaints, Plaintiffs have alleged the contrary. Humana alleges that "putative competitors declined to compete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined winning bid for a different drug" and that "an agreement by a putative competitor to join in the price increase for one drug often instigated a trade-off for that same competitor to lead a price increase for another drug."[150] Plaintiff States allege that

> [t]he agreement among all of the Defendants to adhere to the rules regarding 'fair share' is critical in order to maintain high prices. If even one competitor is not aware of (and behaving in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by competitors.[151]

EPPs assert that

> The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs as well. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.[152]

Similarly, IRPs allege that "Defendants who undercut other Defendants' prices were chastised for 'not playing fair' because lowering prices is considered irresponsible and to the detriment of all."[153] Under the allegations in the Overarching Complaints, Defendants who refused to "play

---

[150] Humana Second Am. Compl. ¶¶ 269-70.

[151] Plaintiff States' Consol. Am. Compl. ¶ 107.

[152] EPP Am. Class Action Compl. ¶ 102.

[153] IRP Am. Overarching Compl. ¶ 70.

fair" with competitors when asked to allocate markets or to raise prices risked retribution not just for the individual drugs implicated, but also for other generic drugs in their portfolios. These allegations create a plausible inference that "Defendants knew that they would need to enter into future agreements with other combinations of would-be competitors (in their existing markets or new markets) and therefore had a vested interest in 'playing fair' according to their shared code of conduct."[154] Whether this will ultimately prove to be the case is not before the Court at this time.

Defendants insist that Plaintiffs cannot show interdependence by alleging "the existence of an alleged 'series' of numerous individual conspiracies in the same industry."[155] They argue that "to state a claim for an overarching conspiracy, a complaint must allege facts demonstrating 'how, when, or where' the individual conspiracies became connected to each other in a single overarching conspiracy."[156] However, through detailed allegations regarding communications and other interactions between individual Defendants, Plaintiffs' Overarching Complaints have sufficiently alleged the how, when, or where needed to make plausible a claim that Defendants' actions regarding the prices of individual generic drugs in their portfolios were beneficial to and reinforced a broader scheme regarding generic drug prices. At this stage of the litigation, Plaintiffs have sufficiently alleged interdependence.

### 3. SUFFICIENT OVERLAP

Even if Plaintiffs' allegations did fall short on the other *Kelly* factors, their allegations of significant overlap among Defendants and the alleged individual drug conspiracies permit their

---

[154] Pls.' Joint Opp. Br. at 22.

[155] Defs.' Mem. in Support of Joint Mot. to Dismiss Pls.' Overarching Conspiracy Claims at 21.

[156] *Id.* at 21-22.

overarching conspiracy claims to withstand dismissal. Defendants argue that there is insufficient overlap between the participants in the alleged individual conspiracies because "none of the Private Plaintiffs alleges that any single Defendant participated in each of the individual drug conspiracies, and the Plaintiff States allege that only one Defendant participated in each of the 15 individual drug conspiracies alleged in the State Complaint."[157] Plaintiffs respond that their claims "rest on far more than the 'mere overlap' of some defendants in the interlocking conspiracies alleged."[158] The States argue that their Overarching Complaint "contains much more connective tissue between the Defendants and their agreements: overlapping, but not identical, sets of Defendants discussing price increases for multiple drugs at the same time; discussions on pricing activities for drugs that a Defendant did not manufacture; constant, crisscrossing communications among each other."[159]

There is no question that "mere overlap of some defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement."[160] But in the Overarching Complaints, Plaintiffs allege much more than the "mere overlap" of some of the Defendants. Plaintiffs allege that Defendants have numerous and sustained contacts through (1) representation on trade association boards of directors; (2) trade association membership; (3) attendance at trade association meetings and events; and (4) other industry gatherings. Under the allegations in the Overarching Complaints, "Defendants participated in (and in many cases

---

[157] Defs.' Mem. in Support of Joint Mot. to Dismiss Pls.' Overarching Conspiracy Claims at 26.

[158] Pls.' Joint Opp. Br. at 23-24.

[159] States' Opp. Br. at 5. In support of their argument, Defendants cite *Dahl v. Bain Capital Partners, LLC*, a decision denying summary judgment on an overarching conspiracy claim where there was sufficient evidence to suggest that there was an "accepted code of conduct" between the Defendants, even though there was "no single Defendant that was involved in every transaction or other indication that the transactions were interdependent." 937 F. Supp. 2d 119, 137-38 (D. Mass. 2013).

[160] *In re Auto. Parts*, 2016 WL 8200512, at *4.

governed) the same trade associations and attended numerous trade association activities."[161]  As EPPs argue, "Defendants' meetings at trade association events were not partitioned into drug-specific conclaves.  Trade events . . . are broadly focused; there were not, for example, Glyburide conferences and Acetazolamide conferences, but rather, an incredible number of events at which all manufacturers of all drugs were together."[162]

DPPs cite their allegations regarding Defendant Zydus as an example of the points of overlap between the alleged individual drug conspiracies.  They cite their allegations that: (1) Zydus was one of many Defendants that received a congressional letter inquiring about drug pricing; (2) like many other Defendants, Zydus received government subpoenas regarding generic drug industry practices; (3) Zydus and its co-Defendants actively participated in numerous trade associations; (4) Zydus's Chairman of the Board served on the GPhA's Board of Directors throughout the relevant time period and attended trade association gatherings at key points during alleged anticompetitive conduct as to acetazolamide pricing; (5) Defendant Heritage's NAM previously worked at Zydus and is alleged to "have colluded with other Defendants' personnel as to many drugs," including his former Zydus colleagues who moved to Citron; (6) communications between Zydus's Senior Director of National Accounts and Teva's Patel regarding pricing of at least acetazolamide; and (7) contacts between Zydus's Vice President of Sales and both Heritage's Malek (who has entered a guilty plea for his conduct relevant to glyburide and doxycycline hyclate) and Teva, which sold over a dozen drugs implicated in this MDL.[163]  Many other allegations in the Overarching Complaints paint a

---

[161]Humana Opp. Br. 11 (citing Humana Second Am. Compl. ¶¶ 178-190 and Ex. A).

[162] EPP Opp. Br. at 18.

[163] DPP Opp. Br. at 12.

similar picture of overlap between Defendants, although the allegations are more detailed with respect to some Defendants than others.

When Plaintiffs' allegations in each Overarching Complaint are viewed as a whole, they "do not simply reflect a series of disconnected conspiracies . . . ."[164] Plaintiffs "do not rely exclusively on the illustrative examples of collusive activity among Defendants or the trade meetings."[165] They also allege similar price trends across the market for generic drugs and various investigations involving overlapping Defendants, including one resulting in Malek's admission of guilt. Malek is specifically alleged to have had numerous contacts with employees of Defendants other than his own employer. These allegations bolster the plausibility of the antitrust claims set forth in the Overarching Complaints. Whether the points of overlap alleged in the Overarching Complaints ultimately will be sufficient to prove Plaintiffs' overarching conspiracy claims is not the question before the Court. Plaintiffs have alleged enough overlap under *Kelly* to allow them to proceed with discovery regarding the question of whether there was or is a broad overarching conspiracy connecting the alleged individual generic drug conspiracies.

## IV.    CONCLUSION

Plaintiffs have sufficiently alleged the existence of an overarching conspiracy and the Court will permit the claims based on an overarching conspiracy theory to proceed. Defendants' joint motion to dismiss plaintiffs' overarching conspiracy claims will be denied. Whether any individual Defendant has a specific defense to the claims raised against it in the Overarching Complaints is a separate question not here resolved.

An appropriate Order follows.

---

[164] *In re Auto. Parts*, 2018 WL 1138422, at *4.

[165] *Id.*

**APPENDIX A**

Defendants in DPPs' action (Civ. A. No. 18-2641) are: Actavis Holdco U.S., Inc.; Apotex Corp.; Aurobindo Pharma USA, Inc.; Citron Pharma LLC; Dr. Reddy's Laboratories, Inc.; Fougera Pharmaceuticals Inc.; G&W Laboratories, Inc.; Glenmark Pharmaceuticals, Inc., USA; Heritage Pharmaceuticals, Inc.; Impax Laboratories, Inc.; Lannett Company, Inc.; Mylan Inc.; Mylan Pharmaceuticals, Inc.; Oceanside Pharmaceuticals, Inc.; Rajiv Malik; Par Pharmaceutical Company, Inc.

Defendants in EPPs' action (Civ. A. No. 18-2401) are: Actavis Holdco U.S., Inc.; Actavis Elizabeth LLC; Actavis Pharma, Inc., Apotex Corp.; Aurobindo Pharma USA, Inc.; Barr Pharmaceuticals, LLC; Citron Pharma LLC; Dava Pharmaceuticals, LLC; Dr. Reddy's Laboratories, Inc.; Fougera Pharmaceuticals Inc.; Generics Bidco I, LLC; Glenmark Pharmaceuticals, Inc., USA; Heritage Pharmaceuticals, Inc.; Lannett Company, Inc.; Mayne Pharma Inc.; Mutual Pharmaceutical Co., Inc.; Mylan Inc.; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Pliva, Inc.; Rajiv Malik; Sandoz, Inc.; Sun Pharmaceutical Ind., Inc.; Taro Pharmaceuticals U.S.A., Inc.; Teva Pharmaceuticals USA, Inc.; West-Ward Pharmaceuticals Corp.; and Zydus Pharmaceuticals (USA), Inc.

Defendants in IRPs' action (Civ. A. No. 18-2533) are identical to those in the End Payor Plaintiffs' action.

Defendants in the Humana action (Civ. A. No. 18-3299) are: Actavis Elizabeth, LLC; Actavis Holdco US, Inc.; Actavis Pharma, Inc.; Akorn, Inc.; Apotex Corp., Breckenridge Pharmaceutical, Inc.; Dr. Reddy's Laboratories Inc., Endo International PLC; Epic Pharma, LLC; Fougera Pharmaceuticals Inc.; Glenmark Pharmaceuticals Inc., USA; Heritage Pharmaceuticals Inc.; Hi-Tech Pharmacal Co., Inc.; Impax Pharmaceuticals, LLC F/K/A Impax Pharmaceuticals, Inc.; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; Mayne Pharma, Inc.; Morton Grove Pharmaceuticals, Inc.; Mylan Pharmaceuticals, Inc.; Mylan Inc.; Mylan N.V., Par Pharmaceutical Companies, Inc.; Perrigo Company PLC; Perrigo New York, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceutical Industries Ltd.; Taro Pharmaceuticals USA, Inc.; Teligent, Inc.; Teva Pharmaceuticals USA, Inc.; UDL Laboratories, Inc.; Upsher-Smith Laboratories, LLC; West-Ward Pharmaceuticals Corp.; Wockhardt USA LLC; and Zydus Pharmaceuticals (USA) Inc.

Defendants in Kroger Plaintiffs' action (Civ. A. No. 18-824) are: Actavis Holdco U.S., Inc.; Actavis Pharma, Inc.; Akorn, Inc.; Apotex Corp.; Aurobindo Pharma USA, Inc.; Breckenridge Pharmaceutical, Inc.; Citron Pharma LLC; Dr. Reddy's Laboratories, Inc.; Epic Pharma, LLC; Fougera Pharmaceuticals, Inc.; G&W Laboratories, Inc.; Glenmark Pharmaceuticals Inc., USA; Heritage Pharmaceuticals, Inc.; Hi-Tech Pharmacal Co., Inc.; Impax Laboratories, Inc.; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; Mayne Pharma USA Inc.; Morton Grove Pharmaceuticals, Inc.; Mylan Inc.; Mylan Pharmaceuticals, Inc.; Mylan N.V.; Oceanside Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Pliva, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teligent, Inc.; Teva Pharmaceuticals USA, Inc.; UDL Laboratories, Inc.; Upsher-Smith Laboratories, LLC; West-Ward Pharmaceuticals Corp.; Wockhardt USA LLC; Valeant

Pharmaceuticals North America LLC; Valeant Pharmaceuticals International; and Zydus Pharmaceuticals (USA) Inc.

Defendants in Marion Plaintiffs' action (Civ. A. No. 14-4137) are:  Ascend Laboratories, LLC; Apotex Corp.; Aurobindo Pharma USA, Inc.; Citron Pharma, LLC; Dr. Reddy's Laboratories, Inc.; Glenmark Pharmaceuticals, Inc., USA; Heritage Pharmaceuticals, Inc.; Lannett Company, Inc.; Mayne Pharma Inc.; Mylan Inc; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Teva Pharmaceuticals USA, Inc.; and Zydus Pharmaceuticals (USA) Inc.  The Court dismissed Marion Plaintiffs' claims against Defendants McKesson Corporation and McKesson Medical Surgical Inc. on June 26, 2019.  *See In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724, 2019 WL 2615592 (E.D. Pa. June 26, 2019)

Defendants in Plaintiff States' action (Civ. A. No. 17-3768) are:  Actavis Holdco, U.S., Inc.; Actavis Pharma, Inc.; Ascend Laboratories, LLC; Apotex Corp.; Aurobindo Pharma USA, Inc.; Citron Pharma, LLC; Dr. Reddy's Laboratories, Inc.; Glenmark Pharmaceuticals, Inc., USA; Heritage Pharmaceuticals, Inc.; Lannett Company, Inc.; Rajiv Malik; Mayne Pharma Inc.; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Teva Pharmaceuticals USA, Inc.; and Zydus Pharmaceuticals (USA), Inc.  Plaintiff States assert that the alleged overarching conspiracy "is broader than the Defendants named in" their consolidated amended complaint.  Plaintiff States' Consol. Am. Compl. ¶ 92.

**APPENDIX B**

The generic drugs identified in DPPs' first amended class action complaint (Civ. A. No. 18-2641) are: acetazolamide, doxycycline delayed release, doxycycline monohydrate, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, metronidazole, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.

The generic drugs identified in EPPs' amended class action complaint (Civ. A. No. 18-2401) are: acetazolamide, doxycycline hyclate (regular release and delayed release), doxycycline monohydrate, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.

The generic drugs identified in the IRPs' amended overarching complaint (Civ. A. No. 18-2533) are acetazolamide, doxycycline hyclate (regular release and delayed release), doxycycline monohydrate, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.

The generic drugs identified in the second amended complaint in the Humana action (Civ. A. No. 18-3299) are: acetazolamide, doxycycline hyclate (regular release and delayed release), doxycycline monohydrate, leflunomide, nystatin, theophylline ER and verapamil.

The generic drugs identified in Kroger Plaintiffs' amended complaint (Civ. A. No. 18-824) are: acetazolamide, albuterol, amitriptyline, baclofen, benazepril-HCTZ, clobetasol, clomipramine, desonide, digoxin, divalproex ER, doxycycline hyclate (regular release and delayed release), doxycycline monohydrate, econazole, fluocinonide, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, levothyroxine, lidocaine-prilocaine, metronidazole, meprobamate, nimodipine, nystatin, paromomycin, pravastatin, propranolol, theophylline ER, ursodiol, verapamil, and zoledronic acid.

The generic drugs specifically identified as being subject to market allocation and price fixing conspiracies in Marion Plaintiffs' second amended class action complaint (Civ. A. No. 14-4137) are: acetazolamide, doxycycline hyclate delayed release, doxycycline monohydrate, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline ER, verapamil, and zoledronic acid. Marion Second Am. Compl. ¶ 51. Marion Plaintiffs allege an overarching conspiracy that includes "all, or nearly all generic drugs" and they allege they purchased many other generic drugs not included in the above list. *See* Marion Second Am. Compl. ¶¶ 12-13.

The generic drugs identified in Plaintiff States' consolidated amended complaint (Civ. A. No. 17-3768) are: acetazolamide, doxycycline hyclate delayed release, doxycycline monohydrate, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.